UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA

V.                                                    CRIMINAL NO. 3:21-CR-107

JAMARR SMITH, THOMAS IROKO AYODELE aka "ROKO,"
and GILBERT MCTHUNEL

**GOVERNMENT'S RESPONSE TO DEFENDANTS'
MOTION FOR NEW TRIAL AND MOTION FOR JUDGMENT OF ACQUITTAL
(DOCUMENT NOS. 140, 141, 142, 143, AND 145)**

Comes now the United States of America, by and through the United States Attorney for the Northern District of Mississippi, and in response to defendants' Motion for New Trial and Motion for Judgment of Acquittal would respectfully show unto the Court the following, to wit:

The defendants were charged in a two-count Indictment in October 2021. Count Two charged the defendants with robbing Sylvester Cobbs, a person having lawful charge, control, and custody of any mail matter, money, and other property of the United States, of such mail matter, money, and property, and in doing so, putting Sylvester Cobb's life in jeopardy by the use of a dangerous weapon. Count One charged the defendants with conspiring to do the same. On February 24, 2023, following a four-day trial, a jury found each of the defendants guilty of both counts of the Indictment. The defendants have now moved for a new trial and for a judgment of acquittal.

      A. **Motion for New Trial**

Rule 33 of the Federal Rules of Criminal Procedure allows a District Court to grant a new

1

trial if the interest of justice so requires. Fed. R. Crim. P. 33(a). However, granting a new trial "should be exercised infrequently by District Courts, unless warranted by 'exceptional' circumstances." *United States v. Tarango*, 396 F.3d. 666, 672 (5th Cir. 2005). Motions for new trial are disfavored and must be reviewed with great caution. *United States v. Piazza*, 647 F.3d 559, 565 (5th Cir. 2011). A new trial should be granted only when the defendant has demonstrated an adverse affect on his substantial rights. *Piazza*, 647 F.3d at 565. While a Court, upon considering a motion for a new trial (as opposed to a motion for judgment of acquittal), may assess the credibility of the witnesses, the Court should not entirely usurp the jury's function or set aside the verdict simply because the Court believes a different result would have been more appropriate. *Tarango*, 396 F.3d at 672. The evidence supported the jury's verdict on all counts of conviction, and the defendants' motion for a new trial should be denied.

In support of their motion for a new trial, the defendants allege that the verdict is not supported by the evidence and that the verdict is contrary to law and the principles of justice. Since both counts charge similar conduct and the evidence as to both counts is the same, the government will address both at once. There was a significant amount of evidence from which the jury could determine that each of the defendants were guilty of both charges in the indictment, including both circumstantial and direct evidence. As this court is aware, and as this court properly instructed the jury, the law makes no distinction between the weight to be given either direct or circumstantial evidence. *See United States v. Clark*, 506 F.2d 416, 418 (5th Cir. 1975). Furthermore, "[t]he evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among

reasonable constructions of the evidence." *United States v. Mitchell*, 484 F.3d 762, 768 (5th Cir. 2007).

In this case, video from a security camera across the street helped the Postal Inspectors to develop suspects. From the video it was clear that Inspectors were looking for an assailant, a driver of a white GMC or Chevrolet SUV who dropped off and picked up the assailant, and a red Hyundai sedan who followed the victim to the scene and acted as a lookout. Also, from the nature of the crime, Inspectors believed that the suspects had ties to the U.S. Postal Service.

A Google geo-fence warrant placed two of the defendants, Smith and McThunel, at the scene of the crime, during the time of the crime. A further Google warrant for Google location information before and after the crime showed Smith and McThunel to have left Batesville mid-afternoon, travelling to Lake Cormorant, where they remained in the Lake Cormorant/Robinsonville area for an hour-and-a-half to two hours, including the time of the crime, subsequently returning to Batesville. It should be noted that there is literally nothing in Lake Cormorant, such as a store or a restaurant, that might attract individuals from Batesville or hold them there for any period of time.

The government obtained phone data on all three defendants which showed the three defendants making an abnormal number of phone calls to and from each other during the time frame immediately before, during, and after the robbery, particularly between Smith and Ayodele and Smith and McThunel. Cell tower location data obtained from Smith's and McThunel's phones confirmed the Google location data showing Smith and McThunel travelling from Batesville to Lake Cormorant, being in Lake Cormorant at the time of the robbery, and returning

3

to Batesville. Cell tower location data for Ayodele's phone showed the same thing in relation to Ayodele's travels that afternoon.

In addition to the phone calls between the defendants, social media and other records developed during the investigation showed the defendants to be friends with each other. Additionally, Inspectors determined that Ayodele had a white GMC SUV that appeared to be identical to the one seen in the video of the robbery, and McThunel had a red Hyundai Sonata similar to the red Hyundai seen in the video. McThunel traded in his red Hyundai three days after the robbery. Inspectors noted that criminals often try to divest themselves of the tools of the crime in an effort to avoid detection or connection to the crime.

Another key piece of evidence was eyewitness testimony placing Smith at the scene of the crime at the time of the crime, driving the red Hyundai. Additionally, there was testimony that Smith was in a relationship with Chevella Hines, the postmaster at Robinsonville. As postmaster, Hines would have knowledge of the postal procedures regarding the handling of postal money, the manner in which postal money would be transported to Memphis each day, the amount of money that would be transported to Memphis each day, and the route that Sylvester Cobbs would take to pick up and transport the money to Memphis. Smith and Hines exchanged an abnormal amount of telephone calls on the afternoon and evening of the robbery. There was evidence for the jury to believe that Hines was the inside source who helped Smith and the other defendants plan the robbery.

The defendants, in arguing to the jury, asserted that while Google location information and cell tower location information might place the defendants' phones at the scene of the robbery, there was no evidence that the defendants were actually in the presence of their phones. To the

4

contrary, there was an eyewitness that placed Smith at the scene of the crime. Vehicles matching the descriptions of vehicles owned and driven by Ayodele and McThunel were seen on video at the scene of the crime, and, from the manner in which they were operated, appeared to be involved in the crime. Additionally, Patra Malone, who exchanged a series of text messages with Ayodele at the time of the robbery, testified that anytime she communicated with the number she knew to be Ayodele's, it was always Ayodele on the other end of the line. Facebook records, Google records, records from Kirk Toyota, and phone subscriber records proved that each of the relevant phone numbers belonged to and was used by one of the defendants. Most importantly, the defendants' argument that their phones were not in their presence but instead, were an hour away from home, defies all logic.

    As the court is aware, and as the court properly instructed the jury, the jury was permitted to draw such reasonable inferences from the testimony and exhibits as it felt were justified in the light of common experience. In other words, the jury could make deductions and reach conclusions that reason and common sense led it to draw from the facts which had been established by the evidence. *See United States v. Thomas*, 627 F.3d 146, 155 (5th Cir. 2010). "Inferences and presumptions are a staple of our adversary system of factfinding. It is often necessary for the trier of fact to determine the existence of an element of the crime—that is, an 'ultimate' or 'elemental' fact—from the existence of one or more 'evidentiary' or 'basic' facts….Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof." *Thomas*, 627 F.3d at 154.

5

The jury knows that each and every one of us has a cell phone that we keep with us at all times. While we might, on occasion, leave our cell phone at home or at the office, our cell phones do not walk out the door, get in the car, and travel all over North Mississippi without us. To argue that the defendants were not in the presence of their cell phones simply defies all common sense. In this case, to believe the defendants, the jury would have to believe that not one, not two, but three defendants' cell phones all wandered off together on the same date, in the hands of another set of three friends, one of whom had a connection to Chevella Hines, and that they each called each other as they carried out this robbery, while driving two of the defendants' vehicles. This assertion is beyond belief, especially when an eyewitness placed one of the defendants at the scene.

There was sufficient evidence for the jury to find that each of the defendants conspired to commit this crime, and participated in this crime, either as the assailant or aiding and abetting the commission of the crime. Accordingly, the defendants' motion for a new trial on the grounds of insufficient evidence should be denied.

In their Motion for New Trial, the defendants have each asserted that the verdict is contrary to law and the principles of justice. The government believes the defendants are expressing their contention that the verdict was against the weight of the evidence and therefore unjust. For the reasons set forth herein, there was sufficient evidence to support the jury's verdict of guilty and accordingly, the defendants' motion for a new trial on the grounds that the verdict is contrary to law and the principles of justice should be denied.

### B. Motion for Judgment of Acquittal

The defendants have moved for a judgment of acquittal, arguing that the court erred in denying their Motion for Judgment of Acquittal at the close of the government's case-in-chief.

As this court is aware, in considering a motion for a Judgment of Acquittal under Rule 29, the court must take the evidence in the light most favorable to the government. *United States v. Duncan*, 164 F.3d 239, 242-243 (5th Cir. 1999). Again, as with the Motion for New Trial, the defendants contend that the jury verdict was against the overwhelming weight of the evidence. For the reasons set forth herein, as well as the reasons set forth by the government when a similar motion was made at the conclusion of the government's case-in-chief, there was sufficient evidence to support the jury's verdict of guilty and accordingly, the defendants' Motion for Judgment of Acquittal should be denied.

### C. Expert Testimony of Christopher Moody

In addition to the aforementioned arguments, defendant Jamarr Smith argues in his motion that the Court erred when it admitted the expert testimony of Christopher Moody in the area of cell site and Google data and location analysis.

On March 10, 2022, the Government designated Christopher Moody as an expert and provided notice to Jamarr Smith and the other defendants that Moody would be used to show "the location of defendants and their cellular phones before, during and after the time of the subject robbery." *See* Exhibit A. His curriculum vitae was also provided at that time. *See* Exhibit B. On February 3, 2023, the Government provided a supplemental expert disclosure in compliance with the recently revised Rule 16 of the Federal Rules of Criminal Procedure which stated in detail Mr. Moody's anticipated testimony. *See* attached Exhibit C. The defendants failed to file a pretrial *Daubert* motion to exclude Mr. Moody.

In support of their Motion to Suppress, on November 3, 2022, the defendants designated Spencer McInvaille as an expert witness in forensics and geolocation analysis. The bulk of Mr.

McInvaille's report concerned Google geolocation data. At the suppression hearing on January 31, 2023, the defendants offered Mr. McInvaille as an expert in the above field and he was accepted by the Court. Mr. McInvaille proceeded to testify about Google geolocation data.

At trial, the Government offered Christopher Moody as an expert in the area of cell site and Google data and location analysis. Following voir dire of the expert witness, the defendants objected to Mr. Moody being qualified on similar grounds as those set forth in Smith's motion. The Court overruled the objection and allowed Mr. Moody to be admitted and testify as an expert in the above field.

Smith now avers in his Motion for Judgment of Acquittal or in the Alternative For New Trial that Mr. Moody 1) had received no training relevant to his opinions on the Google location data, 2) was unaware of any studies or analysis in the scientific community concerning the reliability of the data; 3) was not aware of any peer reviewed publications discussing technology; and 4) could not testify that this technology had received widespread acceptance.

## I.    Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case."

FED. R. EVID. 702. The "touchstone of the rule is whether the testimony will assist the jury."

*United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011).

For an expert to be "qualified" under Rule 702, "it is not necessary that the witness be recognized as a leading authority in the field in question or even a member of a recognized professional community." *United States v. Sutton*, No. CR 21-0598 (PLF), 2022 WL 16960338, at *3 (D.D.C. Nov. 16, 2022) (quoting 29 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 6264.1 (2d ed. 2022)). There is "no requirement that an expert possess formal education, and an expert may be qualified on the basis of his or her practical experience." *Khairkhwa v. Obama*, 793 F. Supp. 2d 1, 11 (D.D.C. 2011). The "degree of 'knowledge, skill, experience, training, or education' required to qualify an expert witness 'is only that necessary to insure that the witness's testimony "assist" the trier of fact.'" *Id.* (quoting *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981)).

As described above, Mr. Moody has extensive training and experience in the relevant field due to his trainings and certifications over a period of years. Mr. Moody testified that he had been working with geolocation technology for many years and had received multiple certifications. He also testified that he completes recertifications regularly. Mr. Moody has also been accepted as an expert in two other cases in the United States District Court for the Western District of Tennessee.

Accordingly, there is no question as to his qualifications nor does the defendant question any specific notation in Mr. Moody's reports. There is no suggestion that he plotted any location information incorrectly or interpreted any data differently from how the defendant would think it should have been interpreted.

The Supreme Court provided trial courts with guidance on the admission of expert evidence at trial in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), which established a two-

prong test for the admissibility of scientific evidence. The first prong rejected the previously widely-used "general acceptance" test enunciated in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), decided a half-century before the Federal Rules of Evidence were adopted, in favor of a more flexible standard that reviews the scientific validity and reliability of the evidence. The second prong, sometimes referred to as the "relevancy" requirement, simply reiterated that scientific testimony or evidence must assist the trier of fact to be admissible.

The trial court's task is to ensure the proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. The Supreme Court in *Daubert* listed four <u>non-exclusive</u> factors that are helpful to determine the reliability of scientific or technical testimony: (1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether a particular technique has a known potential rate of error; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-95. The Court noted that these factors do not constitute a "definitive checklist or test," and that "[m]any factors will bear on the inquiry" that involves "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. at 592-93. It is well established that experts may base their opinions on experience—and that expert testimony can cover areas of technical and other knowledge rather than just science. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148-49 (1999).

    II.    **Historical Cell Location Data Is Scientifically Valid, Probative, Reliable, and Admissible in this Case**

Contrary to the defendant's premise for the entire Motion, the evidence that the Government

10

offered in this case—historical Google location and cell site analysis—is scientifically valid, probative, and reliable for the purposes for which it was offered in this case. The United States respectfully submits that this Court correctly exercised its broad discretion in allowing expert testimony concerning historical cell site and Google location information because the technology and scientific principles used by cellphones to communicate with one another and that Google uses to locate its users are valid, reliable, and probative. In addition, the evidence was relevant and assisted the trier of fact in deciding the facts at issue in this case. Indeed, the defendant does not cite, and the government is not aware of, a case in which the type of testimony being offered in this case has been rejected.

### III. Numerous Courts Have Affirmed the Reliability of Historic Location Analysis for Establishing the General Location of a Cell Phone

To be sure, testimony about cell phone technology and the ability to determine the general area where calls are placed and received has been admitted in courts throughout the country as a matter of course for more than a decade. *United States v. Jones*, 918 F. Supp. 2d 1, 5 (D.C. Cir. 2013) (collecting cases in the context of historical cell site analysis); *see generally Carpenter v. United States*, 138 S. Ct. 2206, 2216 (2017) ("cell phone location information is detailed, encyclopedic, and effortlessly compiled").

As noted above, Mr. Moody has testified as an expert regarding historical cell site analysis on two other occasions. The science behind how cell phones work is accepted in the scientific and legal community. The defendant did not cite any cases in which a court ruled this type of evidence untrustworthy or anything approaching "junk science," or in which a court has excluded a qualified expert from providing testimony on this topic for the purpose of establishing the relevant general location of a cellular phone. Rather, courts routinely admit expert testimony of the kind Mr. Moody

11

provided. As shown in the cases discussed below, experts across the United States have testified in other trials for the purpose of showing the general location of cell phone use through historical cell-site records and the coverage area of cell towers and have recently allowed testimony of Google geolocation evidence. The defendant's claim that Mr. Moody's testimony is unreliable, and he is not qualified, is based on neither fact nor law.

### a. Cell Site Location Information

In *United States v. Schaffer*, 439 F. App'x 344 (5th Cir. 2011), the court found no abuse of discretion in the district court's conclusion that an FBI agent's cell site analysis met standards under *Daubert*, specifically noting that this type of testimony is "neither untested nor unestablished." *Id.* at 347. In *United States v. Weathers*, 169 F.3d 336 (6th Cir. 1999), the appellate court did not even question the appearance of an expert witness on this topic. *Id.* at 339 (discussing expert testimony on cell sites). In *United States v. Feliciano*, 300 F. App'x 795 (11th Cir. 2008) (unpublished), the court allowed a police officer to testify as a lay witness where "he simply reviewed the cellular telephone records and a summary of those calls, which identified cellular towers for each call, and based on his personal knowledge concerning the locations of certain cellular towers," the witness gave a conclusion, in that case suggesting that the cell phone was not near a particular location. *Id.* at 801. The testimony here was relevant and reliable and founded in established methodology.

Mr. Moody has received FBI Cellular Analysis Survey Team (CAST) training, and persons similarly trained have testified as experts in numerous trials around the country for the purpose of showing the general location of someone using their phone through historical cell site records and the coverage area of the cell towers handling those calls. *See, e.g., United States v. Pembrook*, 876

F.3d 812, 824-26 (6th Cir. 2017), *vacated on other grounds by Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) (holding expert testimony related to using cell site data to locate defendants was sufficiently reliable and admissible at trial); *United States v. Lewisbey*, 843 F.3d 653, 659 (7th Cir. 2016) ("Using call records and cell towers to determine general location of a phone at specific times is a well-accepted, reliable methodology."); *United States v. Johnson,* 2015 WL 5012949, at *6 (N.D. Cal. Aug. 24, 2015) ("Historical cell site evidence has consistently been found admissible by federal courts."); *United States v. Jones,* 918 F. Supp. 2d 1, 5 (D.D.C. 2013) ("The use of cell phone records to locate a phone has been widely accepted in both federal and state courts across the country."); *United States v. Davis*, 2013 WL 2156659, at *4 (S.D. Fla. May 17, 2013) (noting FBI agent's testimony that "as a result of the success . . . FBI agents experienced using call-detail records in investigations, the FBI formulated a nationwide Cellular Analysis Survey Team . . . whose sole job it is to analyze cellular telephone records for use in investigation"); *United States v. Machado-Erazo*, 950 F. Supp. 2d 49, 57 (D.D.C. 2013) (finding FBI CAST agent's testimony admissible under *Daubert* as it was based on scientific knowledge that was relevant to the issues at trial). The case law makes clear the wide acceptance of testimony such as the government offered here.

   b.  **Google Location Data**

Mr. Moody testified as to his extensive experience, training and certifications as well as to exactly what processes he implemented to take the Google GPS coordinates and put them in a software program. He also discussed the margin of error/radii of the Google location data. Google geolocation data is used by Google to locate their users. All of this was explained by Mr. Moody.

In *State v. Pierce*, the Superior Court of Delaware determined that expert opinion based on

13

Google location data was reliable and would assist the factfinder. *See State v. Pierce*, 222 A.3d 582, 590 (Del. Super. Ct. 2019) ("Accurate geolocation of a mobile device is an important part of Google's business plan for the Android operating system." "Merchants use this location provided by Google to promote products, often targeting advertisements to specific geographical locations."). Other courts have also allowed evidence/testimony of Google location data. *See United States v. Crawford*, 2021 WL 2367592 (W.D.N.Y. Jan. 14, 2021) (report and recommendation adopted, 2021 WL 1730875, at *3 (W.D.N.Y. May 3, 2021) ("Although the exact methodologies or principles used by Google to obtain this geolocation data are not yet disclosed, this Court is not inclined to find the scientific or technical validity of geolocation gained from Wi-Fi or satellite data to be so lacking in reliability that it should fail to pass the gatekeeping function of the Court under *Daubert*."); *Pierce*, 222 A. 3d at 588, n. 27 (collecting cases).

The defendants' efforts to discredit Mr. Moody's methodology by pointing to the limits of the research he undertook generally go to the weight rather than the admissibility of his testimony. *United States v. Morgan*, 45 F.4th 192, 201 (D.C. Cir. 2022). It is the province of the jury to decide what weight, if any, to give such testimony especially when the defendant's objection is the weight of an expert's testimony. *See United States v. Fama*, 12-CR-186, 2012 WL 2674669, at *10 (E.D.N.Y. Dec. 7, 2012); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *United States v. Gladden*, 11-CR-119, 2013 WL 1916125, at *8 (W.D.N.Y. Oct. 5, 2012) (denying motion for a *Daubert* hearing because the challenges made to expert conclusions went to the weight of the evidence, not to its admissibility).

14

Notably, the defendant's argument is contrary to opinions of the defenses' own expert used in the suppression hearing. That expert, Mr. McInvaille, was tendered as an expert in digital forensics and geolocation analysis with no objection from the Government.

In fact, the defendants' own Google geolocation expert admitted the Google data proved that two devices were on scene around the Post Office on the date and time in question:

> Mr. Mims: For those accounts. Okay. So you don't disagree that Smith and McThunel were present at the Lake Cormorant post office at 5:30 p.m. that evening, do you?
>
> Mr. Mcinvaille: I can't say them physically, but an account that you have associated with them, yes.
>
> Mr. Mims: Okay. Their devices were present, weren't they?
>
> Mr. Mcinvaille: The devices with those accounts, yes.

*See* Exhibit D, P. 46.

In sum, the Court was correct in accepting Mr. Moody as an expert in the area of cell site and Google data and location analysis. Mr. Moody was well qualified in the field of cell site and Google location data. Furthermore, this data is reliable and well accepted within the appropriate fields of science and technology.

**CONCLUSION**

For the foregoing reasons, the government respectfully requests that the defendants' Motions for New Trial and Motions for Judgment of Acquittal be denied.

Respectfully submitted, this the 8th day of March, 2023.

                                        CLAY JOYNER
                                      United States Attorney

By:   *s/ Robert J. Mims*
       ROBERT J. MIMS
       Assistant United States Attorney
       Ethridge Professional Building
       900 Jefferson Avenue
       Oxford MS 38655-3608
       Telephone 662/234-3351
       Criminal Division fax 662/234-0657

      /s/*Clyde McGee IV*
      CLYDE MCGEE IV
      Assistant United States Attorney
      Ethridge Professional Building
      900 Jefferson Avenue
      Oxford MS 38655-3608
      Telephone 662/234-3351
      Criminal Division fax 662/234-0657

**CERTIFICATE OF SERVICE**

      I hereby certify that on March 8, 2023, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

      Goodloe Lewis, Esq.
      glewis@hickmanlaw.com

      Paul Chiniche, Esq.
      pc@chinichelawfirm.com

      Bill Travis, Esq.
      bill@southavenlaw.com

      *s/ Robert J. Mims*
      ROBERT J. MIMS
      Assistant United States Attorney

      *s/ Clyde McGee IV*
      CLYDE MCGEE IV
      Assistant United States Attorney