1       UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF MISSISSIPPI
2              OXFORD DIVISION

3
   UNITED STATES OF AMERICA                    PLAINTIFF
4

5
   VS.                                    NO. 3:21CR107
6

7
   JAMARR SMITH, THOMAS IROKO AYODELE,
8  AND GILBERT McTHUNEL, II                   DEFENDANTS

9

10
              TRANSCRIPT OF JURY TRIAL
11                VOLUME 3 OF 5

12
            BEFORE HONORABLE SHARION AYCOCK
13            UNITED STATES DISTRICT JUDGE

14
              Oxford, Mississippi
15             February 22, 2023

16

17
            (APPEARANCES NOTED HEREIN)
18

19

20

21

22
   Court Reporter:     PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
23                     Federal Official Court Reporter
                       911 Jackson Avenue East
24                     Oxford, MS  38655

25

<u>APPEARANCES:</u>

For the Government:  ROBERT J. MIMS, Esquire
                            CLYDE McGEE, IV, Esquire
                            U.S. Attorney's Office
                            900 Jefferson Avenue
                            Oxford, MS  38655

For the Defendant
 Smith:              GOODLOE T. LEWIS, Esquire
                            Hickman, Goza & Spragins, PLLC
                            P.O. Drawer 668
                            Oxford, MS  38655-0668

For the Defendant
 Ayodele:          WILLIAM F. TRAVIS, Esquire
                            8619 Highway 51 North
                            Southaven, MS  38671

For the Defendant
 McThunel:         PAUL A. CHINICHE, Esquire
                            Chiniche Law Firm, PLLC
                            P.O. Box 1202
                            Oxford, MS  38655-1202

1 (CALL TO ORDER OF THE COURT AT 9:25 A.M.)

2 **THE COURT:** We'll be back on the record. Good morning

3 to all of y'all this morning. I know that I'm told we have an

4 ore tenus motion that we need to take up, and then I need to

5 make a disclosure to you about a juror. So let's take the

6 motion first.

7 **MR. CHINICHE:** Thank you, Your Honor. Paul Chiniche

8 on behalf of Mr. McThunel.

9 I anticipate the Government seeking to introduce

10 records from Kirk Toyota. These records are where Mr. McThunel

11 sold or traded in a 2013 Hyundai Sonata and purchased a -- I

12 think a 2017 Toyota Camry. I'm seeking -- I'm seeking an order

13 from Your Honor prohibiting the Government from introducing

14 that evidence to the jury. And I would argue that it's

15 highly -- highly prejudicial and should be excluded under Rule

16 403.

17 Your Honor, I think this case is clearly a

18 circumstantial case, and there's no direct evidence of

19 Mr. McThunel being involved. And because it's a circumstantial

20 case, I can understand why the Government is putting a number

21 of exhibits in to try to prove their case.

22 Mr. McThunel sits here as an innocent man. He enjoys

23 the presumption of innocence. And these records only show that

24 he traded in a car and got another one. They have zero

25 probative value as to whether or not he assaulted Sylvester

1   Cobbs on the day in question.  If these records were to come
2   in, they would be highly prejudicial toward Mr. McThunel, and
3   it might put him in a situation where he may have to testify in
4   front of the jury and testify as to the reasons why he traded
5   that in because there are reasons other than what the
6   Government thinks, that he traded it in to cover up his crime.

7          And for those reasons, I'm asking the Court to find
8   that this set of documents is highly prejudicial to
9   Mr. McThunel.

10         **THE COURT:**  Okay.  Remind me of the date of the
11  alleged robbery and the date of the trade or sale of the
12  vehicle.

13         **MR. CHINICHE:**  Yes, Your Honor.  The alleged robbery
14  was February 5th, 2018.  And the records cover February 8th,
15  2018.

16         **THE COURT:**  Okay.  Three days later?

17         **MR. CHINICHE:**  Yes, Your Honor.

18         **THE COURT:**  Okay.  May I hear from the Government?

19         **MR. MIMS:**  Your Honor, first of all, the standard
20  under Rule 403 says "The Court may exclude relevant evidence if
21  its probative value is substantially outweighed by a danger of
22  one or more of the following."  Unfair prejudice is what it's
23  asking for, and it has -- but it has to be substantially
24  outweighed by the danger.  Secondly, the records show several
25  things that are important to the Government here.

1    First of all, it does show that Mr. McThunel traded in
2  his red Hyundai Sonata three days after the subject crime.
3  That appears to be or it's very similar in style, color, and
4  look to the red vehicle we're going to see in the video -- that
5  the jury is going to see in the video that the lookout in this
6  crime was driving.

7    So, certainly, the Government intends to argue to the
8  jury at closing that people like to divest themselves of the
9  tools of a crime, and so three days later, he's trading in his
10 car.   That is suspicious and is one piece of evidence -- one
11 piece of the puzzle that can go to convince -- that can go to
12 convince the jury that Mr. McThunel was, in fact, guilty of
13 this crime.

14   But it also shows other important things that the
15 Government wants to get in.   It shows Mr. McThunel's address in
16 Batesville, Mississippi.   More importantly, it shows that his
17 cell phone is 662-710-7511.   Which we're going to have a lot of
18 phone records in here, and we want to confirm that that is his
19 phone number.

20   And the reason that's important -- or, obviously, it's
21 important it shows his phone number, but if you look at the
22 subscriber information for phone 7511, it has a different name.
23 It has -- I believe it's Travonya Nash as the subscriber of
24 that phone or the one that the phone's opened up in paying the
25 bill, but it's his phone.   This confirms that he's using that

1  number as his number.

2  **THE COURT:**  And that phone number is on what document?

3  **MR. MIMS:**  It's in the Kirk Auto records.  He's listed

4  that as his phone number in there.

5  It also shows in here -- he has listed -- he has

6  listed personal references.  One of them is Travonya Nash, who

7  is the person who actually is the subscriber for that phone,

8  and it lists a different phone number for her that she uses.

9  And it also shows as one of his personal references Iroko

10 Ayodele from Batesville, which is -- puts a connection between

11 him and one of the codefendants.

12 And, additionally, it also ties him to the car.  It

13 shows that he, in fact, had a 2013 red Hyundai Sonata, which

14 we're going to show looks just like the car we see in the

15 video.

16 **THE COURT:**  Okay.  I want to ask you about that,

17 Mr. Mims, because you're saying similar in style and color.  Is

18 the Government's position it's the same car or merely similar?

19 **MR. MIMS:**  I think it's the same car, but, Your Honor,

20 we -- obviously, the video doesn't show -- it doesn't show a

21 VIN number, for example.  I can't say here's the VIN number.  I

22 just know in the video it's a red sedan.  Witnesses have

23 described it as a Hyundai.  Mr. McThunel had a 2013 red Hyundai

24 Sonata.

25 If you look at a picture of the red Hyundai Sonata and

1   compare it to the picture in the video, it looks like the same

2   car.  But, obviously, there's more than two red -- or one red

3   Hyundai Sonata from 2013 in this country.  But I do think it's

4   relevant.

5         So it connects him to the car.  It connects him to the

6   phone number.  It connects him to Mr. Ayodele.  And it shows

7   him trading in one of the tools of the crime three days later.

8   For all of those reasons, Your Honor, it's not unfairly

9   prejudicial.

10        **MR. TRAVIS:**  May I address the Court briefly for

11  Mr. Ayodele?

12        **THE COURT:**  You may.

13        **MR. TRAVIS:**  I would simply join in the motion as it

14  appears that it may also try to implicate Mr. Ayodele, Your

15  Honor.  Thank you.

16        **THE COURT:**  Mr. Chiniche, any rebuttal?

17        **MR. CHINICHE:**  No, Your Honor.

18        **THE COURT:**  The Court will permit the evidence to be

19  introduced.  The Court finds that, while it is potentially

20  prejudicial, it does prove a number of other factors in this

21  case, and it will be admitted.  The motion in limine is denied.

22        Counselors, a juror has made some disclosures this

23  morning.  For my understanding, could I ask who's in the

24  courtroom?  Does anyone know these persons?

25        **MR. MIMS:**  Your Honor, this is Shea Brooks in the

1    back.  She's our witness coordinator.

2    **THE COURT:**  I thought so, but I wasn't for sure.

3    Thank you.

4    **MR. MIMS:**  Your Honor, I've never met this gentleman,

5    but I believe he's just here --

6    **UNIDENTIFIED MALE:**  For emotional support is all.

7    **MR. MIMS:**  -- I believe he's a friend of Mr. Cobbs.

8    **THE COURT:**  Mr. Who?

9    **MR. MIMS:**  Mr. Cobbs, who's our first witness.  He was

10    the victim of this crime.

11    **THE COURT:**  Okay.  I'm going to ask you to step out

12    just a second while I make a -- this disclosure about a

13    potential juror.  Ms. Brooks, as an officer of the court, you

14    can stay in here.

15    **MS. BROOKS:**  I'm just going to show him --

16    **THE COURT:**  That's good.

17    Okay.  Now, I'm going to ask Tracy to relate this to

18    you because I wasn't back there to hear it, and I want her to

19    tell you firsthand.

20    **COURTROOM DEPUTY:**  Okay.  So Xxxxxx Xxxxx this morning

21    disclosed -- she's Alternate Number 1 on the jury.

22    **THE COURT:**  Can y'all hear her?

23    **COURTROOM DEPUTY:**  She disclosed that she knows

24    Mr. Smith's mother, and also she believes she may know

25    Mr. Ayodele.  She said she did not realize that yesterday while

1   everything was going on, but last night it occurred to her.  So
2   she wanted to disclose that.

3       **MR. MIMS:**  I'm sorry.  Who is the first person she
4   knew?

5       **COURTROOM DEPUTY:**  Mr. Smith's mother.

6       **MR. MIMS:**  Okay.

7       **THE COURT:**  So this is Juror Number -- Ms. Xxxxx is
8   our Alternate Number 1.  So right now, to tell you the
9   truth --let's see if I can find her.

10      **COURTROOM DEPUTY:**  She was 39 on the list.

11      **THE COURT:**  Yeah.  She's Number 39 yesterday.  She's
12  Alternate Number 1.  She's from Calhoun City.  School -- works
13  in the school cafeteria.  She is white.  So I'm just saying to
14  help you place this lady, that's who she is.  She's sitting
15  third from the end on the back row because I switched up the
16  alternates yesterday.

17      So my belief is that we should discharge her, but I
18  need to hear from you if there's any objections in discharging
19  her.

20      **MR. MIMS:**  Your Honor, for the Government, there's no
21  objection to discharging her.  I think it would be appropriate.
22  I'm sure it was an inadvertent mistake on her part, but it
23  would have been important information that the Government would
24  have used to have exercised a strike on her had she disclosed
25  it.

1       **THE COURT:**  Now, what I should have done before I even

2  asked for a response is give all of you an opportunity to bring

3  her in and voir dire her.  Anybody wish to do that?

4       **MR. LEWIS:**  May we consult, Your Honor?

5       **THE COURT:**  You sure can.

6    (CONFERRING OFF THE RECORD.)

7       **THE COURT:**  Would you like to voir dire her?

8       **MR. CHINICHE:**  Yes, Your Honor.

9       **THE COURT:**  That's fine.  That's fine.  Okay.  Could I

10  ask -- I tell you, I think I -- Tracy, I'm going to send you,

11  if you don't mind, back there to get her because I don't want

12  her to be scared.

13       **COURTROOM DEPUTY:**  Do you want her to come to the

14  podium or --

15       **THE COURT:**  Yes.  She's done nothing wrong.  She did

16  what she was supposed to do.  I just don't want her to be

17  uncomfortable being pulled in here.

18    (ALTERNATE JUROR NUMBER 1 PRESENT.)

19       **THE COURT:**  Ms. Xxxxx, good morning to you.

20       **JUROR:**  Good morning.  How are y'all doing?

21       **THE COURT:**  I'm just going to let you stand right

22  there at the podium.

23       **JUROR:**  Okay.  Thank you.

24       **THE COURT:**  And let me start by saying you've done

25  nothing wrong.  You did everything right by speaking up.  Okay?

1        **JUROR:**  Thank you.

2        **THE COURT:**  So when we have a situation like this

3   after the jury's been impaneled and the case has started, then

4   it's a lot of times appropriate to bring you in and just ask

5   you some questions --

6        **JUROR:**  Yes, ma'am.

7        **THE COURT:**  -- much like we would if you were still

8   sitting out there in the gallery and we were picking a jury.

9   Okay?

10        **JUROR:**  Yes, ma'am.

11        **THE COURT:**  So I'm going to turn to Mr. Mims first,

12   the Government, and ask if they have any questions they want to

13   ask of you.

14        **MR. McGEE:**  How are you?

15        **JUROR:**  Morning.

16        **MR. McGEE:**  Morning.  All right.  So it's been brought

17   to our attention that you do know one of the defendant's

18   mothers?

19        **JUROR:**  Right.

20        **MR. McGEE:**  And that's Ms. Jackie Smith?

21        **JUROR:**  That's right.

22        **MR. McGEE:**  Okay.  And how do you know her?

23        **JUROR:**  I don't live in Batesville now, but I lived in

24   Batesville for 40 years.  I just moved a couple of years ago to

25   my hometown.  And I know her as well as being a police officer

1  and also as a district attorney, mutual friends.  She's a
2  friend.  If I was to see her, you know, we would hug each
3  other, you know.

4         **MR. McGEE:**  Okay.  And so would that be a little
5  uncomfortable?  If, for example, you stayed on this jury and
6  maybe you decided the evidence was against Mr. Smith and you
7  found a guilty verdict, would it be pretty hard to see her
8  again, you think?

9         **JUROR:**  I mean, I would struggle with it, yes, but,
10 you know, I know I have my responsibilities, you know, to be
11 fair with the evidence that's provided to me, you know.

12        **MR. McGEE:**  Yes, ma'am.  And what about Mr. Ayodele?
13 You mentioned you may know him.

14        **JUROR:**  Yes, I think I do.  He's put on a little
15 weight.  I do.  I had a working relationship with him for many
16 years, but I know him as Roko -- Roko.  I never called him the
17 right name then, but we -- we were -- sometimes daily, two or
18 three times, he would send clients to the -- to my job.  I did
19 HR.

20        **MR. McGEE:**  Okay.  And would you agree that you may
21 not be the best juror considering you know one of the
22 defendants and --

23        **JUROR:**  That's why I'm struggling very hard today.  I
24 am.

25        **MR. McGEE:**  I understand.

1          **JUROR:** And I didn't -- like I say, none of this came
2  out yesterday, you know.

3          **MR. McGEE:** I understand. Yes, ma'am.

4          **JUROR:** And I was hoping his attorney as well maybe
5  would tell maybe where he worked, what he did, you know.

6          **MR. McGEE:** Right. I understand.

7          **JUROR:** Because we've -- I've been gone from
8  Batesville for a couple of years. And we were in COVID.

9          **MR. McGEE:** Yes, ma'am.

10          **JUROR:** So there was times I didn't see him probably.
11  Haven't seen him in many years.

12          **MR. McGEE:** Yes, ma'am. I understand. Thank you so
13  much.

14          **MR. TRAVIS:** Thank you for coming out this morning.

15          **JUROR:** You're welcome.

16          **MR. TRAVIS:** You still believe you could be fair and
17  impartial in this case despite your having known him or the
18  other party?

19          **JUROR:** I do. But I'm really struggling. You know,
20  I'm just struggling with it, just knowing Jackie and my
21  relationship -- you know, work relationship with him. So I
22  just --

23          **MR. TRAVIS:** But you mentioned a minute ago if you
24  hear the proof over the next few days that you think you could
25  do your job and be fair and impartial?

1        **JUROR:** I do. I do. But I'm just --

2        **MR. TRAVIS:** Thank you.

3        **JUROR:** -- really not comfortable.

4        **THE COURT:** Ms. Xxxxx, what was the work relationship?

5    Where did y'all work?

6        **JUROR:** I worked with ACI Building Systems. I did HR.

7    And he worked with Mississippi Employment Security.

8        **THE COURT:** Okay.

9        **JUROR:** And he would help us find and put people to

10   work.

11       **THE COURT:** Got you.

12       **JUROR:** Did that for years and years. So --

13       **THE COURT:** Okay. I'm going to dismiss you.

14       **JUROR:** Thank you.

15       **THE COURT:** But I want you to know that I appreciate

16   very much your candor and your coming forth this morning.

17   That's what makes this system work.

18       **JUROR:** Right. And I just -- I struggled all night

19   with it. Like I said, I couldn't say anything yesterday. And

20   I just prayed about it and slept on it, you know, and I'm still

21   shaky, struggly this morning with it.

22       **THE COURT:** You sleep better tonight. Okay?

23       **JUROR:** Yes, ma'am, I sure will.

24       **THE COURT:** You're dismissed.

25       **JUROR:** Thank you.

1    **THE COURT:** Now, do you have personal effects?

2    **JUROR:** I have a purse in there, yes.

3    **THE COURT:** Okay. I'm going to ask you to go back to

4    the jury room. The CSO will escort you. You get your

5    belongings. Don't say anything to anybody --

6    **JUROR:** I won't.

7    **THE COURT:** -- and excuse yourself.

8    **JUROR:** Thank you so much.

9    **THE COURT:** Thank you. If you need an excuse --

10   **JUROR:** I think I'll be good. I think I'll be good.

11   **THE COURT:** Okay. But if you need an excuse, there's

12   one on third floor.

13   **JUROR:** Okay. Thank y'all so much.

14   **THE COURT:** Thank you, Ms. Xxxxx, for your service.

15   (ALTERNATE JUROR NUMBER 1 EXCUSED.)

16   **THE COURT:** Okay. Any other matters?

17   **MR. MIMS:** No, Your Honor.

18   **THE COURT:** Okay.

19   **MR. MIMS:** Your Honor, while we're waiting, can

20   Ms. Brooks go ahead and bring in our first witness?

21   **THE COURT:** Sure.

22   **MR. MIMS:** Okay.

23   (JURY IN.)

24   **THE COURT:** You may have a seat.

25   Good morning, ladies and gentlemen. Thank you and

1    thank you for your patience this morning.  Had a couple of

2    things I had to take care of, but we're now ready to start the

3    case.  And I'll ask the Government to call their first witness.

4           **MR. MIMS**:  Your Honor, we call Sylvester Cobbs.

5        (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

6           **COURTROOM DEPUTY**:  Thank you.  You may take the stand.

7    **SYLVESTER COBBS, GOVERNMENT'S WITNESS, AFTER BEING DULY SWORN,**

8               **WAS EXAMINED AND TESTIFIED AS FOLLOWS**:

9                       **DIRECT EXAMINATION**

10   BY MR. MIMS:

11   **Q.**    Mr. Cobbs, would you state and spell your name for the

12   record, please.

13   **A.**    Sylvester Cobbs.  S-y-l-v-e-s-t-e-r.  C-o-b-b-s.

14   **Q.**    Mr. Cobbs, where are you from?

15   **A.**    Tunica.

16   **Q.**    How long have you lived in Tunica?

17   **A.**    All my life.

18   **Q.**    All right.  What do you do for a living?

19   **A.**    I'm a contractor with the United States Post Office.

20   **Q.**    What does it mean to be a contractor with the U.S. Post

21   Office?

22   **A.**    Well, I deliver mail to five post offices from DeSoto

23   County to Tunica County.

24   **Q.**    Were you doing this in February of 2018?

25   **A.**    Yes, sir.

1    **Q.**    Okay.  And how long have you been doing this?

2    **A.**    Well, I started in '95 with the previous owner of the

3    contract, but I been on my own ever since 2009.

4    **Q.**    When you say been on your own, does somebody buy the

5    contract from the post office?

6    **A.**    No.  The contract was in my name after that.

7    **Q.**    Okay.  So what route did you run?  Tell the jury, if you

8    would, about the route, just in general, that you would run.

9    **A.**    Well, my route number is 38620.  It consists of Walls,

10   Lake Cormorant, Robinsonville, Tunica, and Dundee.

11   **Q.**    Okay.

12   **A.**    Five post office.

13   **Q.**    So when would you run this route?

14   **A.**    Well, I started that evening.  Now, you want to go back

15   to the morning or the evening?

16   **Q.**    Let's just talk about in general.  Do you run a route in

17   the morning and in the afternoons?

18   **A.**    Yes, sir.  I run it in the morning and in the evening.

19   **Q.**    What route -- what's your route in the morning?  Take

20   us --

21   **A.**    Well, I go to Memphis to the distribution center there

22   on -- on 3rd and G.O. (sic) Patterson Boulevard.  That's where

23   they distribute the mail.  Okay.  After the dispatch time, I

24   begin my route on 3rd Street, which runs into 61 Highway, all

25   the way to Walls.  That's my first stop, is Walls.

1  So I then have to go to Lake Cormorant in the morning

2  time because they distribute -- Lake Cormorant mail go to

3  Walls.  And after I leave Walls, I go to Robinsonville.  And

4  from Robinsonville to Tunica and from Tunica to Dundee.  And

5  that's the end of my route.  And so I live at Tunica, so I come

6  back to Tunica and go home.

7  **Q.**  Okay.  All of these post offices are generally along

8  Highway 61?

9  **A.**  Yes, sir.  They on -- well, like, Robinsonville and

10  Tunica, they off on Old 61 --

11  **Q.**  Okay.

12  **A.**  -- you know, the old road.  Sit off the old road.

13  **Q.**  What about in the afternoons?  What's your route in the

14  afternoons?

15  **A.**  Okay.  In the afternoon when I leave home, I go to

16  Dundee -- go south to Dundee.  And, then, after I collect the

17  mail at Dundee, I come back to Tunica and collect that mail and

18  go to Robinsonville, collect Robinsonville mail.  Then I have

19  to go to Lake Cormorant in the evening to collect whatever mail

20  they had.  And, then, after that, I go to Walls.  And after I

21  collect that, I go to Memphis to the distribution center.

22  **Q.**  How many days a week do you do this?

23  **A.**  Six days a week.  Monday through Saturday evening.

24  **Q.**  And what exactly do you pick up when you go to these post

25  offices?

1   **A.**    Well, it would be letters. It would be all consolidated,

2    you know. It -- it be in roll-off equipment. And they -- when

3    they process the mail, they put it in their equipment, you

4    know, called APCs, and I put it on the truck.

5   **Q.**    Okay.

6   **A.**    And then they also had registered mail, which they have

7    in a box. So I have to sign the paperwork and make sure I, you

8    know, keep up with it. And I always put it separate from

9    the regular mail on the back of the truck and, you know, lock

10    the doors.

11   **Q.**    So you pick up regular mail and registered mail; correct?

12   **A.**    Yes, sir, registered mail.

13   **Q.**    Describe for me, if you would, how is the regular mail

14    packaged? Is it in a sack or what?

15   **A.**    Well, it be in white flat tubs. It be in sacks, letter

16    trays, priority boxes. It just varies.

17   **Q.**    What about the registered mail? How --

18   **A.**    The registered mail would -- at that particular time, it

19    was in a white canvas bag, and it was sealed. So whatever in

20    it, I didn't know. I never asked what was in it.

21    When I started, the fellow told me to always put this

22    separate. And after you unload your regular mail, you take it

23    to the register room, and the clerk -- give it to the clerk,

24    and she verifies the serial number, sign off on it, and give

25    you your paperwork so you would have a receipt saying that you

1  did turn it in.

2  **Q.**  Okay.  What time would you normally make your afternoon

3  run?  What time would you start it?

4  **A.**  Well, normally, I would leave home about 3:45 or

5  ten minutes till 4:00 going to Dundee.  And I probably arrive

6  at Dundee maybe about ten after 4:00 and probably leave maybe

7  around about -- between 4:20 or 4:30.

8  **Q.**  What time would you normally make it to Lake Cormorant?

9  **A.**  Well, the time, it varies.  All depends on were they

10 through, you know, processing the mail and have it in the

11 holding area for me to pick up.  And normally I would get to

12 Lake Cormorant roundabout 5:15 or 5:30, normally.

13 **Q.**  Okay.  And what vehicle did you drive?

14 **A.**  I drove a 2011 4300 International bob truck.  Excuse me.

15 **Q.**  Who provides you with this vehicle?

16 **A.**  I beg your pardon?

17 **Q.**  Who provides you with this vehicle?

18 **A.**  First Security.  Not First Security.  I mean Covington

19 Bank.  I'm sorry.

20 **Q.**  Did you own the vehicle?

21 **A.**  Well, I -- they purchased it for me.  It was in my name.

22 **Q.**  Okay.

23       **MR. MIMS:**  May I approach the witness, Your Honor?

24       **THE COURT:**  You may.

25 **BY MR. MIMS:**

 1 | **Q.** Mr. Cobbs, do you recognize those photographs that I've
 2 | shown you?
 3 | **A.** Yes, sir, that's it.
 4 | **Q.** What is that?
 5 | **A.** That's my mail truck.
 6 | **Q.** All right. That's the truck that you would drive on this
 7 | route?
 8 | **A.** Yes, sir. It has my name on it, on the side. S. Cobbs,
 9 | U.S. Mail.
10 | **MR. MIMS:** Your Honor, I'd offer G-2A and G-2B into
11 | evidence.
12 | **THE COURT:** Any objection?
13 | **MR. LEWIS:** No objection.
14 | **THE COURT:** A and B, is it, Mr. Mims?
15 | **MR. MIMS:** 2A and 2B, Your Honor.
16 | **THE COURT:** Okay. Be admitted.
17 | (EXHIBIT NOS. G-2A AND G-2B ADMITTED INTO EVIDENCE.)
18 | **MR. MIMS:** Ms. Tracy, have we got this on the screen
19 | where everybody can see it?
20 | **COURTROOM DEPUTY:** It may -- it's just came up.
21 | **THE COURT:** Can everybody see their screen?
22 | **BY MR. MIMS:**
23 | **Q.** All right. Mr. Cobbs, just so the jury can see --
24 | because they haven't seen this yet. This is G-2A. Is that a
25 | picture of your mail truck?

1  **A.**    (Nods head up and down.)

2  **Q.**    Sir, you have to answer out.

3  **A.**    Oh, yes, sir.  Yes, sir.  That's a picture of my mail

4  truck.  I'm sorry.

5  **Q.**    Thank you.  And, in fact, if I zoom in, is this your name

6  on the side of it?

7  **A.**    That's my name --

8  **Q.**    Okay.

9  **A.**    -- DOT number and motor carrier number and all.

10  **Q.**    All right.  And is this -- G-2B, is this a picture of the

11  back of the truck?

12  **A.**    Yes, sir.

13  **Q.**    All right.  Mr. Cobbs, as far as registered mailbags, how

14  many of those did you pick up on average?

15  **A.**    Five.

16  **Q.**    One at each post office?

17  **A.**    One at each post office.

18  **Q.**    Now, let's talk about Lake Cormorant for a minute.  That

19  post office is only open half a day, isn't it?

20  **A.**    Half a day normally.

21  **Q.**    Okay.  So, when you would get there at 5:15 or 5:30 in

22  the evening, would it be closed?

23  **A.**    Closed.  No one is there.

24  **Q.**    Did you have a key?

25  **A.**    Well, we have a key to the post -- you know, to the back

1   where we collect the mail from.

2   **Q.**   Okay.  Did you run this route by yourself?

3   **A.**   Yes, sir.

4   **Q.**   Okay.  And did you know what was in the registered

5   mailbags?

6   **A.**   No, sir.

7   **Q.**   So let me ask you, what happened to you on February 5th

8   of 2018?

9   **A.**   Well, I kind of hate to think about it because it's

10   really traumatizing, and -- and -- and I wouldn't wish that --

11   I know that's not what you asked me, but I wouldn't wish that

12   on nobody, you know.

13   **Q.**   So what happened that day?  When did you start your

14   route?  Let's take it that way.

15   **A.**   Like I said, I normally start my route -- I leave home

16   normally around a quarter till 4:00 or ten minutes to 4:00, and

17   normally I get to Dundee about ten minutes after.  And as I

18   stated, when I got to Dundee, I collected their mail,

19   registered bag.  And I proceeded on to Tunica, and I did the

20   same thing there.  From Tunica to Robinsonville.

21       And then when I get to Lake Cormorant, at that particular

22   time, we had the blue box where they -- you know, the letters.

23   So I came -- when I got there, I backed in the back like I

24   normally do.  And I came around, collect the mail out of the

25   blue box.  And I can't remember was anything in it that

1   particular day or not.

2       So, when I went around to the back, I unlocked the door,
3   and I had my back turned to the door, and I felt something hit
4   my face.  And I looked up.  I said, "Where is water coming
5   from?"  And by that particular time, I turned around, and the
6   fellow kept -- was trying to -- was pepper spraying me because
7   it had already hit my eyes.  And then he hit me and told me to
8   get back.  He'll shoot me.  And so I got back.  I stepped back.

9       And so I guess after all of that, I kind of got angry,
10  you know, upset.  And so he went over to the truck and came
11  back and looked at me and said he was going to shut the door.
12  And I kicked the door back open.  And by me kicking the door
13  open, his back turned to me.  So I grabbed him from behind, and
14  we was just tussling, tussling.

15      And whatever he -- the weapon he had in his hand, he
16  dropped it.  And so I was trying to get around so I could get
17  in front of him to get it.  And I fell off the sidewalk.  And
18  that was it.  And, then, after that, he picked it up and hit
19  me.

20      And so I stood up, and he told me if I didn't get down
21  again he would kill me.  And so I said, "Please don't kill me."
22  So I -- he said, "Get down."  So I dropped.  And then he hit me
23  repeatedly about three or four times or even more.  So I said
24  in my mind, if I stay here, he going to beat my brains out.  So
25  I stood up.

1    And, like I said, he never asked me for anything. Only

2    thing he told me, he would kill me and get down, you know. And

3    I wouldn't wish that on nobody, you know, nobody. And that was

4    a moment I -- you know, I always wanted to know what happened,

5    who was involved in it, and now, you know, it done came to

6    light, you know, and stuff.

7    **Q.**    Could you identify the person?

8    **A.**    Well, the only thing I know, it was a male, and I believe

9    he was black. He had on a mask. So I couldn't tell, you know,

10   exactly, but I believe he was black and was a male.

11   **Q.**    What kind of clothes was he wearing?

12   **A.**    Seems like it was all dark clothes to me.

13   **Q.**    Okay. Were you injured?

14   **A.**    Yes, sir. When he hit me the first time when I was

15   inside the holding area, I felt blood running down my cheek,

16   and it was hurting. And, then, like I said, after he hit me

17   the first time -- and then he told me to get back. I'll shoot

18   you. So, like I said, I stepped back.

19       And then he was going to shut the door, like I stated

20   earlier. And I just got -- you know, just lost it, and I

21   kicked the door back on him. And, like I said, his back was to

22   me, and I tried to -- from behind. And as we was tussling --

23   because his back was to me, and he dropped it. And, like I

24   said, I fell off the sidewalk.

25       And then when he did pick the weapon up, he hit me. And

1   I stood up. And then he told me if I don't get down again,

2   he'll kill me. And so I dropped to my knees again. He kept

3   hitting me repeatedly over and over. And I stood up after

4   that, you know, and --

5   **Q.**  You've talked about a door. Are you referring to the

6   back door of the post office?

7   **A.**  The back door of the post office. The holding area.

8   **Q.**  So what did the person do after he attacked you?

9   **A.**  After he attacked me?

10  **Q.**  Yes, sir.

11  **A.**  He went over to the truck, and he got that flat tub that

12  the registered mail was in.

13  **Q.**  Did he take anything besides registered mail?

14  **A.**  That's all he got, registered mail, sir.

15  **Q.**  Would that have been the tub that had the registered mail

16  from all three previous --

17  **A.**  All three post office.

18  **Q.**  Okay. What did you do following the attack?

19  **A.**  During the attack?

20  **Q.**  After the attack.

21  **A.**  After the attack?

22  **Q.**  What did you do?

23  **A.**  Well, I got in my truck and came around to the front --

24  **Q.**  Okay.

25  **A.**  -- and called 911.

1   **Q.**    You did call 911?

2   **A.**    Yes, sir.

3   **Q.**    All right. And we listened to that 911 call a few

4   minutes ago before you came in here; right?

5   **A.**    Yes, sir.

6   **Q.**    All right.

7         **MR. MIMS:** Your Honor, at this time, I'd like to play

8   the 911 call for the jury.

9         **THE COURT:** You may.

10   **BY MR. MIMS:**

11   **Q.**    Mr. Cobbs, we'll let this play, and I'm going to ask you

12   a couple questions after. For right now, we're just going to

13   let it play for the jury. Okay?

14   **A.**    Yes sir.

15       (PLAYING 911 CALL, EXHIBIT NO. G-8.)

16         **MR. MIMS:** Just pause it one second.

17       (911 CALL PAUSED.)

18         **MR. MIMS:** Can we adjust the volume?

19         **COURTROOM DEPUTY:** I'm turning it up, but it's not

20   changing. I don't know --

21         **MR. MIMS:** Back up to the very beginning and turn it

22   up.

23       (PLAYING 911 CALL)

24         **THE COURT:** Hang on.

25       (911 CALL PAUSED.)

1         **THE COURT:**  Do you -- you don't have it on your

2  screen, do you?

3         **JURORS:**  (Shake heads from side to side.)

4         **THE COURT:**  I don't either.

5         **MR. MIMS:**  Your Honor, it's just audio.

6         **THE COURT:**  Okay.  Just audio.  I'm sorry.

7         **MR. MIMS:**  Your Honor, can we back it up one more time

8  and turn it up just a little bit just to hear it?  There we go.

9     (PLAYING 911 CALL.)

10     (END OF 911 CALL.)

11  **BY MR. MIMS:**

12  **Q.**   Mr. Cobbs, was that your voice on that 911 call?

13  **A.**   Yes, sir.

14  **Q.**   Did you make that call right after this robbery occurred?

15  **A.**   Yes, sir.

16  **Q.**   All right.

17         **MR. MIMS:**  Your Honor, I have put the 911 call on a

18  wallet drive marked as G-8.  I would offer that into evidence.

19         **THE COURT:**  Any objection?

20         **MR. LEWIS:**  No, Your Honor.

21         **MR. TRAVIS:**  No, Your Honor.

22         **THE COURT:**  It will be admitted.

23     (EXHIBIT NO. G-8 ADMITTED INTO EVIDENCE.)

24  **BY MR. MIMS:**

25  **Q.**   Mr. Cobbs, on the 911 call, you mentioned a gun.  Is that

1   the weapon you're describing he attacked you with?

2   **A.**   Yes, sir.

3   **Q.**   And you also mentioned a red Hyundai. Tell me about that

4   red Hyundai.

5   **A.**   Well, the red Hyundai, like I said, when I came around to

6   the front to bump the blue box, it came across the track. It

7   was driving real slow. And that's kind of unusual. Then they

8   turned around and came back. I assumed they kept going

9   because, you know, like I said, people come through there all

10   of the time. I assumed they kept going south.

11       But after all of this happened, I came around. The car

12   was sitting there, and they pulled off. And that's the end

13   that I saw of the car.

14   **Q.**   Mr. Cobbs, did we watch a video this morning?

15   **A.**   Yes, sir.

16   **Q.**   Did that video show this crime as it occurred?

17   **A.**   Well, it showed it, but it didn't show everything.

18   **Q.**   Did it -- did it show the post office?

19   **A.**   It showed the post office.

20   **Q.**   Showed you pull up in the truck?

21   **A.**   Yes, sir.

22   **Q.**   Show a part of you getting attacked?

23   **A.**   Yes, sir.

24   **Q.**   Is that video an accurate depiction of what occurred that

25   day?

1  **A**.   Yes, sir.

2  **Q**.   All right.

3        **MR. MIMS**:  Your Honor, at this time, I'd like to play

4  the video for the jury.

5        **THE COURT**:  You may.

6        **MR. MIMS**:  Your Honor, for the record, what we've got

7  marked as Exhibit G-1 is an hour-long video from the security

8  camera across the street on a private -- private property.

9  It's an hour-long video.  Rather than playing an hour-long

10  video, we were going to start it when the first suspicious

11  vehicle comes into the scene until the last -- until that

12  suspicious vehicle leaves the scene at the end to shorten that.

13        **THE COURT**:  You may do so.  And subject to --

14  defendants may want to show the entire video.

15      (CONFERRING OFF THE RECORD.)

16        **MR. MIMS**:  Your Honor, we'd like to go ahead and offer

17  it into evidence as G-1.

18        **THE COURT**:  Any objection?

19        **MR. LEWIS**:  No objection.

20        **MR. TRAVIS**:  No objection, Your Honor.

21        **THE COURT**:  G-1 is admitted.

22      (EXHIBIT NO. G-1 ADMITTED INTO EVIDENCE.)

23        **MR. MIMS**:  Your Honor, just for the record, there's

24  a -- there's a clock in the lower left corner of the video.

25  That clock is not the time of day.  It is merely how many

1  minutes into this video it is.  And we're going to start at the

2  5-minute, 44-second mark on the video.

3      And let's go ahead -- we're going to play audio with

4  it too.  You can't hear much, but we're going to go ahead and

5  just play the audio with that as well.

6  **BY MR. MIMS:**

7  **Q.**  Mr. Cobbs, we're just going to watch this probably in

8  silence a good bit.  I might ask you a question or two as we go

9  through it, but mostly we'll just watch it.

10     (PLAYING VIDEO, EXHIBIT NO. G-1.)

11 **BY MR. MIMS:**

12 **Q.**  Mr. Cobbs, is that the side of the post office right

13 there at Lake Cormorant?

14 **A.**  Yes, sir.

15 **Q.**  Okay.  Mr. Cobbs, is that your truck we see pulling into

16 the scene?

17 **A.**  Yes, sir.

18 **Q.**  Mr. Cobbs, you see that vehicle coming across on the

19 right?

20 **A.**  Yes, sir.

21 **Q.**  Is that the red Hyundai that you mentioned earlier?

22 **A.**  I believe it is.

23     **MR. MIMS:**  Let's pause the video right here for just

24 one second.

25     (PAUSED VIDEO.)

1  **BY MR. MIMS:**

2  **Q.**   Mr. Cobbs, are you one of the gentlemen we just saw come

3  out from behind the truck?

4  **A.**   I'm the one was rolling on the ground.

5  **Q.**   All right.

6       **MR. MIMS:**  Let's go ahead and keep playing.

7       (PLAYING VIDEO.)

8  **BY MR. MIMS:**

9  **Q.**   Mr. Cobbs, can you see what the person who attacked you

10  has in his hands?

11  **A.**   Yes, sir.

12  **Q.**   What is that that he has in his hands?

13  **A.**   A gun.

14  **Q.**   No, sir.  He has something white in his hands.

15       **MR. MIMS:**  Tracy, you can go ahead and turn the volume

16  down now.  We're just going to hear a train at this point.

17  **BY MR. MIMS:**

18  **Q.**   Did you see anything white in his hands a minute ago?

19  **A.**   That's the tub that I would have the registered bags in.

20  **Q.**   Thank you.  And what are you doing at this point?

21  **A.**   I'm sitting in the truck calling.  Face burning.

22  Terrified.  Scared to death.

23  **Q.**   Was this when you made the 911 call?

24  **A.**   Yes, sir.

25  **Q.**   Did you make any other calls?

1  **A.**   Well, I called my wife, and I also called the post office

2  to report to them that I -- you know, what happened, the people

3  that are in transportation.

4  **Q.**   Mr. Cobbs, is that you we see out walking around in front

5  of your truck?

6  **A.**   Yes, sir.

7  **Q.**   Let me ask you this while we're watching this.  What's

8  behind the post office?

9  **A.**   What did you say?

10  **Q.**   What's behind the post office?

11  **A.**   What's behind it?  It's a -- a farm shop.

12  **Q.**   Is there anything else back there?

13  **A.**   Equipment, trees.

14  **Q.**   In other words, is there a road?  Can you drive off and

15  go down that road?

16  **A.**   Old 61 run parallel with the post office.

17  **Q.**   Parallel with the post office?

18  **A.**   Yes sir.  Parallel with the road -- excuse me -- with the

19  railroad track.

20  **Q.**   But as far as directly behind the post office, is there

21  any roads or anything back that way?

22  **A.**   Further south -- further north it is and then the road

23  going back towards the levee.

24  **Q.**   Mr. Cobbs, is this you -- looks like you've walked around

25  to the back of the post office.  Why did you do that?

1   **A.**    I don't remember walking around behind the post office.

2   I don't remember now.  Maybe I did.  Maybe -- I don't recall.

3         **MR. MIMS:**  All right.  We can stop it right there.

4      (STOPPED VIDEO.)

5         **MR. MIMS:**  Can we shade this for a minute while she

6   works on something on her computer so we will not be showing it

7   to everybody?

8         **COURTROOM DEPUTY:**  Just a second.

9   **BY MR. MIMS:**

10  **Q.**    Mr. Cobbs, does that video accurately depict what

11  happened that day?

12  **A.**    Yes, sir.

13  **Q.**    Let me ask you this question.  Do you know a Chevella

14  Hines?

15  **A.**    From being at Robinsonville post office -- Robinsonville

16  and Lake Cormorant.

17  **Q.**    Who is Ms. Hines?

18  **A.**    I beg your pardon?

19  **Q.**    Who is Chevella Hines?

20  **A.**    She's a lady that was over the post office.

21  **Q.**    When you say "over," what do you mean?

22  **A.**    She was the active postmaster at that time.

23  **Q.**    Okay.  At which post office?

24  **A.**    Robinsonville and Lake Cormorant.

25  **Q.**    Okay.  Ask you this question.  Did you seek any medical

1   treatment after this attack?

2   **A.**   Yes, sir.

3   **Q.**   What did you do for medical treatment?

4   **A.**   Went to the emergency room, DeSoto Baptist.

5   **Q.**   I'm sorry.  What was the last thing you said?

6   **A.**   DeSoto Baptist in Horn Lake.

7   **Q.**   Okay.  How has this -- how has this affected you?

8   **A.**   Would you repeat that?

9   **Q.**   How has this -- did this affect you at all, this robbery?

10  **A.**   Yes, sir.

11  **Q.**   How has it affected you?

12  **A.**   It hurts.  It still hurts.  And, then, when you're trying

13  to make a living, provide for your family, an honest living,

14  hard worker, and then something like this here happen to you.

15  You know, this is something you don't want to remember, but you

16  never forget.

17       Like I say, I'll never forget that day -- that day,

18  February the 5th, 2018.  You know, it always -- and it -- and I

19  still have flashbacks when I get to it, but I'm more cautious

20  now, you know.

21  **Q.**   Okay.  Still running your route every day?

22  **A.**   Still -- I don't run it every day, but I -- I'm still

23  responsible for it.

24  **Q.**   Okay.  When you don't run it, do you have a substitute

25  that runs it for you?

1   **A.**   Yes, sir.

2   **Q.**   Mr. Cobbs, I want to go back to the video for one second

3   and look at something that we didn't see a minute ago.

4          **MR. MIMS:**  Let's go back to the video.

5      (PLAYING VIDEO, EXHIBIT NO. G-1.)

6   **BY MR. MIMS:**

7   **Q.**   All right.  This is the same video.  Now we've got it

8   where we can see -- I think maybe we were zoomed in a little

9   bit a minute ago.  Now we can see the store on the right.  Do

10  you see that store on the right?

11  **A.**   Yes, sir, I see it.

12  **Q.**   Okay.  Is that store -- is it open or closed or --

13  **A.**   Closed.  It's been closed for years.

14  **Q.**   All right.

15        **MR. MIMS:**  Let's go back, if we would -- we don't have

16  to play the whole thing, but let's play where -- where you see

17  the red car go across the tracks and come back, and we'll start

18  from there.

19      (REWINDING VIDEO.)

20         **MR. MIMS:**  All right.  Here we go.

21  **BY MR. MIMS:**

22  **Q.**   Mr. Cobbs, a minute ago, we had it zoomed in a little

23  bit, and you couldn't see the store.  I just want to watch a

24  brief portion of it again where we can see the store.

25      (PLAYING VIDEO.)

1   BY MR. MIMS:

2   **Q.**    Mr. Cobbs, on the video there, did you see the red car

3   pull up in front of the store and turn around?

4   **A.**    Yes, sir.

5   **Q.**    I know at this moment you're being attacked at the back.

6   When you got in your truck and pulled forward, did you see that

7   red car?

8   **A.**    It pulled off when I got around to the front.

9           **MR. MIMS:**  Thank you.  That's good, Ms. Bailey.

10          (STOPPED VIDEO.)

11  BY MR. MIMS:

12  **Q.**    Mr. Cobbs, just a couple more questions for you.  Where

13  had you been right before Lake Cormorant?

14  **A.**    Say what now?

15  **Q.**    Where had you been right before the Lake Cormorant stop?

16  What was your stop right before that?

17  **A.**    Robinsonville.

18  **Q.**    All right.  And where did these registered mailbags come

19  from that were stolen?

20  **A.**    Dundee, Tunica, and Robinsonville.

21          **MR. MIMS:**  Your Honor, I have no further questions.

22          **THE COURT:**  Thank you.

23          Cross-examination.

24          Counselors, if it's okay with you, during the trial,

25  I'm just going to take you in this order for cross-examination.

1    **MR. CHINICHE:**  Sure, Your Honor.

2    **MR. LEWIS:**  Sure.

3                             **CROSS-EXAMINATION**

4    **BY MR. LEWIS:**

5    **Q.**    Good morning, Mr. Cobbs.  My name is Goodloe Lewis.

6    Sorry to meet you under these circumstances.

7          Just to be clear, you could not and did not identify who

8    was in the red car.  You have no idea who was driving?

9    **A.**    No, sir.

10   **Q.**    Okay.  Now, you were talking about Old 61 and, I guess

11   you'd say, new 61 there in the vicinity of the post office;

12   correct?

13   **A.**    Right.

14   **Q.**    New 61 is a four-lane; correct?

15   **A.**    Correct.  Now.

16   **Q.**    And was then too?

17   **A.**    Yes, sir.

18   **Q.**    Okay.  And pretty -- pretty busy four-lane highway.  Good

19   bit of traffic going up and down 61?

20   **A.**    Yes.

21   **Q.**    Okay.  And then that was true even around the time of

22   this incident.  There was a good bit of traffic out there on

23   61; correct?

24   **A.**    Which one now?

25   **Q.**    New 61, the four-lane.

1  **A.**    I wasn't on new 61.

2  **Q.**    I understand.  I'm just asking you -- there was a lot of

3  traffic out there on new 61.  You could see that.  You could

4  tell that.  You knew that?

5  **A.**    I assume it was.

6  **Q.**    Okay.  I mean, that's reasonable; correct?

7  **A.**    Possible.

8  **Q.**    Okay.  Let me ask you about an incident that occurred on

9  the date of the -- of the incident you're talking about here

10  today that you told a -- an investigator about.  You said that

11  when you were at the Robinsonville post office that somebody

12  approached you and asked you some questions.  You recall that?

13  **A.**    I recall that.

14  **Q.**    Okay.  And this was -- I -- it's not clear.  Was this in

15  the morning or the evening?

16  **A.**    Evening.  Evening.

17  **Q.**    Okay.  And this was before you got to Lake Cormorant;

18  correct?

19  **A.**    Yes, sir.

20  **Q.**    Okay.  And a person approached you at that time and asked

21  you some questions; correct?

22  **A.**    Correct.

23  **Q.**    This person, you said, was about your height; correct?

24  **A.**    Or a little taller.

25  **Q.**    Okay.  Medium build, no hair on the face, possibly in the

Cobbs - Cross by Lewis

1  mid-30s; correct?

2  **A.**   Possible.

3  **Q.**   Okay.  Well, I'm asking you what you remember.  Does that

4  sound like what you remember?

5  **A.**   It sounds like what I remember.

6  **Q.**   Okay.  And the -- this person was driving a new model

7  small maroon SUV; correct?

8  **A.**   I didn't say maroon.  I said two-toned.  Brown.  Tan and

9  Brown.

10  **Q.**   Fair enough.  And you told this person how to apply for a

11  job like you had; correct?

12  **A.**   Yes, sir.  I told him he had to go on line.

13  **Q.**   Okay.  And then that person drove off; correct?

14  **A.**   Correct.

15  **Q.**   And you told the investigating officer that you thought

16  it was odd and felt like it was possibly a setup that this

17  person came and talked to you?

18  **A.**   Could have been.

19  **Q.**   Okay.  You're pretty familiar with the Walls area;

20  correct?

21  **A.**   Yes, sir.

22  **Q.**   You come through Walls, I guess, just about every day;

23  correct?

24  **A.**   Yes, sir.

25  **Q.**   There's a salvage yard there called Tri-State Salvage?

1  **A.**   Tri-State?

2  **Q.**   Tri-State.

3  **A.**   That's back over in the field area off of Church Road.

4  **Q.**   Okay.  Not in the Walls area?

5  **A.**   No.

6  **Q.**   You're not familiar with a salvage yard in --

7  **A.**   I'm familiar with it, but it's off of 61 Highway.

8  **Q.**   Okay.  In the Walls area?

9  **A.**   In the Walls area.  Between Lake Cormorant and Walls.

10 **Q.**   That's what I'm asking.  I'm asking you about Tri-State

11 Salvage in the area of Walls.  You know that exists?

12 **A.**   Yes, sir.

13 **Q.**   And they sell salvage vehicles, salvage engines, things

14 of that nature?

15 **A.**   I don't know what all they sell.

16 **Q.**   Okay.

17         **MR. LEWIS:**  Thank you, Your Honor.  I have no further

18 questions.

19         **THE COURT:**  Thank you.

20         Mr. Chiniche.

21         **MR. CHINICHE:**  Yes, Your Honor.

22                     **CROSS-EXAMINATION**

23 BY MR. CHINICHE:

24 **Q.**   Morning, Mr. Cobbs.  I represent Mr. McThunel in this

25 case.  You cannot identify Mr. McThunel as the assailant who

1     attacked you, can you?

2   **A.**    Not personally.

3   **Q.**    You can't say that it was Mr. McThunel that attacked you?

4   **A.**    If you're wearing a mask, how can I?

5   **Q.**    I just want to be sure. You can't say it was my client?

6   **A.**    No.

7   **Q.**    Mr. Cobbs, were you using your cell phone that day?

8   **A.**    After everything happened.

9   **Q.**    You called -- I understand that you first called your

10   wife before 911?

11   **A.**    Correct.

12   **Q.**    Why did you call your wife first?

13   **A.**    Well, that's normally what a -- you know, you do when

14   stuff happens to you, let your wife know what's going on.

15   **Q.**    You didn't call 911 first?

16   **A.**    And I called 911. She reminded me.

17   **Q.**    And in that video, we first saw you back into the back of

18   the post office, get out, and then you walked to the front of

19   the post office?

20   **A.**    Correct.

21   **Q.**    What were you doing walking to the front of the post

22   office?

23   **A.**    I have a blue box. I have to get the letters out.

24   That's why I went to the front.

25   **Q.**    Is that the registered mail?

Cobbs - Cross by Chiniche

 1  **A.**   No, sir.

 2  **Q.**   And then you -- you got your blue box, and you walked to

 3  the back of the building again?

 4  **A.**   Correct.

 5  **Q.**   And during that process, you saw a red Hyundai?

 6  **A.**   When I came around to the front.

 7  **Q.**   Okay.  And you're sure it was a red Hyundai?

 8  **A.**   It was red.

 9  **Q.**   But what did you tell investigators?

10  **A.**   I said it was a red Hyundai.  That's what I described.  A

11  red Hyundai.  Whatever after that, that's it.

12  **Q.**   Are you sure about that, or could you be mistaken?

13  **A.**   I'm sure.

14  **Q.**   You sure it's not a red Honda?

15  **A.**   I'm sure.

16  **Q.**   You sure it's not a small Toyota Corolla?

17  **A.**   I'm sure.

18  **Q.**   Okay.  Do you have -- do you use e-mail?

19  **A.**   Beg your pardon?

20  **Q.**   Do you use e-mail?

21  **A.**   Sometimes.

22  **Q.**   Do you have a Gmail account?

23  **A.**   Yes.

24  **Q.**   So your e-mail is through Gmail, Google; right?

25  **A.**   Whatever.

Higgs - Direct

1  **Q**.    Okay.  How old are you, Mr. Cobbs?

2  **A**.    70 years old.

3         **MR. CHINICHE**:  Thank you, Your Honor.  No further

4  questions.

5         **THE COURT**:  Thank you.

6         Mr. Travis.

7         **MR. TRAVIS**:  No cross.  Thank you, Your Honor.

8         **THE COURT**:  Thank you.  May this -- do you have any

9  redirect?

10         **MR. MIMS**:  No redirect, Your Honor.  Thank you.

11         **THE COURT**:  May he be finally excused?

12         **MR. MIMS**:  Yes, please.

13         **THE COURT**:  Is it okay if he remains in the courtroom?

14         Mr. Cobbs, you're free to leave the courthouse.  If

15  you'd like to stay, you can sit out here in the gallery now

16  that you've testified.  Thank you, sir.

17         **THE WITNESS**:  Okay.

18         **THE COURT**:  Who would the Government call next?

19         **MR. MIMS**:  Government would call Trece Higgs.

20      (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

21         **COURTROOM DEPUTY**:  Thank you.  You may take the stand.

22    **TRECE HIGGS, GOVERNMENT'S WITNESS, AFTER BEING DULY SWORN,**

23            **WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

24                    **DIRECT EXAMINATION**

25  BY MR. MIMS:

Higgs - Direct

1 **Q.**   Would you please state and spell your name for the

2 record, please.

3 **A.**   It's Trece Higgs, H-i-g-g-s.

4 **Q.**   Would you spell the first name too, please.

5 **A.**   T-r-e-c-e.

6 **Q.**   All right.

7      **THE COURT:**  I'm going to need you to speak up.  Thank

8 you.

9 **BY MR. MIMS:**

10 **Q.**   Who are you employed by?

11 **A.**   I'm currently employed by AT&T.

12 **Q.**   All right.  And what is your job title?

13 **A.**   I am a custodian of records and a trial analyst for AT&T.

14 **Q.**   What does that mean?  What would your job duties be?

15 **A.**   As a custodian of records, I'm responsible for the

16 safekeeping of AT&T's record.  As a trial analyst, I'm

17 responsible for attending court sessions like this to

18 interpret, analyze, and inform the requested party about the

19 records.

20 **Q.**   All right.  Are you familiar with how AT&T keeps its

21 business records?

22 **A.**   Yes, I am.

23 **Q.**   And are you familiar with how AT&T keeps phone call,

24 detail records, and cell site location records?

25 **A.**   Yes, I am.

1 **Q.** Okay. Earlier this morning we showed you records on a
2 wallet drive. Do you recall that?
3 **A.** Yes, I do.
4 **Q.** And I have in my hand G-7 and G10.
5     **MR. MIMS:** May I approach the witness, Your Honor?
6     **THE COURT:** You may.
7 **BY MR. MIMS:**
8 **Q.** Are those -- it appears to be some initials and a date on
9 there. Are those your initials?
10 **A.** Yes, it is.
11 **Q.** Is that today's date?
12 **A.** Yes, it is.
13 **Q.** Did you put those initials and date on there?
14 **A.** Yes, I did.
15 **Q.** In reviewing these records, are these records the type
16 that AT&T keeps in the ordinary course of its business?
17 **A.** Yes, they are.
18     **MR. MIMS:** Your Honor, I would offer these into
19 evidence as Exhibits G-7 and G-10.
20     **MR. LEWIS:** No objection.
21     **MR. TRAVIS:** No objection, Your Honor.
22     **THE COURT:** 7 and 10 will be admitted.
23   (EXHIBIT NOS. G-7 AND G-10 ADMITTED INTO EVIDENCE.)
24 **BY MR. MIMS:**
25 **Q.** I'm going to show you a couple other documents that are

1   associated with G-7, see if you recognize these. Just for the

2   record, I'm going to show you Exhibit G-7 -- I'm sorry -- G-7C

3   and G-7D.

4           MR. LEWIS: Are these already in evidence?

5           MR. MIMS: These are part of the records. They're --

6   I don't think they're actually on that wallet drive. It's a

7   paper copy that came with the records.

8           MR. LEWIS: Okay. I just wanted to be sure.

9           THE COURT: All of that is encompassed in G-7?

10          MR. MIMS: Yes, ma'am.

11          THE COURT: Okay.

12  BY MR. MIMS:

13  Q.   What is G-7C?

14  A.   G-7C is our Subscriber Information Report.

15  Q.   Okay. And that's part of the records that AT&T provided

16  to the Government in this case?

17  A.   Yes, they did.

18  Q.   Now, what is G-7D?

19  A.   G-7D is an AT&T records key.

20  Q.   What is a records key?

21  A.   The records key is a guide. So when you're reviewing the

22  records, if you have any questions or need reference, you'll

23  turn to this document for further explanations.

24          MR. MIMS: Your Honor, I would offer G-7C and G-7D

25  into evidence.

Higgs - Direct

1      **MR. LEWIS:**  No objection, Your Honor.

2      **MR. TRAVIS:**  No objection, Your Honor.

3      **THE COURT:**  They'll be received.

4      (EXHIBIT NOS. G-7C AND G-7D ADMITTED INTO EVIDENCE.)

5  **BY MR. MIMS:**

6  **Q.**   I'm going to show you G-7C.  Tell me again.  What is --

7  what is this information here?

8  **A.**   This is the Subscriber Information Report.

9  **Q.**   Hang on one second.  We're going to get it up on the

10 screen where everybody can see it.  I'm not sure it's --

11      **COURTROOM DEPUTY:**  They should be able to see it.

12      **THE COURT:**  Can you see it?

13      **THE WITNESS:**  Yes.

14      **THE COURT:**  Can you see it?

15      **JURORS:**  Yes.

16 **BY MR. MIMS:**

17 **Q.**   All right.  What information does a subscriber report

18 tell you?

19 **A.**   The Subscriber Information Report will entail the

20 financial liable party, the billing party, and the user

21 information.

22 **Q.**   Okay.  What is the phone number associated with this

23 record?

24 **A.**   The telephone number is 228-596-4000.

25 **Q.**   And we see that number right here; is that correct?

1  **A.**   That is correct.

2  **Q.**   All right.  And who is the subscriber for that phone

3  number?

4  **A.**   The subscriber is Thomas Ayodele.

5  **Q.**   Okay.  And that's where we find it right here

6  (indicating); correct?

7  **A.**   That is correct.

8  **Q.**   All right.  So what I'd like to do is review a few

9  specific records.  And what I've done for ease is I've actually

10  made paper copies that we can put into evidence that focus more

11  on February 5th because we are interested in February 5th,

12  2018.

13       **MR. MIMS:**  So I'm going to ask Ms. Bailey -- no, let

14  me -- yeah, let's do this.  Go ahead and pull up excerpts from

15  Exhibit 7, please.

16       We've got them on the computer, and I've got paper

17  copies that we can offer into evidence at the appropriate time,

18  but I want to use the computer for right now.

19       Let's go into the excerpts.

20       **THE COURT:**  Okay.  Is it on your screens?

21       **MR. MIMS:**  And, Your Honor, for the record, these are

22  all -- these are all -- these are excerpts from the record

23  that's already in evidence as Exhibit G-7.

24       **THE COURT:**  Okay.  Do you want these on the screen so

25  they can review them?

1    **MR. MIMS:**  Yes, please.  Yes.

2    **THE COURT:**  Are they there?  Okay.

3    BY MR. MIMS:

4    **Q.**  Let's go into G-7E.  Is this part of the -- part of the

5    record for AT&T for the phone number ending in 4000?

6    **A.**  Yes, it is.

7    **Q.**  Okay.  And for simplicity's sake, rather than using the

8    whole phone number, I'm just going to refer to the last four

9    digit of each number.  Okay?

10   **A.**  Okay.

11   **Q.**  What does this show?  What is mobility with cell

12   location?  What kind of record is that?

13   **A.**  The mobility with cell location report will show you the

14   transactions that occurred for the time period that was

15   requested on your legal demand.

16   **Q.**  Let's talk about the different columns here.  What is the

17   first -- or the second column where it says c-o-n period date.

18   What is that?

19   **A.**  The con date means connection date in reference to the

20   con time.

21   **MR. MIMS:**  Okay.  I tell you what, let's scroll down

22   to 2/5/18; time, 23:24:15.  Let's see.  Keep going.  A little

23   farther down.  I'm sorry.  I gave you the wrong thing.  I'm

24   sorry.  17:05:09.  Let's go back up.  All right.  There we go.

25   BY MR. MIMS:

1  **Q.**  You see the first highlighted line there?

2  **A.**  Item number 1599.

3  **Q.**  Okay.  Let's talk about that for a second.  Item Number

4  1599, what is the date that that -- is that a -- is that a cell

5  phone call we're looking at?

6  **A.**  Yes.  So this record is showing the voice usage.  Those

7  are actual telephone calls that occurred on this record.

8  **Q.**  All right.  So when we look at Item Number 1599, what was

9  the date of that call?

10  **A.**  The date of the call is February the 5th of 2018.

11  **Q.**  And what was the time of the call?

12  **A.**  The time of the call in UTC is 17:05:09.

13  **Q.**  All right.  So what is UTC?

14  **A.**  UTC stands for Universal Time Coordinated.  It is a time

15  standard that is used by AT&T and the rest of the world, and

16  that's how we gather the information.

17  **Q.**  If you are in North Mississippi in February, how do you

18  calculate the actual time when looking at this time using UTC?

19  **A.**  UTC is six hours ahead of Central Time Zone during this

20  time frame.

21  **Q.**  Okay.  And in addition to UTC time, we also have these

22  times written in military time, correct, 24-hour time?

23  **A.**  That is correct.

24  **Q.**  All right.  So when the call -- the call says it's made

25  at -- what is that?  17 -- 17 hours, 5 minutes, and 9 seconds;

1  is that correct?

2  **A.**   That is correct.

3  **Q.**   Okay.  In civilian time, what time of day would that call

4  have been made in Mississippi in February 2018?

5  **A.**   Okay.  One moment.

6  **Q.**   If you would, as you figure it up, explain the process to

7  us that you're figuring.

8  **A.**   Okay.  1705 is 5:05 p.m., and six hours' difference will

9  be 11:05 a.m. of that day.

10  **Q.**   Okay.  So when you see 1705, first you've converted that

11  to civilian time, which is 5:05 p.m.; right?

12  **A.**   That is correct.

13  **Q.**   And then you back up six hours to account for UTC time;

14  right?

15  **A.**   To make the difference back into Central Time Zone.

16  **Q.**   Yes.  And AT&T keeps all of their records in UTC time;

17  correct?

18  **A.**   For the most part, based on this time frame.

19  **Q.**   Do you know what other phone companies do?  Do you know

20  if other phone companies all have UTC or not?

21  **A.**   No, sir.  I only know about AT&T.

22  **Q.**   So let's look at that line, 1599.  What does the seizure

23  time mean, 17 seconds?  What does that mean?

24  **A.**   Seizure time is the amount of time that the call

25  traversed in our network for the ring; so that's the actual

Higgs - Direct

1   ring time.

2   **Q.**   Okay.  And ET, is that elapsed time?

3   **A.**   ET stands for elapsed time.

4   **Q.**   What does that mean?

5   **A.**   That would be the duration of the call.

6   **Q.**   Okay.  So in this case, the call -- nobody ever answered

7   the call; is that correct?

8   **A.**   There was no connection.  If there's a 000, there was no

9   connection.

10  **Q.**   There's a lot of abbreviations here, but do we see these

11  abbreviations in this records key, such as ET?

12  **A.**   Yes.  They will be inside of the records key as well.

13  **Q.**   All right.  So let me ask you, with this attempted phone

14  call at what was 11:05 a.m., what number was the person

15  actually making the phone call?

16  **A.**   The target number ending in 4000 initiated the phone call

17  to telephone number ending in 6029.

18  **Q.**   Okay.  So phone 4000 called phone 6029?

19  **A.**   That is correct.

20  **Q.**   All right.  And on the right, it says cell location.  Can

21  you explain to me what that means?

22  **A.**   Sure.  On the cell location, the number 052284950, that

23  first nine digit is the cell tower identity; so that's how we

24  identify the cell tower in reference to the longitude and the

25  latitude.

1   **Q.**   I'm sorry.  What was the last thing you said after that?

2   **A.**   In reference to the longitude and the latitude.  So the

3   cell tower identity number in reference to the longitude and

4   the latitude.

5   **Q.**   Does it also show the longitude and latitude there?

6   **A.**   Yes.  I'll get to that shortly.

7   **Q.**   Okay.  Now, what is azimuth?

8   **A.**   I'm sorry?

9   **Q.**   What is azimuth, a-z-i-m-u-t-h?

10  **A.**   I don't know, sir.  Did you see that on the record?

11  **Q.**   I don't know.  Maybe not.

12  **A.**   Okay.

13  **Q.**   Let me ask you this question.  Can you explain what all

14  we see under cell location?  I know you said the first number

15  was the tower location.  What else do we see there?

16  **A.**   204238.  That would be the identification number for the

17  antenna that was used on the actual tower.

18  **Q.**   Okay.

19  **A.**   Then we have negative 89.95779.  That is the longitude.

20  **Q.**   Okay.

21  **A.**   Then we have 34.310384.  That's the latitude.

22  **Q.**   What's the number after that, the 30?

23  **A.**   Then we have 30.  That would be the sector.  And then we

24  have negative 1.0.  That's the beamwidth.

25  **Q.**   Okay.  You said 30 is a sector.  What is a sector?

1  **A.**    The sector is the side of the antenna that was actually

2  used to process this call.

3  **Q.**    So how many sides does an antenna have?  Are you talking

4  about a cell phone antenna or a tower -- cell tower?

5  **A.**    Tower.  Tower.  Cell tower.

6  **Q.**    How many sides does a tower have?

7  **A.**    Well, it's a 360.  It goes all the way around.  So it's

8  out of 360 degrees.

9  **Q.**    Okay.  Well, how many sectors does it have?

10  **A.**    Four sectors in a circle.

11  **Q.**    Okay.  When you say it's 30, what does that tell me?

12  Does that tell me the direction, or what does it tell you?

13  **A.**    30 would be on the north before you get to the east, so

14  30 degrees and the angle.

15  **Q.**    Okay.  So I'm not going to ask you to plot latitude and

16  longitude here today.

17  **A.**    Okay.

18  **Q.**    But I just want to make sure what we're seeing here.  If

19  you look at the cell location, can a person take that and

20  figure out what tower that phone call is using?

21  **A.**    Yes.  With the longitude and the latitude, that will give

22  you the location of the AT&T cell tower.

23  **Q.**    All right.  And what about with the sector?  Can -- can

24  the sector be used to show the direction that the phone would

25  be?

1  **A.**   It shows the section of the call -- the section of the

2  tower that processed the call.

3  **Q.**   Okay.  So let's look at a few more of these -- of these.

4  Let's scroll down to 23:13:25.  There we go.  Do you see Item

5  Number 1650, next to the last on the page?

6  **A.**   Yes, I do.

7  **Q.**   Okay.  So all of these calls I have highlighted, are they

8  all occurring on February 5th, 2018?

9  **A.**   Yes, they are.

10 **Q.**   All right.  And let's look at the one that I've said is

11 1 -- Item Number 1650.  Tell me, if you would, who was the

12 originating number?

13 **A.**   Telephone number 6029 is the party that originated the

14 call.

15 **Q.**   Okay.  And that's the person doing the dialing; right?

16 **A.**   That is correct.

17 **Q.**   Who's the person that answered the phone?

18 **A.**   The receiving party was telephone number 4000.

19 **Q.**   Okay.  And 4000 is the number associated with this

20 account; correct?

21 **A.**   Yes, it is the target number.

22 **Q.**   And the subscriber of this account is Thomas Ayodele?

23 **A.**   That is correct.

24 **Q.**   All right.  How long did this call last?

25 **A.**   The phone rang for four seconds, and the duration of the

Higgs - Direct

1  call was two minutes and eighteen seconds.

2  **Q.**   And, if you would, tell me what time in civilian North

3  Mississippi time that call occurred.

4  **A.**   One moment.

5  **Q.**   Sure.

6  **A.**   That would be 5:13 p.m.

7  **Q.**   So 5:13 p.m. on February 5th is when that call was made?

8  **A.**   That is correct.

9  **Q.**   And, again, it has cell location; correct?

10  **A.**   That is correct.

11  **Q.**   So a person could take that cell location and plot where

12  the tower was that the phone caller was using to make that

13  call?

14  **A.**   Yes -- yes, you can.

15  **Q.**   Let's -- let's go down to 23:30:14.  All right.  I'm

16  going to ask you about Item Number 1653.  That would be the

17  second -- second row on our screen there.  You see that Item

18  1653?

19  **A.**   I'm sorry.  Repeat the Item Number.

20  **Q.**   1653.

21  **A.**   Okay.

22  **Q.**   Can you tell what time that phone call was made?

23  **A.**   That call would be made at 5:30 p.m. --

24  **Q.**   Okay.

25  **A.**   -- Central Time.

1   **Q.**   How long did the call last?

2   **A.**   The phone rang for three seconds, and the call lasted

3   four minutes and one second.

4   **Q.**   And who was -- who was the -- what number was the one

5   dialing that call?

6   **A.**   7511 called target number 4000.

7   **Q.**   And who answered the call?  4000?  Is that right?

8   **A.**   That is correct.

9   **Q.**   All right.  I do have one question I'm a little uncertain

10  of here.  I see a call a minute later.  You see the call right

11  below it, 1654?

12  **A.**   Yes, I do.

13  **Q.**   All right.  And that -- who is making that phone call?

14  **A.**   6029 called 4000.

15  **Q.**   All right.  So that phone call also lasted four minutes

16  and thirty-one seconds; is that right?

17  **A.**   That is correct.

18  **Q.**   So can you explain to me how -- if a phone call is made

19  at 5:30 p.m. and lasted four minutes, how is there another one

20  at 5:31 that lasted four minutes?

21  **A.**   Sure.  There is a Feature column on Item Number 1653.  So

22  in addition to NIOP that shows the number was identified with

23  caller ID, CMH means the call was placed on hold.  So Item

24  Number 1653 -- so in layman's term, telephone number 7511

25  called 4000.  Then 6029 also called 4000.  The call was placed

1 on hold, and then the transaction continued.

2 **Q.** So you're talking about under the Feature column, the

3 next to the last column on the right; is that correct?

4 **A.** That is correct.

5 **Q.** Okay. And that tells you something about the call?

6 **A.** That tells you that the call -- one call was placed on

7 hold --

8 **Q.** All right.

9 **A.** -- for the other call to be answered.

10 **Q.** And I'm not going to put it up here on the screen. If we

11 look on page 4 of the records key, we can see on here CMH, and

12 it says call hold; is that right?

13 **A.** That is correct.

14 **Q.** All right. And so that's how we could have two calls

15 that seem to overlap?

16 **A.** Yes, sir.

17 **Q.** So --

18     **MR. MIMS:** Let's go back, if we would, to just Exhibit

19 G-7.

20 **BY MR. MIMS:**

21 **Q.** I'm going to go back to G-7 for a second. So which

22 report were we just now looking at with the mobility records?

23 Is that the top report?

24 **A.** Report AU will have all of the information that we just

25 looked at.

1    **Q.**    I'm sorry?

2    **A.**    On the records key which one?

3    **Q.**    That one right there?

4    **A.**    The report?

5    **Q.**    Yes.

6    **A.**    The mobility -- it will be under AU.

7         **MR. MIMS:**  All right.  Let's open that up real quick.

8    **BY MR. MIMS:**

9    **Q.**    So that's the report -- that's the excerpts we just

10   looked at, correct, where they came from?

11   **A.**    Well, not that one.

12   **Q.**    Right.  I'm sorry.

13   **A.**    But the -- the one that the telephone number -- where we

14   looked at the call on hold, yes.

15   **Q.**    Yes.  The one we have on the screen with all of the lines

16   highlighted, that came off of this report right here; correct?

17   **A.**    That is correct, sir.

18   **Q.**    Okay.

19        **MR. MIMS:**  So let's go back out for one second.

20   **BY MR. MIMS:**

21   **Q.**    I want to look at the report that says Report Landline.

22   Let's pull that up real quick.  What is -- this says wire line.

23   What is that?

24   **A.**    The Report Landline is a report that comes through one of

25   our networks whenever a wire line, which is a plain old

1    telephone service, or voice over IP has been used.

2    **Q.**    Okay.

3    **A.**    So this is also a subset of the wireless report.

4    **Q.**    Subset.  What do you mean it's a subset of the wireless

5    report?

6    **A.**    All of these information that's in the wire line report

7    is taken from -- if it -- if it connected on or -- wire

8    line or -- if a wire line was included or a voice over IP phone

9    was included, then it would be found on this report because it

10   goes through a separate network.

11   **Q.**    When you look at the --

12            **MR. MIMS:**  Let's go back out for one second.

13   **BY MR. MIMS:**

14   **Q.**    When you go back out -- and I read on here, and it's

15   titled "Report Landline."  I think of a landline being what I

16   used to have plugged into my wall at home.  Is that what this

17   means here?

18   **A.**    Well, that's a part of it, but there's also new

19   technology, which is voice over IP.

20   **Q.**    Explain that to me.  What do you mean?

21   **A.**    Voice over IP is telephone services that's provided with

22   partial Internet and landline combined.

23   **Q.**    All right.  In other words, I guess my question is, if I

24   see a phone call under this report, that doesn't mean somebody

25   is sitting at their house with the old phone cord plugged into

1  the wall, does it?

2  **A.**   Not necessarily, no.

3          **MR. MIMS:**  Let's go into that report for a second, and

4  let's scroll down to February 5th.  It's going to be a ways

5  down.

6  **BY MR. MIMS:**

7  **Q.**   So here we go.  I want to look at --

8          **MR. MIMS:**  Let's go on down to February 5th.  A little

9  bit farther down.  There we go.  Hold it right there.

10         All right.  Can you highlight for me, please, the one

11  that's on 23:13:25?  Let's highlight the whole line across.

12  That's good.  Okay.

13  **BY MR. MIMS:**

14  **Q.**   Now, a minute ago I believe I asked you about a phone

15  call that was on 2/5/18 at 23:13:25, and we saw that on the

16  other report, on the mobility report.  Do you remember that?

17  **A.**   Yes, I do.

18  **Q.**   Okay.  Is this the same phone call we see here?

19  **A.**   Yes, it is.

20  **Q.**   All right.  When we look at this, is that showing us

21  anything different than what we saw on the mobility record?

22  **A.**   We have some other codes for accounting purposes.

23  **Q.**   Okay.  But that's the same -- same phone call?

24  **A.**   It's the same transaction.  Yes, it is.

25  **Q.**   Same transaction.  Okay.  And is it fair to say that the

1   transactions you see listed on this report would already be

2   included in the mobility report?

3   **A.**   Yes, they are.

4   **Q.**   All right.  Let's look at one other thing.  Let's go to

5   7B in the excerpts.  7B.  I just want to look at the -- at the

6   first line here, the first highlighted line, 10910.  First of

7   all, can you tell me what information we're having here?  Or

8   what record is this in general?

9   **A.**   This is the mobility record that shows the SMS, otherwise

10   known as text messaging usage, for the target number 4000.

11   **Q.**   So everything on this list is text messages for the phone

12   4000?

13   **A.**   That is correct.

14   **Q.**   All right.  And so just take the first one, 10910, what

15   time did that occur -- did that text message occur?

16   **A.**   10910 occurred at 17:50 UTC time.

17   **Q.**   And is that going to -- what time would that be in

18   civilian Mississippi time?

19   **A.**   11:50 a.m.

20   **Q.**   Okay.  And who was sending the text?

21   **A.**   The text message was sent by the target number 4000.

22   **Q.**   I'm sorry.  It was sent by --

23   **A.**   I'm sorry.  It was sent from 1566 to the target number.

24   **Q.**   Which is 4000?

25   **A.**   4000.  That's correct.

Higgs - Direct

1    **Q.**   Okay.  And under this DESC -- does that mean description?

2    **A.**   Description.

3    **Q.**   What does SMST --

4    **A.**   Short message services terminated.

5    **Q.**   What does that mean?

6    **A.**   It means -- in reference to the target number, they're

7    the person who received -- the text message ended on that

8    particular number.

9    **Q.**   And on the one below it, it says SMSO.  Does that just

10   mean the target number is the one that sent the message?

11   **A.**   Originated the text, yes.

12   **Q.**   All right.  And, again, do we have the -- under cell

13   location, that shows the tower that's being used?

14   **A.**   That is correct.

15   **Q.**   Let's go do one more.

16          **MR. MIMS:**  Scroll down to the next page.  Actually, go

17   one more page.

18   **BY MR. MIMS:**

19   **Q.**   Let's look at Item Number 10985 and really all the way

20   down through 10991, just the highlighted ones.  Okay?

21   Approximately what time period are these text messages

22   occurring?

23   **A.**   In Central Time, sir?

24   **Q.**   Yes, ma'am.

25   **A.**   Okay.  So it started on 5:24 p.m. Central Time Zone.

1  **Q.**    Okay.  And we don't have to worry about which one's

2  texting and which one's receiving, but who are the -- what are

3  the two numbers involved in these text messages?

4  **A.**    Target number 4000 and 1566.

5  **Q.**    And, again, we have cell location that shows -- now, is

6  that the cell location for just the 4000 number?

7  **A.**    In reference to the 4000 number, yes.

8  **Q.**    Thank you.

9          **MR. MIMS**:  Your Honor, I would offer into evidence

10  Exhibits G-7B and G-7E.  These are excerpts from the -- these

11  are printed excerpts from the Exhibit G-7 that focus on the

12  February 5th date with highlights that we've gone over with the

13  witness.

14          **THE COURT**:  Any objection?

15          **MR. LEWIS**:  No objection.

16          **MR. TRAVIS**:  No objection, Your Honor.

17          **THE COURT**:  Okay.  They'll be received.

18      (EXHIBIT NOS. G-7B AND G-7E ADMITTED INTO EVIDENCE.)

19          **MR. MIMS**:  Let's go to G-10.  Let's go to the

20  excerpts.

21  **BY MR. MIMS:**

22  **Q.**    I just want to ask you about G-10 for a second.

23          **MR. MIMS**:  Go into excerpts.  There you go.  Let's

24  open that up.

25  **BY MR. MIMS:**

Higgs - Direct

1   **Q.**   So this is 10A.  What is this record we see here?

2   **A.**   This is the mobility reporting for the voice usage for

3   telephone number 4131.

4   **Q.**   Okay.  4131?

5   **A.**   That is correct.

6   **Q.**   And does this show phone calls, or what does it show?

7   **A.**   Voice -- voice phone calls, telephone calls.

8   **Q.**   Telephone calls?

9   **A.**   Yes.

10  **Q.**   Okay.  And it's similar in reading to the other AT&T

11  records we've just looked at; is that correct?

12  **A.**   That is correct.

13  **Q.**   In other words, you can look at the line same way as we

14  just went over with the other phone number?

15  **A.**   That is correct, sir.

16  **Q.**   All right.  And are these part of -- are these the same

17  records that we would see on G-10 that we looked at this

18  morning?

19  **A.**   Yes, it is.

20          **MR. MIMS:**  All right.  Your Honor, I offer into

21  evidence G-10A, which is simply excerpts, paper copies from

22  G-10.

23          **THE COURT:**  Any objection?

24          **MR. LEWIS:**  No objection.

25          **MR. TRAVIS:**  No objection, Your Honor.

1          **THE COURT:**  It will be received.

2          (EXHIBIT NO. G-10A ADMITTED INTO EVIDENCE.)

3          **MR. MIMS:**  Your Honor, may I have one moment?

4          **THE COURT:**  You may.

5          (CONFERRING OFF THE RECORD.)

6          **MR. MIMS:**  Your Honor, I have no further questions.

7          **THE COURT:**  Let's take a break at this time very

8    briefly.  Ladies and gentlemen, we're going to take about a

9    ten, fifteen-minute break, let you go to the restroom and

10   freshen up, and then we will be back in to finish.

11         Ma'am, you're welcome to go to the restroom

12   yourself -- can't speak to anyone while you're on this break --

13   and then just return to the witness chair.  You're excused.

14         (JURY OUT.)

15         (RECESS TAKEN.)

16         **THE COURT:**  Before I bring the jury back in,

17   Ms. Bailey, would you do me a favor?  Would you pull up what

18   you've been -- I'm going to call it the index of where all of

19   the various categories of recordings are.  Thank you.

20         **MR. McGEE:**  Your Honor, for the record, those are not

21   my personal Facebook photos where it says "Clyde Facebook

22   photos."

23         **THE COURT:**  Yeah.  But you're onto my concern.  There

24   are some things on this sheet that I'm a little bit worried

25   about the jury seeing, if I can figure out how to scroll down.

1        **MR. MIMS**:  Your Honor, we can certainly move those to

2  another -- we can take that folder and move it somewhere else.

3        **THE COURT**:  Can you scroll down just a minute?  Yeah.

4  I realize that's your way of keeping up with your documents,

5  but the jury is going to see those -- that itemization of

6  things, and I'm not sure that that's good, like, deposit slips

7  and other records showing total cash.  I think I would prefer

8  that those things just not be shown to the jury.

9        **MR. MIMS**:  Yes.  We'll figure that out.

10        **THE COURT**:  Okay.  I don't know if it's all eventually

11  going to be introduced or not, but it could be prejudicial.

12        **MR. MIMS**:  Okay.

13        **THE COURT**:  And I sure don't want to see Mr. McGee's

14  Facebook photos.

15        **MR. MIMS**:  Your Honor, I think she can do this while

16  they're doing their cross-examination because I don't --

17        **MR. CHINICHE**:  Can she just shrink that window?

18        **MR. MIMS**:  Yeah.  We're going to shrink the window

19  too.  We're going to do that.

20        **THE COURT**:  Okay.  Sounds good.

21        **MR. MIMS**:  We're going to move a couple of folders all

22  together, and then the other things that are -- we anticipate

23  being exhibits, we'll at least shrink that, hopefully, to where

24  you can't see it at all.

25        **THE COURT**:  I doubt if the jury has had a chance to

Higgs - Cross by Mr. Lewis

1  kind of focus on it, but some jurors do strange things.  They

2  don't listen to the evidence.  They focus on other things.

3       Okay.  Let's bring the jury in.

4       **MR. MIMS**:  It's not on -- okay.  I just wanted to make

5  sure it wasn't on their screen.  I see it on other screens.  I

6  wanted to make sure it wasn't on their screens while she's

7  working.

8       **THE COURT**:  And where's my witness?

9       You can come on, ma'am.  Thank you.

10      (JURY IN.)

11      **THE COURT**:  You may have a seat.  Let the record

12  reflect that the jury is back in the jury box.

13      Mr. Lewis.

14                    **CROSS-EXAMINATION**

15  **BY MR. LEWIS**:

16  **Q.**   Hi, Ms. Higgs.  You, yourself, did not gather the

17  information that's contained in these documents; correct?

18  **A.**   That is correct, sir.

19  **Q.**   You did not verify the accuracy of those documents or

20  records?

21  **A.**   The documents were verified by a member of my team.

22  **Q.**   I understand.  You, yourself, did not verify the accuracy

23  of the records?

24  **A.**   Could you explain?  When you say "verify the accuracy of

25  the records," what exactly do you mean?

Higgs - Cross by Mr. Lewis

1    **Q.**    You didn't go back to check and double-check and make

2    sure they were correct.  You, yourself, did not do that?

3    **A.**    No, sir.  A member of my team already did the work; so it

4    would be irrelevant for me to go back and double-check that the

5    records were -- given were not correct.

6    **Q.**    You talked about on those records that there's time

7    stamps, notations of time.  Where is that time kept?  Is it

8    kept in the device itself?

9    **A.**    The UTC time?

10   **Q.**    Yes.

11   **A.**    So UTC time is based on AT&T's network.

12   **Q.**    Okay.  So the time is kept at AT&T's home office for lack

13   of a better --

14   **A.**    Our secured network, yes, sir.

15   **Q.**    All right.  It is not kept in the device itself?

16   **A.**    No, sir.

17   **Q.**    Now, you testified about AT&T towers or antennas.  What

18   do you call them?

19   **A.**    The cell tower.

20   **Q.**    Yes.

21   **A.**    And then there are antennas.

22   **Q.**    Okay.  And you testified that there are four sectors on

23   every AT&T tower?

24   **A.**    No.  In terms of sector, you have four quadrants.  He

25   asked about the sectors.  There are four quadrants in the

Higgs - Cross by Mr. Lewis

1 sectors out of 360.

2 **Q.** Okay.  Are there -- are there four quadrants, then, of a

3 tower?  A tower has four quadrants?

4 **A.** Not necessarily.  A tower, if I could give a description,

5 is a triangular angle, but it -- there are 360 degrees in which

6 you could access the information from.

7 **Q.** I understand.  And the records you have provided provide

8 the sector that that information came from; correct?

9 **A.** The sector --

10 **Q.** Yes.

11 **A.** -- is out of 360.

12 **Q.** Okay.

13 **A.** And out of 360, you could have 0 through 90, 90 through

14 180, 180 to 270, and 270 to 360 --

15 **Q.** Okay.

16 **A.** -- in terms of north, south, east, west.  It's just for

17 directional purposes.

18 **Q.** Right.  So my question is, though, does a tower have --

19 does a tower have three or four sectors?

20 **A.** A tower has a cell antenna that points in a particular

21 angle.

22 **Q.** How many?

23 **A.** It's out of 360.

24 **Q.** How many antennas, though, does it have?

25 **A.** Every tower is different, sir.  It could be a 4G tower.

1   It could be a 3G tower.  It's a different tower.

2   **Q.**   Okay.  So let me just show you a little drawing I made.

3   You can see that.  So if this dot in the middle is the tower,

4   my question is does it have these four 90-degree sectors coming

5   off of it?

6   **A.**   It does.

7   **Q.**   Okay.  It does not have three sectors coming off of it;

8   correct?

9   **A.**   No, sir.

10  **Q.**   Okay.  So if I flip my paper over, here is a three-sector

11  tower.  If that dot is in the middle, you would have three

12  sectors showing 120 degrees; correct?

13  **A.**   That is correct.

14  **Q.**   But your testimony is an AT&T tower has four sectors like

15  I've depicted right here?

16  **A.**   It's in terms of reference to the angle.  So north,

17  south, east, west.  We go by north from the -- the north

18  through east just for directional purposes.

19  **Q.**   Okay.

20  **A.**   But the point is -- the angle at which the antenna points

21  is out of 360 degrees.

22  **Q.**   I understand.  And so -- but you're saying that the tower

23  contains four 90-degree sectors that come off the tower for

24  location purposes?

25  **A.**   No, sir.  In terms of directional purposes, I reference

1    the four -- the four sectors.  So north -- we were talking

2    about 30 degrees.  So I referenced -- in that 90 degrees,

3    30 degrees would be northeastern direction in reference to the

4    sector.

5    **Q.**    Okay.  Would a map that depicted an AT&T tower as having

6    three sectors that looked like this be inaccurate?

7    **A.**    Sir, my job is a trial analyst.  I'm not an engineer.

8    **Q.**    Okay.

9    **A.**    So that would be reference to an engineer.

10   **Q.**    Is your answer I don't know?

11   **A.**    That would be a fair answer.

12   **Q.**    Okay.  Thank you.  When a device connects with a tower,

13   that is not necessarily the closest tower to that device;

14   correct?

15   **A.**    That is correct.

16           **MR. LEWIS:**  No further questions, Your Honor.

17           **THE COURT:**  Mr. Chiniche?

18           **MR. CHINICHE:**  No questions, Your Honor.

19           **THE COURT:**  Mr. Travis?

20           **MR. TRAVIS:**  Just briefly.  Thank you, Your Honor.

21                          **CROSS-EXAMINATION**

22   **BY MR. TRAVIS:**

23   **Q.**    Good morning, Ms. Higgs.

24   **A.**    Good morning.

25   **Q.**    Just briefly, so I can relate something to the jury if I

Higgs - Redirect

1   can be clear in my mind. This is my cell phone, and I have a

2   mobility record on that. Is that fair enough to assume?

3   **A.**   You have a mobility record?

4   **Q.**   A mobility record. We all do. Is that fair?

5   **A.**   No, sir. I don't know.

6   **Q.**   But if you do have what you're calling a mobility record

7   with the exhibits that have been put here today, okay, and you

8   particularly tie that to a particular 4000 number or whatever

9   number, that means that phone is being used. Is that fair?

10   **A.**   On the records that we looked at, the telephone number

11   4000, we captured that record.

12   **Q.**   Okay. But you captured the record of that phone usage,

13   but that doesn't tell you -- it might tell you who the -- who

14   has the phone in that record, but it doesn't tell you

15   specifically on that date who was using that phone. Is that

16   fair?

17   **A.**   That is correct, sir.

18   **Q.**   Other people could be using that phone; right?

19   **A.**   Yes. I only testify to the telephone number that the

20   transaction occurred.

21   **Q.**   Thank you.

22         **THE COURT:** Any redirect?

23         MR. MIMS: Yes, ma'am.

24                   **REDIRECT EXAMINATION**

25   BY MR. MIMS:

Higgs - Redirect

1   **Q.**   How many times have you testified in the last month?

2   **A.**   Three times.

3   **Q.**   Okay.  What about in the past year?

4   **A.**   About six times.

5   **Q.**   Is this something you do on a regular basis?

6   **A.**   Yes, sir.

7   **Q.**   Is anything about cell tower information unusual or

8   novel?

9   **A.**   No, sir.

10  **Q.**   Or what about -- is cell tower information reliable?

11  **A.**   They are.

12        **MR. LEWIS:**  Your Honor, excuse me.  I think this is

13  improper redirect.

14        **THE COURT:**  Sustained.

15  **BY MR. MIMS:**

16  **Q.**   Let me ask you this question.  You were asked a question

17  about sectors and AT&T towers.  Do I understand you correctly

18  that an AT&T tower has four sectors?

19  **A.**   The AT&T tower in reference to direction.  We go by

20  directional to say four towers.

21  **Q.**   AT&T is not the only company with towers out there; is

22  that correct?

23  **A.**   That is correct, sir.

24  **Q.**   And an AT&T phone, is it searching for an AT&T tower that

25  makes the call or is it just searching for the closest tower?

1  **A.**   The best reception for the transaction.

2  **Q.**   Okay.  So a phone might not necessarily connect to an

3  AT&T tower even if it's an AT&T phone?

4  **A.**   That is correct.

5  **Q.**   And might other towers from other companies have three

6  sectors?

7  **A.**   I don't know.

8  **Q.**   Okay.  Let me ask you this question.  Can -- a person who

9  would be able to take the latitude and longitude and take the

10 cell tower data that we see in the records and plot that on the

11 map, can they use that sector number to determine the direction

12 that a phone is located in relation to that tower?

13 **A.**   Repeat that question in part for me, please.

14 **Q.**   So a person who's way smarter than I am who -- can take

15 latitude and longitude and plot it on a map?

16 **A.**   So you take the longitude -- latitude and longitude that

17 was given -- yes, you could plot that on a map to show the

18 location of the towers.

19 **Q.**   And you can use that sector data that we looked at -- the

20 one we looked at in particular was 30; correct?

21 **A.**   That is correct.

22 **Q.**   You can use that to determine the direction the phone is

23 located in relation to the tower?

24 **A.**   Not the phone -- not the section where the phone is

25 located.  We could tell that -- the angle of where the antenna

1    was used or pointed.  That's the direction that it was pointed

2    for that transaction.

3    **Q.**    All right.  In fact, I'm going to show you G-7D.  This is

4    the records key; is that correct?

5    **A.**    That is correct.

6    **Q.**    And at the -- near the bottom here it says "sector."

7    That says a number out of 360 degrees that indicates the side

8    of the cell site antenna used in processing the call.  That's

9    what you're talking about there; is that correct?

10    **A.**    That is correct, sir.

11    **Q.**    Now, you were asked a question about cell phones and

12    whether or not it uses the closest tower.  Does the cell phone

13    look for the closest available tower?

14    **A.**    We look for the best reception to process the call.

15    **Q.**    All right.  How does that work?  I guess I'm asking, if

16    I'm in Oxford, Mississippi, and I have my cell phone with me, I

17    make a call, what tower is it looking for?

18    **A.**    It's going to look for the tower that's going to give it

19    the best reception for that call to be processed.

20    **Q.**    Is that typically going to be the closest tower?

21    **A.**    Usually.

22    **Q.**    Usually?  Are there occasions when, for one reason or

23    another, it might not hit the closest tower?

24    **A.**    Yes, it can.

25    **Q.**    What would those -- what would be the cause of that?

1  **A.**    I'll give you an example.  I see the Mississippi down

2  the -- the university down the street.  So there's a big game

3  and everyone is calling; so that tower is overloaded.  We may

4  route the calls to another tower because that one is overloaded

5  with thousands and thousands of phone calls.  We may route it

6  to another tower so that that reception can go forward.

7  **Q.**    Okay.  But under normal circumstances, is the best tower

8  going to be the closest tower?

9  **A.**    Usually.

10  **Q.**    All right.

11            **MR. MIMS:**  No further questions, Your Honor.

12            **MR. LEWIS:**  Your Honor, may I have a re-cross on some

13  of the information she just provided about overloading a tower

14  and that sort of thing?

15            **THE COURT:**  Limited to just that.

16                          **RECROSS-EXAMINATION**

17  BY MR. LEWIS:

18  **Q.**    A traffic -- call traffic is not the only reason it

19  wouldn't connect to the nearest tower; correct?

20  **A.**    That is correct, sir.

21  **Q.**    Tower could be down for maintenance?

22  **A.**    That is correct.

23  **Q.**    Weather?

24  **A.**    That is correct.

25  **Q.**    It -- the closest tower could be obscured by buildings,

1  vehicles, topography?

2  **A.**  That is correct.

3  **MR. LEWIS:**  Okay.  No further questions, Your Honor.

4  **THE COURT:**  Thank you.

5  May this witness be finally excused?

6  **MR. MIMS:**  Yes, please.

7  **THE COURT:**  Thank you.  You're excused, ma'am.  Thank

8  you for your testimony.

9  **THE WITNESS:**  Thank you.

10  **THE COURT:**  Who would the Government call next?

11  **MR. McGEE:**  The Government calls Tiajuanna Williams.

12  (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

13  **COURTROOM DEPUTY:**  Thank you.  You may take the stand.

14  **MR. McGEE:**  May I proceed, Your Honor?

15  **THE COURT:**  Not yet.

16  Thank you.  You may proceed.

17  **TIAJUANNA WILLIAMS, GOVERNMENT'S WITNESS, AFTER BEING DULY**

18  **SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

19  **DIRECT EXAMINATION**

20  **BY MR. McGEE:**

21  **Q.**  Would you state your name for the record.

22  **A.**  Tiajuanna Williams.

23  **Q.**  Ms. Williams, by whom are you employed?

24  **A.**  T-Mobile.

25  **Q.**  And what do you do for T-Mobile?

1 **A.** I'm a legal custodian of records.

2 **Q.** And what does that job entail?

3 **A.** We receive legal demands, and we travel all over the

4 United States and testify in court.

5 **Q.** And do you regularly testify on phone records and cell

6 site records?

7 **A.** Yes, we do.

8 **Q.** How many times would you say that you testified on cell

9 site and cell phone records?

10 **A.** Hundreds of times.

11 **Q.** And would those be in criminal cases?

12 **A.** Correct. Yes.

13 **Q.** And some civil maybe?

14 **A.** Yes.

15 **Q.** Is this something you've done for a long time?

16 **A.** I was in the legal demand -- I've been in the legal

17 demand department for about two years.

18 **Q.** So it would be fair to say this cell site technology is

19 nothing new; correct?

20 **A.** Correct.

21 **Q.** And are you familiar with the records -- I think we

22 discussed earlier --

23     **MR. McGEE:** I'll hand the witness what's been

24 previously marked for identification G-5 and G-5A, G-5B, and

25 G-5C.

Williams - Direct

1           May I approach, Your Honor?

2           **THE COURT:**  You may.

3    **BY MR. McGEE:**

4    **Q.**  Do you recognize what I've just handed you?

5    **A.**  Yes, I do.

6    **Q.**  And what did I just hand you?

7    **A.**  These are records on paper and on a saved drive.

8    **Q.**  Okay.  And are those records from T-Mobile?

9    **A.**  Yes, they are.

10   **Q.**  And are those your initials on the G-5 jump drive?

11   **A.**  Yes.

12   **Q.**  Okay.  And are those a fair and accurate representation

13   of the call detail records and the cell site location records

14   from T-Mobile?

15   **A.**  Yes, they are.

16   **Q.**  And so they haven't been manipulated or anything like

17   that; is that correct?

18   **A.**  Correct.

19   **Q.**  Okay.  So they're accurate?

20   **A.**  Yes.

21   **Q.**  Okay.

22          **MR. McGEE:**  Your Honor, we would at this time move to

23   introduce G-5, G-5A, G-5B, and G-5C.

24          **THE COURT:**  Any objection?

25          **MR. LEWIS:**  No objection.

Williams - Direct

1    **MR. TRAVIS:** No, Your Honor.

2    **THE COURT:** All will be received.

3    (EXHIBIT NOS. G-5, G-5A, G-5B, AND G-5C ADMITTED INTO

4    EVIDENCE.)

5    **MR. McGEE:** Okay. I'm now showing the witness the CDR

6    mediations file contained within the G-5 records.

7    Your Honor, I would show the paper copies, but they're

8    very hard to see, at least the first part. I just think it

9    would be smoother -- well, I won't show you, but it's small

10   letters and numbers, and so I'm just going to show them through

11   computer means.

12   **BY MR. McGEE:**

13   **Q.** So these are the records that you pulled from T-Mobile;

14   is that correct?

15   **A.** Yes.

16   **Q.** Okay. And the -- what -- do you remember what number

17   this is?

18   **A.** It's 662-360-6029.

19   **Q.** Okay. And we'll go over these in detail in a second.

20   **MR. McGEE:** But, Robin, do you mind pulling up the

21   subscriber -- it's the subscribe -- or subtipco file, please.

22   **BY MR. McGEE:**

23   **Q.** Okay. What are we looking at here?

24   **A.** This is the subscriber information.

25   **Q.** Okay. And I don't see a name on there. All I see is

1 Walmart brand; is that correct?

2 **A.** Yes.

3 **Q.** Okay. What does that mean?

4 **A.** This means that this is a prepaid account.

5 **Q.** Okay. What does that mean?

6 **A.** That means that they did not have to show identification

7 when they activated the services.

8 **Q.** Okay. So how does that work? You go to Walmart and buy

9 a prepaid phone?

10 **A.** Right. You can go to any retailer that has our

11 third-party services, and you can pay to add services on a

12 phone and activate it.

13 **Q.** Okay. So as long as it's prepaid, you do not have to

14 give a name, ID, et cetera?

15 **A.** Correct.

16 **Q.** Okay. And, again, can you repeat the number on that?

17 **A.** It is 662-360-6029.

18 **Q.** And it was activated what date?

19 **A.** This was activated November 16, 2017.

20 **Q.** And then terminated?

21 **A.** October 17, 2018.

22 **Q.** Okay.

23     **MR. McGEE:** Robin, can you go back to that CDR

24 mediations file?

25 **BY MR. McGEE:**

1  **Q.**    So this is the CDR mediation file contained within G-5.

2  Let's talk -- let's talk specifically about these columns,

3  Ms. Williams.

4  **A.**    Okay.

5  **Q.**    We've got the date right here.  That is pretty

6  self-explanatory.  Now, the time -- is this time also -- we had

7  heard a previous witness talk about UTC; is that correct?

8  **A.**    Yes, it is.

9  **Q.**    And that's what it states up here.  Coordinated Universal

10 Time up here at the top of the document; is that right?

11 **A.**    Yes.

12 **Q.**    Okay.  And we talked about before it was minus six hours.

13 Is that -- is that how this works as well?

14 **A.**    Right.

15 **Q.**    Okay.

16 **A.**    Depending on the time of the year, you would subtract

17 five or six hours.

18 **Q.**    Time of year and time zone; correct?

19 **A.**    Correct.

20 **Q.**    And so Central Time Zone around February would be minus

21 six?

22 **A.**    Correct.

23 **Q.**    Okay.  So what about call type?  Will you please explain

24 to the jury the different types of call types?

25 **A.**    A call type can be text message or voice call.

1    **Q.**   Okay.  So, for example, MS originating, what would that
2    be?
3    **A.**   That is a text message.
4    **Q.**   Okay.  And then MS terminating, what would that mean?
5    **A.**   That is a text message.
6    **Q.**   Okay.  And then what would a call -- what would a call
7    state?
8    **A.**   Call will state MOC or MTC.
9    **Q.**   Okay.  And then direction is pretty self-explanatory, but
10   if you could tell the jury what that means.
11   **A.**   It's either an incoming call or text message or an
12   outgoing call or text message.
13   **Q.**   Okay.  And what does calling number mean?
14   **A.**   That is the number that initiated the call.
15   **Q.**   Okay.  Dialed number?
16   **A.**   The dialed number is the number that was dialed from the
17   phone.
18   **Q.**   And called number?
19   **A.**   The call number could be the way that it's either saved
20   in the phone or the number that was actually dialed on the
21   keypad.
22   **Q.**   And then destination number?
23   **A.**   That's the final number that was connected.
24   **Q.**   Okay.  And IMSI -- or IMSI and IMEI?
25   **A.**   IMI -- IMSI is the International Mobile Serial Identifier

1    number, which is also known as the SIM card number.  And the

2    IMEI is the International Mobile Equipment Identifier number,

3    which is the serial number for the actual cell phone device.

4    **Q.**    Okay.  What about completion code?

5    **A.**    Completion code lets us know on our end if the phone call

6    completed successfully or if it was abnormal, meaning that the

7    phone call most likely disconnected before it was a connected

8    call.

9    **Q.**    Okay.  Service code?

10   **A.**    Service code -- there is a key that comes with this.  It

11   will tell you, like, if it was a call waiting call, call

12   forwarding, or voice mail, et cetera.

13   **Q.**    Okay.  And then switch name?

14   **A.**    Switch name is the tower that it -- the switch of the

15   tower that it connected to to initiate the -- to complete the

16   call.  I'm sorry.

17   **Q.**    Okay.  And what is -- I see the word -- or the initials

18   LTE.  What does that mean?

19   **A.**    It's just the network connection or an upgraded network.

20   **Q.**    What are some other varieties of LTE or other coverages,

21   I guess?

22   **A.**    Other coverages would have been 2G, 3G, 4G, and then

23   upgraded to the LTE.

24   **Q.**    Okay.  And is it fair to state that during the times when

25   these records were pulled y'all were using LTE; is that right?

Williams - Direct

1  **A.**   Yes.

2  **Q.**   Okay.  And it says site ID.  What does that mean?

3  **A.**   The site ID is just for the -- just gives us the

4  information as far as with the sector.

5  **Q.**   Okay.  And what does sector mean?

6  **A.**   Sector -- so on a cell phone tower, there's three sectors

7  on a tower that a call can connect through.

8  **Q.**   Okay.  So two level has three sectors; is that right?

9  **A.**   On one tower, yes.

10  **Q.**   Okay.  What about first LAC?  What does that mean?

11  **A.**   That's just information letting us know that it actually

12  connected through the LTE network.

13  **Q.**   Okay.  First cell ID?

14  **A.**   Basically the same thing.

15  **Q.**   Okay.  What is the azimuth mean?

16  **A.**   That's basically telling us if it -- which side of the

17  tower that it connected to.

18  **Q.**   So is that in degrees?

19  **A.**   Basically, yes.

20  **Q.**   So it will essentially tell you where it's pointed?

21  **A.**   Correct.

22  **Q.**   Okay.  And what about first tower lat and long there?

23  **A.**   That's what we use to determine the location of the cell

24  phone tower at the time of a call being connected.

25  **Q.**   And then it also has the tower address here?

1  **A.**   And that's just the general address that we use for that
2  cell tower.
3  **Q.**   Okay.  What about last tower?  You know, it's basically a
4  repeat of the same thing we just went over, but it says last.
5  What does all of that mean?
6  **A.**   So if they're traveling, then it could connect to a -- it
7  has to be on LTE.  It will connect to a tower or whatever if
8  they're in a traveling motion.
9  **Q.**   Okay.  So these records have text messages and call
10  records; is that right?
11 **A.**   Yes.
12 **Q.**   And they're all contained within the -- those -- it shows
13 cell sites for all of those; is that correct?
14 **A.**   Some will show cell towers, depending if it's an LTE cell
15 tower.  Some may not.
16 **Q.**   Okay.
17        **MR. McGEE:**  So pull up that 6029, that top document
18 which is G-5A.  Let's go down to 1716 -- I'm sorry -- 2316.
19        **THE COURT:**  Mr. McGee, I'm wondering -- yes, thank
20 you.
21        **MR. McGEE:**  Yes, Your Honor.
22        **THE COURT:**  That's what I was going to ask for.
23        **MR. McGEE:**  Yes, Your Honor.  I know.  Very small.
24 **BY MR. McGEE:**
25 **Q.**   Okay.  So why don't we look at -- this is February 5th,

1  2316.  And, again, I'm not a math wizard, but I believe that

2  would be military time 1716 if you subtract six; correct?

3  **A.**  Yes.

4  **Q.**  And in military time 1716 is 5:16?

5  **A.**  Correct.

6  **Q.**  Okay.  And so this would be an outgoing call from who to

7  whom?

8  **A.**  So it was a 342-second call.  It was outgoing.  So the

9  number 662-360-6029 dialed to the number 662-710-7511.

10  **Q.**  Okay.  And looks like a call was made; is that right?

11  **A.**  Yes.

12  **Q.**  So, again, I'm on the line that says 2316, scrolling over

13  here in the center of the screen.

14          **MR. McGEE:**  Keep scrolling, please.

15  **BY MR. McGEE:**

16  **Q.**  Okay.  So you see where it says 230, and then it has a

17  latitude/longitude and an address.  What exactly is that again?

18  **A.**  The -- do you want me to start at the 230?

19  **Q.**  Yes, please.

20  **A.**  So the 230 would be the degrees of the tower that it

21  connected to -- for the sector.  I'm sorry.  The latitude is

22  the 34.889013, and the longitude is the negative 90.206626.

23  So, typically, law enforcement would put those numbers into a

24  mapping tool to get the location.

25  **Q.**  Okay.  And what's the address on that tower?

1   **A.**   The address?  That's just the general billing address for

2   that tower.

3   **Q.**   Okay.  And on this particular one, what does it say?

4   **A.**   12245 Nesbit Road.

5   **Q.**   And what's the city and state?

6   **A.**   Lake Cormorant, Mississippi.

7   **Q.**   Okay.  And then we see some down here as well.

8   **A.**   38641.  That -- that must be the zip code.

9   **Q.**   Okay.

10          **MR. McGEE:**  Court's indulgence, one moment.

11          **THE COURT:**  Yes, sir.

12       (CONFERRING OFF THE RECORD.)

13          **MR. McGEE:**  Tender the witness, Your Honor.

14          **THE COURT:**  Mr. Lewis.

15                      **CROSS-EXAMINATION**

16   BY MR. LEWIS:

17   **Q.**   Hi, Ms. Williams.

18   **A.**   Hello.

19   **Q.**   When the warrant from the Government came in, some

20   employee of T-Mobile compiled this information or obtained this

21   information; correct?

22   **A.**   Correct.

23   **Q.**   That was not you?

24   **A.**   No.  I -- that's the department I came from originally.

25   **Q.**   Okay.  But at any rate, you didn't do it yourself?

1  **A.** Correct. I did not.

2  **Q.** And then before you came here and testified, you didn't

3  go back and check or verify the information that came through;

4  correct?

5  **A.** I did.

6  **Q.** You did?

7  **A.** Yes.

8  **Q.** You plugged it back into the system?

9  **A.** There's a number on there that we use to reference when

10  we receive requests, and so we can go in to make sure that the

11  records match what we released.

12  **MR. McGEE:** Your Honor, the defense didn't object to

13  the authenticity of the records. I don't understand how he's

14  now going back into the authenticity of the records. The

15  records are in evidence.

16  **MR. LEWIS:** It's cross-examination, Your Honor.

17  **THE COURT:** You may proceed. It's overruled.

18  **BY MR. LEWIS:**

19  **Q.** So you just verified what was given to the Government is

20  what you're testifying here about today?

21  **A.** Correct.

22  **Q.** That was the verification you made?

23  **A.** Correct.

24  **Q.** Okay. And your testimony is this -- this account had no

25  person's name associated with it; correct?

Williams - Cross by Mr. Chiniche

1  **A.**   Correct.

2          **MR. LEWIS:**  Thank you, Your Honor.  That's all I have.

3          **THE COURT:**  Mr. Chiniche?

4          **MR. CHINICHE:**  Yes, Your Honor.

5                          **CROSS-EXAMINATION**

6  **BY MR. CHINICHE:**

7  **Q.**   Ms. Williams, you were just asked, when that Excel

8  spreadsheet was up, about a tower being at Nesbit Road.  Do you

9  remember that?

10 **A.**   Yes.

11 **Q.**   You don't -- you have no idea where that tower is; right?

12 **A.**   No, not personally.

13 **Q.**   And you don't know how far it is from the post office?

14 **A.**   Generally, when a tower connects, it connects to the

15 strongest tower.  So with a rural area, that's within one or

16 two and a half miles.

17 **Q.**   Right.  But you have no idea where the tower is at that

18 address in Nesbit?  You don't know where that tower is, do you?

19 **A.**   No, I don't.

20 **Q.**   And you don't know how far that tower is from the post

21 office?

22 **A.**   No, I don't.

23 **Q.**   Okay.  Do you know that this case involves a crime that

24 happened at a post office?

25 **A.**   No, I do not.

1  **Q.**    Okay.  Thank you.

2          **MR. CHINICHE:**  No further questions.

3          **THE COURT:**  Mr. Travis?

4          **MR. TRAVIS:**  No cross.  Thank you, Your Honor.

5          **THE COURT:**  Redirect?

6          **MR. McGEE:**  No, Your Honor.  Thank you.

7          **THE COURT:**  Thank you.

8          **THE WITNESS:**  Thank you.

9          **THE COURT:**  You're finally excused.  Thank you, ma'am,

10  for your testimony.

11          Ladies and gentlemen, we're going to take our lunch

12  break at this time.  I'm going to remind you you're not to

13  discuss the case with anybody or undertake to do any

14  independent research.  We're going to start back about 1:15.

15  I've got about eight after there now.  About 1:15.  So if

16  you'll have your lunch and then return to the jury room, I'll

17  bring you back in 1:15 or 1:20.  You're excused.

18          (JURY OUT.)

19          **THE COURT:**  Okay.  We're in recess.  I'll see you at

20  1:15.

21          (LUNCH RECESS TAKEN.)

22          **THE COURT:**  Are we ready to bring in the jury?

23          **MR. MIMS:**  Your Honor, one thing just to clarify

24  before the jury comes in.

25          Earlier this morning, we played a video that is G-1.

1   If you recall, when we first played it, you couldn't see in the
2   video the store on the right-hand side of the screen.  I asked
3   Ms. Bailey if she could look at the settings.  She
4   double-checked the settings.  She was able to adjust the
5   settings on the video where you could then see the store on the
6   right side of the screen, which we again played a portion of
7   that for Mr. Cobbs.

8           Over the lunch break, I asked her to check the actual
9   wallet drive from G-1 just to make sure the settings were
10  appropriate so you could see the whole screen, including the
11  store.  She double-checked it, saw that she had to adjust the
12  settings to make it show the store.  And so she made that
13  adjustment on G-1.

14          I just wanted to disclose that to let you know that's
15  what we did over the lunch break, is to adjust the settings so
16  it would show the complete video.

17          **MR. CHINICHE:**  So I have a question.  Does that mean
18  the updated G-1 is the zoomed-out version?  Because we first
19  saw a zoomed-in version and then a zoomed-out version.

20          **MR. MIMS:**  Yeah.  Zoomed out -- I'm not sure that's --
21  that's a term I kind of used earlier.

22          **MR. CHINICHE:**  Yeah.

23          **MR. MIMS:**  And so that's kind of a layman's term for
24  it, but, yes, it's the -- it's where you can see the whole
25  left-to-right screen.  I think what had happened is, at the

1 time of the motion to suppress hearing, we focused in on

2 something, and the settings were so that it was kind of focused

3 in over here (indicating) instead of the zoomed out so to

4 speak, and we just adjusted that so it will be the zoomed out,

5 yes.

6 **MR. CHINICHE**: So the G-1 that's in evidence is the

7 zoomed-out version?

8 **MR. MIMS**: Yes.

9 **THE COURT**: Do y'all want to review it because we can

10 at a break?

11 **MR. CHINICHE**: I trust the Government. Thank you,

12 Your Honor.

13 **THE COURT**: Okay. Thank you.

14 Okay. You may bring in the jury.

15 (JURY IN.)

16 **THE COURT**: You may have a seat. Let the record

17 reflect that the jury has returned to the courtroom.

18 Who would the Government call as its next witness?

19 **MR. McGEE**: Your Honor, the Government would call

20 Patrick Wilson.

21 (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

22 **COURTROOM DEPUTY**: Thank you. You may take the stand.

23 **MR. McGEE**: May I proceed, Your Honor?

24 **THE COURT**: Let him take a seat.

25 **MR. McGEE**: I keep jumping the gun.

Wilson - Direct

1  **PATRICK WILSON, GOVERNMENT'S WITNESS, AFTER BEING DULY SWORN,**

2  **WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

3  **DIRECT EXAMINATION**

4  BY MR. McGEE:

5  **Q.**    Would you state your name for the record.

6  **A.**    Patrick Wilson.

7  **Q.**    And, Mr. Wilson, with whom are you employed?

8  **A.**    I work for Telapex, Inc., which is the parent company for

9  C Spire and Cellular South and Franklin Telephone Company and

10 Troy Cable Company and others.

11 **Q.**    Okay.  And you're here today about which -- which

12 company's records?

13 **A.**    Specifically, Cellular South.

14 **Q.**    Okay.  Would that also be known as C Spire?

15 **A.**    C Spire is the trade name, yes.

16 **Q.**    And how long have you worked for Telapex/C Spire?

17 **A.**    Since July of 2021.

18 **Q.**    Okay.  And what is your position there?

19 **A.**    I am the subpoena compliance manager.

20 **Q.**    And are you familiar with how C Spire keeps its business

21 records?

22 **A.**    I am.

23 **Q.**    And are you familiar with how specifically they keep the

24 call detail records and cell site location records?

25 **A.**    I am.

1          **MR. McGEE:**  Your Honor, may I approach the witness?

2          **THE COURT:**  You may.

3          **MR. McGEE:**  I'm showing the witness what's previously

4  been marked for identification G-6 and G-9, G-6A and B, and

5  G-9A through D.

6  **BY MR. McGEE:**

7  **Q.**    If you could take a moment to review those.

8  **A.**    (Peruses documents.)  Okay.

9  **Q.**    And are you familiar with the records I just showed you?

10  **A.**    I am.

11  **Q.**    And are those -- have you reviewed those records prior to

12  this trial?

13  **A.**    I have.

14  **Q.**    And are those the records kept in the ordinary course of

15  business by C Spire?

16  **A.**    Yes, they are.

17  **Q.**    And so those records are accurate?

18  **A.**    Yes.

19  **Q.**    And they are reliable?

20  **A.**    Yes.

21  **Q.**    And they have not been manipulated?

22  **A.**    No.

23  **Q.**    So they are authentic?

24  **A.**    Yes, they are.

25          **MR. McGEE:**  Your Honor, at this time, the Government

1  would ask to introduce G-6, G-6A, G-6B, G-9, G-9A, G-9B, G-9C,

2  G9-D.

3          **THE COURT:**  Any objection?

4          **MR. LEWIS:**  No objection.

5          **MR. TRAVIS:**  No objection, Your Honor.

6          **THE COURT:**  It will be received.  All will be

7  received.

8      (EXHIBIT NOS. G-6, G-6A, G-6B, G-9, G9-A, G-9B, G-9C, AND

9  G-9D ADMITTED INTO EVIDENCE.)

10 **BY MR. McGEE:**

11 **Q.**  I first show the witness --

12         **MR. McGEE:**  Robin, if you wouldn't mind pulling up the

13 last page of the PDF for G-6, please.  It's the last page.

14 Zoom out a little bit.

15 **BY MR. McGEE:**

16 **Q.**  Okay.  And, Mr. Wilson, what -- are these part of the

17 records we just talked about?

18 **A.**  They are.

19 **Q.**  Okay.  And what number is this?

20 **A.**  This is the subscriber information for telephone number

21 662-710-7511.

22 **Q.**  Okay.  And when was that activated?

23 **A.**  This device was activated on August the 3rd of 2016.

24 **Q.**  Okay.  And when was it deactivated?

25 **A.**  It was deactivated on June the 17th of 2018.

1    **Q.**    Okay. And who is the subscriber and address?

2    **A.**    The subscriber for this device was Travonya Nash at

3    P.O. Box 233; Batesville, Mississippi.

4        **MR. McGEE:** Okay. If you could pull up G-9.

5    **BY MR. McGEE:**

6    **Q.**    Okay. And this is a second set of records that you

7    produced to the Government through C Spire; is that right?

8    **A.**    Correct.

9    **Q.**    Okay. What's the mobile number on this one?

10    **A.**    662-209-0205.

11    **Q.**    And when was it activated?

12    **A.**    It was activated on August the 1st --

13    **Q.**    And --

14    **A.**    -- in 2017.

15    **Q.**    I'm sorry I interrupted you. And when was it

16    deactivated?

17    **A.**    It was deactivated on February the 5th of 2018.

18    **Q.**    Okay.

19        **MR. McGEE:** Will you scroll down a little bit. I'm

20    sorry. Scroll back up to the subscriber.

21    **BY MR. McGEE:**

22    **Q.**    And who is the subscriber on this call -- I mean, on

23    these phone records?

24    **A.**    Chevella Hines.

25    **Q.**    Okay.

1     **MR. McGEE:**  If you'll scroll down a little bit.

2   **BY MR. McGEE:**

3   **Q.**   And what does all this mean down here, the ESN history,

4   the mobile number history, and the MOBN account number history?

5   **A.**   The ESN is an Electronic Serial Number that's assigned to

6   a device.  So that's just showing the history of the devices

7   and the serial numbers for those devices that have been on that

8   account, when they were established and when they were

9   terminated.

10      So during the length of time that someone has a cell

11  phone account with us, they may have multiple cell phones.

12  People are always upgrading.  So every time you upgrade a

13  device you get a new device that has a new serial number, and

14  this just signifies the dates that that particular device was

15  in use.

16      The mobile number history is the actual number of your

17  cell phone.  So it depicts the entire time frame that you have

18  that actual number assigned to you.  So you may switch mobile

19  devices three or four times, but you generally keep the same

20  number.

21      The mobile account number is also -- again, it's the

22  number for the account, the administrative number that's --

23  that's assigned to that account.  One account may have multiple

24  phones, multiple different calling plans.  You may change your

25  plan from time to time to get a better rate and those kind of

1  things, but generally your mobile account number will stay the

2  same, unless you cancel your account and come back later and

3  want a new account opened.  So those are the dates that the

4  account number was in effect.

5  **Q.**  And what is the mobile number history?  I may have missed

6  this but --

7  **A.**  That's the actual number of the phone; so it generally

8  stays the same.  But if you wanted to, for example, change your

9  number, you can keep your device, and C Spire or any carrier

10  will change your number for you if you so desire.  So that's

11  just the mobile number history.

12  **Q.**  Okay.  So let's look specifically -- if this doesn't

13  work, I may have to do it electronically.

14        **MR. McGEE:**  But Tracy -- thank you.

15  **BY MR. McGEE:**

16  **Q.**  So we're going to look at February 5th, 2018, at 1716.

17  Now, that's in military time; correct?

18  **A.**  Yes.  That would be 5:15 -- or 5:16, rather.

19  **Q.**  Okay.  So 5:16 Central Standard Time.  And then what is

20  this category right here, this second category?

21  **A.**  That is going to be like we were previously discussing,

22  the Electronic Serial Number or IMEI, which also represents a

23  number assigned to a device.  It will either show one of the --

24  one or the other for the -- in this case, the particular

25  billing party.  It's an internal thing between carriers.

1    So if you're -- you've got multiple phone calls between

2    people who have different carriers, it's a -- it's -- one

3    number is assigned as a billing number, and it's purely an

4    accounting type use.

5         **MR. McGEE:**  Okay.  And for record purposes, I'm

6    showing the witness G-6A and 1716 time on 2/5/2018.

7    **BY MR. McGEE:**

8    **Q.**   What are the calling numbers?  What does that mean?

9    **A.**   That is the number of the device that initiates the call.

10   **Q.**   Okay.  Now, I see a strange number here under dialed

11   digits.  What is that?

12   **A.**   73 -- that 731 number and dialed digits, in this

13   particular case, is a routing number.  The number that is

14   called, 662-710-7511, is the actual number that was listed in

15   the search warrant.  So when the calling number attempted to

16   reach the C Spire customer, in all likelihood, they were off

17   our network.

18        Our network is limited primarily to the state of

19   Mississippi, but we have roaming agreements with other

20   carriers.  So when you're outside our footprint, you're what is

21   considered roaming.  So you may roam on T-Mobile or AT&T or

22   someone else's towers.

23        And in order to connect that phone call, it's -- a

24   routing number is used.  It's not a number that the user dials.

25   It's invisible to the user of the phone, but for us, it just

1  shows that that call was transferred through this routing

2  number to the -- the C Spire customer.

3  **Q.**  Okay.  So would it be fair to state, though, that this

4  number right here (indicating), this 6029 ending, was

5  contacting this number (indicating)?

6  **A.**  Correct.

7  **Q.**  Okay.  And there's obviously other ones here above

8  showing this number under the dialed digits.  And what does --

9  what does terminating mean?

10  **A.**  That's the -- that's a column for the mobile role, and it

11  just indicates the direction of the call, whether it's incoming

12  or outgoing.

13  **Q.**  Okay.  And then obviously answered, not answered.  I

14  think that's pretty self-explanatory.  What does first cell

15  site mean?

16  **A.**  The first cell site and the last cell site -- those are

17  cell tower ID numbers that's internal to our network, and so

18  that's a number that is assigned to a particular cell site.

19  **Q.**  Okay.  And we see up here switch.  What does that mean?

20  **A.**  Well, with -- especially with the older technology, CDMA,

21  3G, you have -- we have a number of switches, maybe three or

22  four different switches, that cover the entire state, and each

23  one of those switches may service, you know, potentially

24  hundreds of different cell towers.

25  So when a phone call is made and it connects through a

1  particular tower, it is routed to the switches.  It's almost

2  like a server for computers.  It goes through that switch, and

3  then it's routed into the correct direction to the correct

4  recipient.

5  **Q.**    So just making sure, that doesn't mean the call was made

6  or received in Memphis; correct?

7  **A.**    Absolutely.  That is correct.  That is just the name of

8  the switch that routed that particular phone call.

9  **Q.**    And duration, what -- what time unit is that in?

10 **A.**    That's in seconds.

11 **Q.**    Okay.  And then what is CDMA cell address and CDMA city?

12 **A.**    Okay.  CDMA is the technology.  It's, like I said

13 previously, 3G essentially.  It's not 4 or 5G or LTE.  It's an

14 older technology.  And CDMA cell address is going to be the

15 physical location of the tower that serviced that particular

16 phone call.

17 **Q.**    Okay.  And then what about azimuth?  What does that mean?

18 **A.**    If you'll move it over to the right.

19 **Q.**    I'm sorry.

20 **A.**    That's fine.  So when we say cell tower, the tower itself

21 doesn't have any relevance other than to put the devices that

22 we use -- position them in a -- at a higher location.  You --

23 you could have a cell tower on top of a high-rise building.  It

24 could be placed anywhere.

25        Essentially, a cell -- what we refer to as a cell tower

1   is a box with an antenna, and the physical tower that it's

2   placed on is -- or whatever location of that box with an

3   antenna is going to be considered the cell address and --

4   **Q.**    For the -- go ahead.  Well, I was just going to say, so

5   would it be fair to say that's the way it's pointing?

6   **A.**    Yes.  So far as the azimuth.  Is that --

7   **Q.**    Yes.  Azimuth.  Yeah.

8   **A.**    Yes.  I was just going to go back over sector.

9   **Q.**    Yeah.  Go ahead.  Go ahead.

10  **A.**    So if you, for example, picture a cell location as a

11  point on a map and then you draw a circle -- large circle

12  around that location, that dot on the map, and if you were to

13  slice up that circle into three different slices, say, slices

14  of pie, each slice of pie would be a sector.  And those sectors

15  are numbered one, two, and three.  And that's how -- that's

16  essentially the side of a tower.

17          So each one of those sectors is a -- is a box with an

18  antenna essentially, and it's pointed in a specific direction,

19  three different directions coming off of that tower.  The

20  direction -- if you imagine that circle as a compass with

21  360 degrees, the actual direction that each one of those boxes

22  are pointing is the azimuth.  So that azimuth, if you picture

23  the compass, will have a numeric number just like on a compass,

24  and that's the direction that the device is pointed.

25          The beamwidth is going to be the longest -- the distance

1    and the longest part of that sector, that slice.  So,

2    essentially, it's all the way to the end of its range and the

3    total width of the distance that that sector covers.

4    **Q.**    So, in other words, the width of the wedge or the slice,

5    as you say?

6    **A.**    Correct.

7    **Q.**    Okay.  And that's beamwidth?

8    **A.**    That is the beamwidth.

9    **Q.**    And then what is the lat/long?

10   **A.**    The lat/long, again, is just the physical location on a

11   map in longitude and latitude for that cell tower location.

12   **Q.**    And so this call was answered.  So I can look on the --

13   let's say that this calling number is a T-Mobile customer.  I

14   can pull up T-Mobile records and pretty much match the call,

15   can't I?

16   **A.**    Correct.

17            **MR. McGEE:**  I'm showing the witness G-6B here.

18   **BY MR. McGEE:**

19   **Q.**    And what are these from your records?

20   **A.**    These are all going to be text messages -- a record of

21   text messages from that particular device.

22   **Q.**    Okay.  And I don't see any locations or cell towers on

23   that.  Why is that?

24   **A.**    We do not collect location information on text messages.

25   **Q.**    Okay.  So if there's a location in G-6A, the one we

Wilson - Direct

1  looked at previously, that would be from a phone call?

2  **A.**   Correct.

3  **Q.**   Okay.

4         **MR. McGEE:**  Okay.  Next, I'm going to show the witness

5  G-9A.  This is the Hines records.

6  **BY MR. McGEE:**

7  **Q.**   Okay.  So this is a call at 1710.  That's 5:10 p.m.,

8  correct --

9  **A.**   Correct.

10 **Q.**   -- on February 5th, 2018?  And you've got -- what was the

11 calling number, and then what was the called number on that?

12 **A.**   The calling number is 662-209-0205.

13 **Q.**   And what is the called number?

14 **A.**   And the called number is 662-360-6029.

15 **Q.**   And, again, on this one, you know, you've got a few of

16 these where it's got these random numbers under dialed digits.

17 And what are those again?

18 **A.**   Routing -- typically, routing numbers.

19 **Q.**   Okay.

20 **A.**   And in this particular case, you'll see the -- there's

21 another phone call that took place -- if you look at the first

22 one that you -- we were just looking at, the 1710 -- 5:10 and 5

23 seconds.

24 **Q.**   Uh-huh.

25 **A.**   If you look over the -- you can see that it doesn't have

1    any cell sites associated with it.  This other --

2    **Q.**   Let me stop you real quick.  The 17:10:05 is what you're

3    talking about?

4    **A.**   Correct.

5    **Q.**   Okay.

6    **A.**   You can see the 00 during the first and last cell site.

7    **Q.**   Right.

8    **A.**   And then the second one, you can see it's only one second

9    apart.  And if you look at the duration of the first one and

10   the second one, you've got 46 seconds and 48 seconds.  This is

11   actually the same phone call -- represents the same phone call.

12        If you look in the mobile role, you can see where -- the

13   original caller, I guess, is a mobile phone, and it goes to

14   land, which is indicator that it's going to a landline.  And

15   when it shows up as tandem, that's another indicator that

16   it's -- it's transitioning from cell tower so to speak to a

17   landline network, whatever it may be.

18   **Q.**   Okay.  That may confuse people.

19   **A.**   Yes, sir.  I'm sorry.

20   **Q.**   It certainly confused me when I heard landline at first.

21   Does that mean they're calling, like, Domino's Pizza or

22   somebody with a landline?

23   **A.**   Again, landline these days could be your traditional

24   telephone or voice over IP, where the phone -- it's a

25   traditional phone that goes through the Internet.

1   **Q.**   Okay. So I guess what I'm asking is, if I go look at

2   these T-Mobile records, would it show this transaction between

3   these two numbers?

4   **A.**   If the other one was a T-Mobile, then, yes.

5   **Q.**   Okay. So T-Mobile versus your C Spire phone, I can go

6   look at T-Mobile right now, and it's going to have the same --

7   because that's who called each other; correct?

8   **A.**   Correct.

9   **Q.**   I just want to make sure I'm clear on that. Those two

10   numbers are calling each other?

11   **A.**   Yes.

12   **Q.**   Okay. And that was at 1712 and 1741, the same -- the

13   same two numbers; correct?

14   **A.**   Correct.

15   **Q.**   So if you'll look at 1712 and 1741.

16   **A.**   Correct.

17   **Q.**   Okay.

18       **MR. McGEE:** Court's indulgence.

19       **THE COURT:** Yes.

20    (CONFERRING OFF THE RECORD.)

21       **MR. McGEE:** Tender the witness, Your Honor.

22       **THE COURT:** Cross-examination.

23    (CONFERRING OFF THE RECORD.)

24       **MR. LEWIS:** May I proceed, Your Honor?

25       **THE COURT:** You may.

1    **MR. LEWIS:** Sorry.

2                    **CROSS-EXAMINATION**

3    **BY MR. LEWIS:**

4    **Q.** I'm going to represent -- Mr. Williams, my name is

5    Goodloe Lewis.

6    **A.** Mr. Wilson.

7    **Q.** Oh, Wilson. Excuse me. That's what it says. I'm going

8    to represent to you that these records were produced sometime

9    in 2019, maybe during the summer.

10   **A.** Correct.

11   **Q.** That's -- you know that?

12   **A.** July -- yes.

13   **Q.** Okay. So since you've worked for the company since 2021,

14   you did not participate in producing those documents?

15   **A.** I was not working for the company when these records were

16   produced, correct.

17   **Q.** Okay. So what I said was correct. You didn't

18   participate in producing the documents?

19   **A.** No.

20   **Q.** Correct?

21   **A.** Correct.

22   **Q.** Okay. And you did not compile that information yourself?

23   **A.** No.

24   **Q.** Okay. Your job is to come in here and validate and

25   explain the records as records of C Spire?

1  **A.**   Correct.

2  **Q.**   Okay.  Not how the information was obtained or what

3  actually went in to get the information.  Does that sound

4  correct?

5  **A.**   I don't follow that question.

6  **Q.**   Okay.  I'll withdraw it.

7        **MR. LEWIS:**  I have no further questions.

8        **THE COURT:**  Thank you.

9        Mr. Chiniche?

10        **MR. CHINICHE:**  Yes, Your Honor.

11                    **CROSS-EXAMINATION**

12  BY MR. CHINICHE:

13  **Q.**   Good afternoon, Mr. Wilson.

14  **A.**   Good afternoon.

15  **Q.**   The document that the prosecutor showed you was a letter

16  dated July 19th, 2019; is that right?

17  **A.**   For one of the numbers, yes.

18  **Q.**   For one of the numbers?

19  **A.**   Yes.  The 7511 number.  Correct.

20  **Q.**   Right.  And it's -- and that number, 7511, is the subject

21  of the subpoena?

22  **A.**   Search warrant.

23  **Q.**   Search warrant.  7511; right?  You've seen these

24  documents?

25  **A.**   Yes.

1  **Q**.    And the account holder was a person with the last name

2  Nash; is that right?

3  **A**.    That is the name on the account, correct.

4  **Q**.    Now, from this -- from this document, can you tell if

5  this was a prepaid account or a subscriber account?

6  **A**.    It's a postpaid account, meaning they paid their bill in

7  the rear.  You'll see that there's a social security number

8  associated with this account because, in order to pay in

9  arrears and have an account like that, you have to have a

10  credit check, and you have to produce identification in order

11  to have that.  So I can tell just because there is a social

12  security number on this account that it was a postpaid account.

13  **Q**.    So postpaid meaning they use it for a month, and then

14  they -- they --

15  **A**.    No.  It means you get a bill every month, and you pay it

16  in the rear.  So you pay the previous month's charges.

17        A prepaid phone you purchase minutes.  You purchase a

18  device on your own, and then you buy "X" amount of minutes.

19  And soon as those minutes are over -- up, the device is

20  inactivated unless you purchase additional minutes.

21        But you don't -- for prepaid devices, you don't -- you're

22  not required to show identification or anything.  You just have

23  to continue to purchase minutes.

24  **Q**.    But for this phone number, 7511, identification was

25  necessary and a credit check?

Wilson - Cross by Mr. Chiniche

1   **A.**    Correct.

2   **Q.**    And was this phone number under a contract, or do you --

3   **A.**    It doesn't say on there whether it was or not, but

4   typically most people enter into a contract.  That's generally

5   where you get the best rates.

6   **Q.**    Okay.  And does C Spire have its own towers?

7   **A.**    At this particular time in 2018 when these records were

8   produced, we did have some, but we've since sold all of our

9   tower locations.  We now lease them.

10   **Q.**    Did C Spire own any cell towers in the -- in the

11   Mississippi Delta region or North Mississippi or in DeSoto

12   County?  Did C Spire have any cell towers in February of 2018

13   in DeSoto County, Mississippi?

14   **A.**    Yes.

15   **Q.**    It did?  Okay.  But since that time, C Spire has sold

16   the -- sold those towers.  Am I understanding you correctly?

17   **A.**    Yes.  And when we -- in this particular instance, when

18   you're referring to towers, you're talking about a physical

19   location where there's a physical tower.

20   **Q.**    Right.

21   **A.**    The equipment that are -- that is on that tower, the

22   actual cell site itself, a little box with an antenna, we still

23   own, but you may have multiple carriers using the same -- or

24   leasing the same antenna -- I mean, the same cell tower

25   location.

1    **MR. CHINICHE:**  Thank you, Your Honor.  No further

2    questions.

3    **THE COURT:**  Mr. Travis?

4    **MR. TRAVIS:**  I have no cross of this witness.  Thank

5    you, Judge.

6    **THE COURT:**  Redirect?

7    **MR. McGEE:**  No, Your Honor.  Thank you.

8    **THE COURT:**  May this witness be finally excused?

9    **MR. McGEE:**  Yes, Your Honor.

10   **THE COURT:**  Thank you, sir, for your testimony.

11   **THE WITNESS:**  Thank you, Your Honor.

12   **THE COURT:**  Who would the Government call next?

13   **MR. MIMS:**  Stephen Mathews.

14   (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

15   **COURTROOM DEPUTY:**  Thank you.  You may take the stand.

16   **MR. MIMS:**  Your Honor, may I give them one minute?

17   **MR. CHINICHE:**  Your Honor, may we have just a moment?

18   **THE COURT:**  Yes, you may.

19   **MR. MIMS:**  It's my fault, Your Honor.

20   **THE COURT:**  Let me ask you this, Counselors.  Do you

21   need to step out?  Do I need to get the jury out?

22   **MR. CHINICHE:**  If we could just have a four-minute

23   recess.  We can stay here.

24   **THE COURT:**  Okay.  Do you want them out?

25   **MR. CHINICHE:**  Your Honor, yes, if you don't mind.

1     **THE COURT:**  Okay.  That might be best so they can

2  confer.  Do not discuss the case.  I'll get you back in in a

3  few minutes.

4     **MR. CHINICHE:**  Thank you, Your Honor.

5     (JURY OUT.)

6     (RECESS TAKEN.)

7     **THE COURT:**  Bring them in.

8     (JURY IN.)

9     **THE COURT:**  You may have a seat.  Let the record

10  reflect that the jury has returned to the courtroom.

11     Mr. Mims, you may continue.

12     **MR. MIMS:**  Thank you, Your Honor.

13  **STEPHEN MATHEWS, GOVERNMENT'S WITNESS, AFTER BEING DULY SWORN,**

14                **WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

15                     **DIRECT EXAMINATION**

16  **BY MR. MIMS:**

17  **Q.**   Sir, will you state and spell your name for the record,

18  please.

19  **A.**   Stephen, S-t-e-p-h-e-n, Mathews, M-a-t-h-e-w-s.

20  **Q.**   Where are you from?

21  **A.**   I live in Bowling Green, Kentucky.

22  **Q.**   How long have you lived there?

23  **A.**   About two and a half years.

24  **Q.**   I'm sorry.  How long?

25  **A.**   About two and a half years.

Mathews - Direct

1   **Q.**   What are you doing for a living these days?

2   **A.**   Well, I'm -- actually, from August of 2020 to just until

3   last month, I worked for a consulting company doing fraud

4   investigations, but I'm currently retired.

5   **Q.**   What did you do prior to that?

6   **A.**   I was a postal inspector in Mobile, Alabama.

7   **Q.**   Okay. What does it mean to be a postal inspector?

8   **A.**   Basically, a postal inspector -- I started Office of

9   Postal Inspector in 2001 in Birmingham, Alabama. I was there

10   for 13 years. Basically, we investigate any crimes related to

11   the post office, whether it's mail theft, robberies, assaults,

12   homicides, drugs in the mail, all kinds of crimes associated

13   with the post office.

14   **Q.**   Okay. Does that mean you're a federal agent so to speak?

15   **A.**   Yes, sir, we are.

16   **Q.**   Is that for the postal -- it's the Postal Inspection

17   Service that you work for; correct?

18   **A.**   That is correct.

19   **Q.**   And they call their agents inspectors instead of an

20   agent; right?

21   **A.**   That's correct.

22   **Q.**   What was your job title or your position in February of

23   2018?

24   **A.**   2018 -- in February 2018 I was a team leader in Mobile,

25   Alabama. Basically, team leader is a supervisor. I had

1 several offices that I supervised.  One in Mobile where -- I

2 had inspectors there; one in Jackson, Mississippi, inspectors

3 there; and one in Oxford, Mississippi, had inspectors there.

4 **Q.**  I think you mentioned a minute ago.  Just to be sure, how

5 long were you a postal inspector?

6 **A.**  For 19 years.  From 2001 to 2020.

7 **Q.**  So what kind of training did you receive to be a postal

8 inspector?

9 **A.**  Postal inspector, we go to a 14-week academy in Potomac,

10 Maryland.  Classes in all kinds of legal and officer safety

11 type situations, including executing search warrants, writing

12 search warrants, subpoenas, different type things like that.

13 **Q.**  That's -- do you do that at the beginning of your term?

14 **A.**  Yes, sir.  We -- that's the initial 14-week academy, but

15 during the course of our career, there's continual training --

16 ongoing training yearly on different aspects.  Part of it is

17 legal training that we have throughout the career.

18 **Q.**  Okay.  Are you familiar with the investigation of the

19 robbery of the Lake Cormorant post office that occurred on

20 February 5th, 2018?

21 **A.**  Yes, sir, I am.

22 **Q.**  What was your involvement at the beginning of that

23 investigation?

24 **A.**  At the very beginning, that was a -- that was a Monday.

25 I was actually in -- I believe it was in Maryland for training

1    the first couple of days it happened, but I received initial
2    notification on it, coordinated who would respond to the scene,
3    and got continual updates until I returned a few days later.
4    **Q.**    Okay.  As a team leader, was it your responsibility to
5    assign other inspectors to investigate?
6    **A.**    Yes, sir, it was.
7    **Q.**    And also, as team leader, even though you were out of
8    town, communicate and participate -- maybe not boots on the
9    ground in Lake Cormorant but participate in the investigation?
10   **A.**    Yes, sir, I did.
11   **Q.**    Okay.  At some point, did you return back from this --
12   was it training, did you say?
13   **A.**    Yes, sir, it was training.  It was in three or four days,
14   I believe, that I returned back.
15   **Q.**    All right.  When you came back, did you take an active
16   role in the investigation?
17   **A.**    Yes, I did.  I continued to supervise and coordinate the
18   investigation and assist with various steps in the
19   investigation.
20   **Q.**    So for those of us who may have never been to the post
21   office at Lake Cormorant, can you lay out the scene for us?
22   **A.**    You saw the video earlier, but the Lake Cormorant post
23   office is in a -- in a rural area.  It's on the corner of Star
24   Landing Road and Blythe Road.  Blythe Road is, I believe, also
25   called Old 61.  It's located on a corner.

1    On the opposite corner from there is an old store that's

2    not in operation anymore.  Behind the post office, there is a

3    farm office and a farm shop.  There's a big shed where the

4    gentleman kept all of his farm equipment.

5    And along Blythe Road, which runs beside the post office,

6    is a railroad track that runs basically north/south or

7    northeast/southwest that follows Highway 61 or Old 61, Blythe

8    Road.

9    **MR. MIMS**:  May I approach the witness, Your Honor?

10   **THE COURT**:  You may.

11   **BY MR. MIMS:**

12   **Q.**   Sir, do you recognize those photographs?

13   **A.**   Yes, sir, I do.

14   **Q.**   Where did those come from?

15   **A.**   Those were from -- are still shots from a drone video

16   that we took of the area.

17   **Q.**   Okay.  So y'all took a drone video as part of your

18   investigation?

19   **A.**   Yes, sir, we did.

20   **Q.**   And those are simply still shots taken from that video?

21   **A.**   Yes, sir, they are.

22   **Q.**   Does that depict the area where this robbery occurred?

23   **A.**   Yes, sir, it does.

24   **Q.**   All right.

25   **MR. MIMS**:  Your Honor, I would offer these into

Mathews - Direct

1    evidence as exhibits.  I believe it's 13A and 13B.

2            **THE COURT:**  Any objection?

3            **MR. LEWIS:**  No objection.

4            **MR. TRAVIS:**  No, Your Honor.

5            **THE COURT:**  The photos will be admitted.

6        (EXHIBIT NOS. G-13A AND G-13B ADMITTED INTO EVIDENCE.)

7    **BY MR. MIMS:**

8    **Q.**    So this is 13A.  I believe you can actually -- if you

9    touch that screen, it will mark on there if there's anything

10   you want to do.  Can you -- can you show me where the post

11   office is on this screen?

12   **A.**    Yes, sir.  It's this building right there (indicating).

13   **Q.**    Okay.  And do you know which way is north and south on

14   this particular picture?

15   **A.**    The road you see running in front of the post office here

16   (indicating), Star Landing Road, basically runs east/west.

17   **Q.**    Okay.

18   **A.**    So Blythe Road, this other road here (indicating),

19   basically runs northeast/southwest.

20   **Q.**    So the front of the post office, which is at the lower

21   part of the screen, that would be facing which direction?

22   **A.**    It would be facing south.

23           **MR. MIMS:**  And what do we need to do to clear that

24   screen?

25           **COURTROOM DEPUTY:**  I'll do it.

Mathews - Direct

1   BY MR. MIMS:

2   **Q.**   All right.  Where is the old store that you're referring

3   to?

4   **A.**   This -- this building here (indicating).

5   **Q.**   Okay.  And is that the store that we see in that video we

6   watched earlier today?

7   **A.**   Yes, sir, it is.

8   **Q.**   Where did that video come from?

9   **A.**   It came from this -- this is the farm office that I was

10  talking about (indicating).  It came from that building.  About

11  that corner where I marked -- it was on the corner of that

12  building kind of at an angle.  Kind of generally like that

13  (indicating).

14  **Q.**   I'm going to show you Exhibit 13B.  Is this basically the

15  same -- same area but just taken from a different -- different

16  angle?

17  **A.**   Yes, sir, it is.

18  **Q.**   And, again, just on here, would you mark the post office

19  for me, please?

20  **A.**   Yes, sir (marking).

21  **Q.**   All right.  And where is that -- where's the farm office

22  where the security video came from?

23  **A.**   Right there (marking).

24  **Q.**   What's the operating hours of this post office?

25  **A.**   They operate Monday through Friday 8:00 to 12:00.

1  **Q**.   Can you explain to the jury postal procedures from the

2  standpoint of -- and I'm talking about in this area in

3  particular -- as far as what does the post office do with the

4  mail every day?

5  **A**.   Mail is collected every day and placed in -- there's a

6  vestibule on the -- in the back part of the post office.

7  There's actually a door from the -- what we call the workroom

8  floor to the post office.  And then there's a room -- a small

9  room and then another door that goes outside the post office.

10      So, basically, if you're coming from the outside from the

11  back dock area, you -- you open the first door.  You're in a

12  small room.  And then there's another door that opens up into

13  the actual workroom floor where they actually do all of the

14  work in the post office.

15  **Q**.   What does the post office do with the mail each day?

16  **A**.   They take that mail, and they put it in that back room.

17  They put it, whether -- depending on how much mail they have,

18  in these big carts, or they put them in tubs or trays or sacks,

19  depending on what type of mail it is and how much mail they

20  have.

21  **Q**.   Okay.  What about registered mail?  What is registered

22  mail?

23  **A**.   Registered mail is the most secure form of mail for the

24  postal service.  It's -- the reason for that, it's accounted

25  for every step of the way.  Everybody that touches that piece

1  of mail has to sign a logbook to keep track of that.  When it

2  actually gets to the plants in Memphis or larger facilities,

3  there's actually what we call cages where they store that to

4  keep it secure.  It's a very secure type of mail.

5      And it's -- when it's processed from location to

6  location, at the time, it was placed in these white sacks.  And

7  once they're -- once all of the mail is in there, a seal goes

8  on top of the sacks.  It's a metal seal that goes on these

9  sacks.  It's recorded in the book.  So when the next person

10  gets it, they check to make sure the same seal number is

11  correct and that the seal hasn't been broken.

12  **Q.**   The registered mail sacks -- do they look different than

13  the regular mail?

14  **A.**   Yes, sir.  They're just -- they're white sacks.  Those

15  are white sacks, and the other regular mail is not -- is not

16  contained in white sacks.

17  **Q.**   Okay.  What else is put in the registered mail sacks

18  besides registered mail?

19  **A.**   Besides registered mail, the deposits for the day for the

20  post office.  What happens is each post office will come up

21  with their deposit at the end of day.  They will put it in a

22  registered mail piece, assign a registered mail number to it,

23  put it in the sack.  That number has to be written on the book

24  with that seal number.

25      So there's -- there will be a registered mail number that

1    goes with that specific deposit or any other piece of

2    registered mail, but then it goes in that sack.  And we know

3    inside that sack there's, you know, registered mail piece

4    whatever.  You know, it's got all of the different numbers that

5    are supposed to be in that sack.

6         So when it gets to the cage and they open the sack, they

7    can confirm that all of the pieces are in there.  So that

8    deposit goes in that bag with that registered mail, and it's

9    signed off for just like the other registered mail.

10   **Q.**   And where is that taken every day?

11   **A.**   That's taken to that back dock area where the rest -- I'm

12   sorry -- the vestibule area where the rest of the mail is and

13   is left there for the HCR driver to pick up at the end of the

14   day.

15   **Q.**   And the HCR driver is somebody like Mr. Cobbs who we

16   heard from earlier today; right?

17   **A.**   Yes, it is.

18   **Q.**   Where does he take that mail?

19   **A.**   He takes that mail -- he'll then put it on his -- his

20   truck, and he'll take it to the eventual location.  In this

21   instance, it was the Memphis P&DC, the processing center.

22   **Q.**   Who all knows that postal money is transferred to Memphis

23   or any other distribution center in registered mailbags?

24   **A.**   I wouldn't say it's common knowledge.  It would generally

25   just be the people who handle that, whether it's a clerk or the

Mathews - Direct

1   postmaster or supervisor that's actually counting down the

2   drawers and required to make the deposit.

3   **Q.**  As a general rule, is that something the general public

4   would know?

5   **A.**  No, sir, it's not.

6   **Q.**  What about other workers at the post office, like the

7   person that delivers mail to my house, would they know the

8   procedures for sending money through the registered mailbags?

9   **A.**  No, sir, they generally would not.

10   **Q.**  Would a postmaster know that?

11   **A.**  A postmaster would, yes.

12   **Q.**  Do you know the route -- Mr. Cobbs's route that he ran

13   every day?

14   **A.**  Yes, sir.

15   **Q.**  What was that route?  Let's just focus on the afternoon.

16   **A.**  Okay.  In the afternoon, he would start in Dundee,

17   Mississippi.  From Dundee, he would go to Tunica.  Then he

18   would go to Robinsonville.  Then he would go to Lake Cormorant,

19   then to Walls, and then to the Memphis plant.

20   **Q.**  Okay.  I've got a map here of Northwest Mississippi.  Can

21   you see that map from there?

22   **A.**  Pretty much.

23         **MR. LEWIS:**  May we --

24         **THE COURT:**  Excuse me just a second.

25         **MR. MIMS:**  I'm sorry.

1   **BY MR. MIMS:**

2   **Q.**   You said he starts at Dundee?

3   **A.**   Yes, sir.

4   **Q.**   And that's down here; right?

5   **A.**   Yes, sir.

6   **Q.**   And Tunica?

7   **A.**   Yes, sir.

8   **Q.**   And Robinsonville?

9   **A.**   Yes, sir.

10  **Q.**   And Lake Cormorant?

11  **A.**   That's correct.

12  **Q.**   Walls?

13  **A.**   Yes, sir.

14  **Q.**   And on to Memphis?

15  **A.**   Yes, sir.

16  **Q.**   So that route's on Highway 61 corridor?

17  **A.**   Yes, sir.

18  **Q.**   If you would -- we may get into details a little bit

19  longer but -- in a little while, but can you just explain in

20  brief the robbery, what occurred that day?

21  **A.**   Basically, Mr. Cobbs arrived at the post office.  He

22  checked the mail at the front of the post office, and when he

23  came back, an individual was waiting for him on the back dock.

24  The individual assaulted him, tried to lock him in the

25  vestibule.  Mr. Cobbs fought back.

1      The individual hit him with a -- hit him -- I believe hit

2 him with a gun, also maced him, and then eventually took the

3 sacks of registered mail out of the back of the truck.

4 Mr. Cobbs was able to get back in his truck and drive to the

5 front of the post office and make phone calls.

6 **Q.**   Is that all of the information you had at the beginning

7 of your investigation?

8 **A.**   Yes, sir.

9 **Q.**   All right. Can you identify that document marked as

10 G-14?

11 **A.**   Yes, sir. That looks like the deposit slips or the

12 counts for the deposits for each post office -- or for --

13 actually, for the Dundee, the Tunica, and the Robinsonville

14 post office.

15 **Q.**   What do you mean the deposit slips? What are we talking

16 about?

17 **A.**   That was -- like I said, at the end of the day, they

18 would consolidate -- or they would make their deposit. They

19 would take all of the money from the office they had gotten

20 during the day. They would count it all out, make a deposit

21 slip, and that's what they would put in the registered mail

22 sack for that particular post office.

23 **Q.**   Does each post office keep a copy of that deposit slip?

24 **A.**   Yes, sir, they do.

25 **Q.**   Okay. And are those the ones from the date of the

Mathews - Direct

1  robbery?

2  **A.**   Yes, sir, they are.

3  **Q.**   From what locations?

4  **A.**   From Dundee, Robinsonville, and from Tunica.

5  **Q.**   Okay.  Do those deposit slips show the amount of money

6  that was taken that day?

7  **A.**   Yes, sir.

8  **Q.**   What's the approximate total?

9  **A.**   Approximate total is $60,706.

10  **Q.**   How much of that money -- I'm sorry.  Let me take that

11  from you for a second.

12        **MR. MIMS:**  Your Honor, I would offer this into

13  evidence as G-14.

14        **MR. LEWIS:**  No objection.

15        **MR. TRAVIS:**  No objection, Your Honor.

16        **THE COURT:**  G-14 is admitted.

17     (EXHIBIT NO. G-14 ADMITTED INTO EVIDENCE.)

18  BY MR. MIMS:

19  **Q.**   So what is this the deposit slip from?

20  **A.**   That's the Tunica deposit slip.

21  **Q.**   And how much money does it show was taken that was

22  related to the Tunica deposit?

23  **A.**   $25,387.22.

24  **Q.**   Okay.  Where's this deposit slip from?

25  **A.**   That's from Dundee.

1 **Q.** And how much money was in the Dundee registered mail
2 sack?

3 **A.** $252.

4 **Q.** Okay. And then these final three pages -- where are they
5 from?

6 **A.** They were from Robinsonville.

7 **Q.** Let me slide it up where you can see the bottom. How
8 much money was taken from the Robinsonville registered mail
9 sack?

10 **A.** $35,066.47.

11 **Q.** Let me ask you, as part of your investigation, did you
12 attempt to determine if there were any witnesses to this
13 robbery?

14 **A.** Yes, sir, we did.

15 **Q.** Did you find anybody who may have been a witness?

16 **A.** Yes, sir.

17 **Q.** Who would that have been?

18 **A.** A gentleman by the name of Forest Coffman.

19 **Q.** Okay. Now, let's talk about the video for a second.
20 Matter of fact, while we're doing that, I want to get that
21 ready. We're going to play and watch just a little bit of it,
22 if we can. Did you review the video as part of your
23 investigation?

24 **A.** Yes, sir, I did.

25 **Q.** In reviewing the video, how many suspects did you have?

1  **A.**  Based on the video, we believe we have three suspects.

2  **Q.**  What did you determine their roles to be as you watched

3  the video?

4  **A.**  Well, as we watched the video, we saw a white SUV coming

5  from -- it would be from the -- we'll say south along Blythe

6  Road.

7  **Q.**  Hold that thought for one second.

8  **A.**  Okay.

9  (CONFERRING OFF THE RECORD.)

10 **BY MR. MIMS:**

11 **Q.**  I'm going to play the video.  We're going to kind of skip

12 ahead a few places, but I just want to ask you a few questions

13 as we go through it.

14 (PLAYING VIDEO, EXHIBIT NO. G-1.)

15 **BY MR. MIMS:**

16 **Q.**  Now, you mentioned what about a white car?

17 **A.**  There was a white SUV that you'll see that comes from --

18 comes from right to left on the screen.  We saw that vehicle

19 come from right to left.  It goes out of screen to the left.

20 And then we see it back in screen stopped behind -- beside the

21 post office where an individual gets out.

22 **Q.**  Let me stop you there for one second.  Now, we're going

23 to see that in just a second; correct?

24 **A.**  Yes, sir.

25 **Q.**  Okay.  Matter of fact, is that the white vehicle you're

1    talking about?

2    **A.**   Yes, sir, it is.

3    **Q.**   In your investigation, were you able to determine what

4    type of vehicle that appeared to be?

5    **A.**   Yes, sir.  It appeared to be a Yukon XL or a Chevy

6    Suburban.

7    **Q.**   In a minute we see that vehicle come back.  And do we see

8    an individual get out of the vehicle?

9    **A.**   Yes, sir, we do.

10   **Q.**   Now, why is that important to you as an investigator?

11   What does that appear to you?

12   **A.**   It appears to me that there is an individual in the white

13   SUV dropping another person off to commit the robbery.

14   **Q.**   Okay.  And when the individual gets out of the SUV, what

15   does he do?

16   **A.**   He runs to the back of the post office.  You see him

17   walking back and forth as if he's waiting on something.

18   **Q.**   And is that the individual that we later see assault

19   Mr. Cobbs?

20        **MR. LEWIS:**  Excuse me, Your Honor.  This is getting

21   into what we talked about earlier.  Just -- the video speaks

22   for itself.

23        **THE COURT:**  It's sustained.

24        **MR. MIMS:**  Okay.

25   **BY MR. MIMS:**

Mathews - Direct

1  **Q.**  So is that the white SUV now leaving the scene?

2  **A.**  Yes, sir.

3  **Q.**  All right.  Do we see that vehicle again later?

4  **A.**  Yes, sir, we do.

5      **MR. MIMS:**  So let's fast-forward to -- let's go about

6  two or three minutes forward to about the time the postal truck

7  comes in.  Let's back it up just a little bit.  That's good

8  right there.

9  **BY MR. MIMS:**

10  **Q.**  Now, do you see a vehicle entering the screen?

11  **A.**  Yes, sir, I do.

12  **Q.**  How would you describe that vehicle?

13  **A.**  A red, maroonish sedan type vehicle.

14  **Q.**  Okay.  Is there anything about the actions of that

15  vehicle that's important to you in your investigation?

16      **MR. LEWIS:**  Objection, Your Honor.

17      **MR. MIMS:**  Your Honor, if I may --

18      **THE COURT:**  No, not here.  Approach, please.

19      (PAUSED VIDEO.)

20      (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

21      **THE COURT:**  Okay.

22      **MR. LEWIS:**  It's my objection to him providing expert

23  testimony.  Why is this important?  What's your interpretation?

24  In identifying the vehicle, he did a good job.  He said a red

25  or maroonish sedan.  I understand that's -- but to identify the

1  make, model of this vehicle, I think it's inappropriate, and

2  that is for the jury to determine.

3       **MR. TRAVIS:**  Ayodele joins in.

4       **THE COURT:**  Okay.  Thank you.

5       **MR. MIMS:**  Your Honor, if I may, I think I should be

6  allowed to ask him what he saw that is important in the

7  investigation and why it led him to do further -- take further

8  steps in the investigation, like looking for somebody who has a

9  similar red vehicle or similar white vehicle or how many

10  suspects he identified.

11       I'm trying really hard to make sure I follow what the

12  Court said yesterday.  And I don't mean to overstep, but I do

13  think it's important what did he see that was important to his

14  investigation.

15       **THE COURT:**  But let him -- let him say that because I

16  sense, too, that you are leading him a little bit to get the

17  information that you are trying to elicit.  And I understand

18  that, but he needs to qualify the information of why he thinks

19  it's important.

20       **MR. LEWIS:**  I suspect that he's going to say that

21  vehicle was a lookout, and I object to that.

22       **THE COURT:**  I will sustain that.  Uh-huh.

23       (END OF BENCH CONFERENCE.)

24       **MR. MIMS:**  Let's go ahead.  Let's back up just for a

25  second.  There we go.  That's good right there.  Go ahead and

1  play it.

2      (PLAYING VIDEO.)

3  **BY MR. MIMS:**

4  **Q.**  Mr. Mathews, just yes or no.  Was that vehicle of

5  interest to you?

6  **A.**  Yes.

7  **Q.**  All right.  Based on what you see from the video, does

8  it -- did you think that vehicle had any involvement?  Was that

9  of interest?

10  **A.**  Yes, sir.

11  **Q.**  Did you later attempt to determine who owned that

12  vehicle?

13  **A.**  Yes, sir.

14      **MR. MIMS:**  Let's go ahead and skip forward just a

15  little bit until that red car comes back in.  There we go.

16  That's good.  Let's go ahead and play it from there.

17  **BY MR. MIMS:**

18  **Q.**  Do you see the red car in the video again?

19  **A.**  Yes, sir, I do.

20  **Q.**  Was that -- seeing that car again important to you in

21  your investigation?

22  **A.**  Yes, sir.

23  **Q.**  Okay.  We watched this video earlier so we're not going

24  to belabor the point.  You sat here and watched it earlier in

25  the courtroom; right?

1  **A.**    Yes, sir.

2  **Q.**    Do you later see the white SUV or a white SUV enter the

3  video?

4  **A.**    Yes, sir.

5  **Q.**    How many times?

6  **A.**    Twice more.

7  **Q.**    What does it do?  Describe it.

8  **A.**    It's coming again from -- from right to left.  It comes,

9  goes out of view again to the left, and then a short time later

10 you see it coming back again from left to right and exit out of

11 the frame again.

12 **Q.**    Did that appear to you to be the same white SUV you'd

13 seen earlier?

14 **A.**    Yes, sir, it did.

15 **Q.**    Seeing that vehicle again, was that important to you in

16 your investigation?

17 **A.**    Yes, sir, it was.

18     (STOPPED VIDEO.)

19 **BY MR. MIMS:**

20 **Q.**    What did you do based on seeing that?

21 **A.**    We did a bunch of stuff.  We -- one of the things we did,

22 particularly in reference to the vehicles, we started

23 requesting information on rental cars in the area, information

24 from the tax assessor's office, basically where it would tell

25 vehicle registrations.  We got all of that information from the

1   fusion center in Mississippi and started trying to identify

2   owners of vehicles that were similar to that.

3   **Q.**   I ask you this question.  After your review of the video,

4   how many -- how many suspects were you thinking about at that

5   time?

6   **A.**   We believe it was at least three.

7   **Q.**   So you mentioned Mr. Coffman.  Did any of your colleagues

8   interview Mr. Coffman shortly after this?

9   **A.**   The sheriff's deputy actually initially interviewed

10  Mr. Coffman, but then, subsequently, an inspector interviewed

11  Mr. Coffman.

12  **Q.**   Okay.  Did Mr. Coffman see -- let me ask you this.  Could

13  Mr. Coffman identify anybody at that time that may have been

14  involved?  Just a yes or no.

15           **MR. LEWIS:**  I'll let him ask that question.

16           **THE COURT:**  Okay.

17  **BY MR. MIMS:**

18  **Q.**   Yes or no.  Could Mr. Coffman identify anybody at that

19  time that he -- that he may have seen that day?

20  **A.**   No, he could not identify anybody.  No.

21  **Q.**   So after watching the video, what else did you do to

22  further your investigation?

23  **A.**   At that point, we tried a bunch of different

24  investigative techniques.  One of them was called a tower dump

25  where we're getting information from cell phones that were used

1   on the towers in the area.  We're re-running the route to look

2   for any evidence that might have been dropped along the way,

3   looking for people to interview, looking for other surveillance

4   video.  We're looking for vehicles that matched that

5   description, a lot of different investigative techniques that

6   we were looking for.

7        We were -- you know, based on what was taken -- it was

8   just the registered bags -- we were also, you know,

9   interviewing all of the postal employees.  We were getting

10  information on registered mail employees in Memphis, anything

11  that might show some type of connection to the post office who

12  would have that knowledge what was in those bags.

13  **Q.**   Let me ask you this question.  Could you identify any of

14  the potential suspects at that time?

15  **A.**   No, sir, not at that time.

16  **Q.**   Okay.  So you mentioned a tower dump a minute ago.  What

17  was the purpose of a tower dump?

18  **A.**   Basically, the tower dump gets or provides information on

19  all cell phones that were using that particular cell tower at

20  that time of day.

21  **Q.**   Why would you do that?

22  **A.**   It would let us know -- I mean, if the individuals were

23  on cell phones, we would be able to see phone contacts between

24  the cell phones.

25  **Q.**   Okay.  What did you eventually do to really get this

1  investigation going?

2  **A.**   Well, in November 2018, we learned of a new investigative

3  technique or search warrant that's through Google.  Google

4  houses a lot of data information regarding accounts; so we

5  submitted a search warrant to Google.  We actually -- it's

6  called a geofence search warrant, where we drew a map around

7  the post office and requested that Google provide us any

8  information regarding any devices that activated on their

9  accounts within that specified fence, that geofence.

10 **Q.**   When you say a "geofence," is that like a box you draw?

11 **A.**   Yes.  Basically, it was a box.  And the four points of

12 the box were latitude/longitude coordinates, and we requested

13 any devices activated within that box.

14 **Q.**   Did Google send you any information responsive to that

15 search warrant?

16 **A.**   Yes, they did.

17 **Q.**   What was the first information that you received?

18 **A.**   The first information we received was -- it was

19 anonymized information.  It had account numbers -- Google

20 account numbers, and it showed us how many times these

21 particular devices activated between this 5:00 and 6:00 p.m.

22 time period on February 5th, 2018.

23 **Q.**   You mentioned 5:00 to 6:00.  Was that the time period

24 that you put on the geofence warrant?

25 **A.**   Yes, sir, it was.

1  **Q.**   Okay.  So I'm going to come back to that in a minute.

2  They did identify some devices?  Google did?

3  **A.**   Yes, sir.  They identified three devices.

4  **Q.**   Okay.  Did you get additional information from Google --

5  **A.**   Yes, sir.

6  **Q.**   -- in a further step?

7  **A.**   Yes, sir.

8  **Q.**   Okay.  What other steps did y'all take as part of this

9  warrant?

10  **A.**   As part of this warrant, we -- like I said, we got the

11  additional information that provided the account holder

12  information for those devices that were within that geofence.

13  **Q.**   Okay.  When you say the account holder's information,

14  what does that mean?

15  **A.**   It's the registered account information that Google has

16  regarding the Google ID devices that were within the geofence.

17  It has sometimes phone numbers, sometimes e-mail addresses,

18  names, whatever information the customer puts in.

19  **Q.**   I'm going to hand you a wallet drive marked as G-3 and

20  some pages that are marked G-3C.  Can you identify what -- have

21  you reviewed what's on that wallet drive as G-3?

22  **A.**   Yes, sir.

23  **Q.**   What is that?

24  **A.**   That's the records that we received from Google.

25  **Q.**   For each step of the way with the Google geofence

Mathews - Direct

1  warrant?

2  **A.**   Yes, sir.

3  **Q.**   Okay.  Now, there was one part, as you reviewed those a

4  little while ago, that was missing -- is that right? -- that I

5  failed to put on the wallet drive?

6  **A.**   Yes, sir.

7  **Q.**   What was missing?

8  **A.**   That was the letter you provided me here.  It was the

9  original letter from November 21st that basically just says

10 here's the information that we provided.

11 **Q.**   And was that the step one information?

12 **A.**   Yes, sir.

13 **Q.**   Okay.  That was just inadvertently left off of the wallet

14 drive, but all of it combined is what Google sent you in

15 regards to the geofence warrant?

16 **A.**   Yes, sir.  That's correct.

17        **MR. MIMS:**  Your Honor, we'd offer that into evidence

18 as G-3 and G-3C.

19        **MR. LEWIS:**  No objection.

20        **MR. TRAVIS:**  No objection, Your Honor.

21        **THE COURT:**  It will be received.

22    (EXHIBIT NOS. G-3 AND G-3C ADMITTED INTO EVIDENCE.)

23        **MR. MIMS:**  Your Honor, I have here G-3A and G-3B.

24 These are documents that are on the wallet drive that -- to

25 make it easier to handle and show the witness, I have just

1    printed paper copies.  They're in evidence as G-3.  I'd like to

2    offer G-3A and B into evidence.

3          **MR. LEWIS:**  No objection.

4          **MR. TRAVIS:**  No objection, Your Honor.

5          **THE COURT:**  They'll be received.

6       (EXHIBIT NOS. G-3A AND G-3B ADMITTED INTO EVIDENCE.)

7    **BY MR. MIMS:**

8    **Q.**    Mr. Mathews, can you identify this document that's G-3A?

9          **THE COURT:**  Can you see it?

10          **THE WITNESS:**  Yeah.

11          **THE COURT:**  Okay.

12   **BY MR. MIMS:**

13   **Q.**    What is that?

14   **A.**    That's -- that's the initial information we received from

15   Google.

16   **Q.**    Okay.  Is that what we call a step one --

17   **A.**    Yes, sir.

18   **Q.**    -- information?  So what information are they giving you

19   here?

20   **A.**    The first column was the device ID.  That's their --

21   their account number.  The date is, obviously, February 5th.

22   The time of the -- or the time of the hit within that

23   geofence -- that's all in military time, and it's been

24   converted to military time -- I'm sorry -- converted to Central

25   Standard Time, which would be -- say, the first one is 5:22.

1    And then it provides latitude and longitude of the -- the
2    location hit.
3    **Q.**    So how many different devices do we have here?
4    **A.**    There are three.
5    **Q.**    Okay.  And fair to say that that's device 859, 479, and
6    768?
7    **A.**    Yes, sir.  That's correct.
8    **Q.**    Okay.  And so for two of those devices, do we have more
9    than one -- I've been calling them a hit.  That may not be the
10   right word.  But more than one return?
11   **A.**    Yes sir.  For 859 and 768, there's more than one return.
12   **Q.**    And these are all between 5:00 and 6:00 p.m.?
13   **A.**    Yes, sir.
14   **Q.**    That's what your warrant asked for; correct?
15   **A.**    That's correct.
16   **Q.**    So what did you do to determine whose devices these were?
17   **A.**    I went back to Google and got additional information
18   regarding the account holders.
19   **Q.**    All right.  And this is G-3B.  Is this the information
20   received from Google at the end of the process?
21   **A.**    Yes, sir, it is.
22   **Q.**    So let me just ask you a question.  How many devices do
23   we actually see on here?
24   **A.**    There's three.
25   **Q.**    Okay.  So keydot@CSV, is that a device?

1   **A.**    No, sir, it's not.

2   **Q.**    Okay.  The devices are what?

3   **A.**    The bleek2004, jamarrsmith33, and permanentwavesrecords.

4   **Q.**    All right.  Now, you see this page here as well?

5   **A.**    Yes, sir.

6   **Q.**    Was that part of the Google geofence search warrant

7   return?

8   **A.**    Yes, sir.

9   **Q.**    And what does that do?

10  **A.**    That gives more detail subscriber information.

11  **Q.**    All right.  Pertaining to who?  Pertaining to which of

12  these accounts?

13  **A.**    That's the bleek2004.

14  **Q.**    Okay.  And we see bleek2004; correct?

15  **A.**    Yes, sir.  That's correct.

16  **Q.**    And who does it have for the subscriber information for

17  bleek2004?

18  **A.**    Gilbert McThunel.

19  **Q.**    All right.  Does it also provide a phone number?

20  **A.**    Yes, sir, it does.

21  **Q.**    Where's that phone number?

22  **A.**    On the SMS line.

23  **Q.**    It's right here (indicating).  And what's the last four

24  of that phone number?

25  **A.**    7511.

Mathews - Direct

1  **Q.**   Okay.  And what is this page?

2  **A.**   That's more account information for the jamarrsmith33

3  account.

4  **Q.**   And so it shows jamarrsmith33.  The subscriber is Jamarr

5  Smith.  Is that fair to say?

6  **A.**   Yes, that's what it says.

7  **Q.**   And this does not actually have a phone number on it,

8  does it?

9  **A.**   It does not.

10  **Q.**   So once you got that information, what did you do with

11  it?

12  **A.**   A bunch of investigative steps we took.  We looked

13  through this database that is called CLEAR.  It basically is a

14  website -- restricted access website that attorneys can use,

15  law enforcement, other government agencies for certain

16  purposes.  We have restricted access depending on what your --

17  your priorities are.  We use that access.

18      It basically gets information from credit bureau reports,

19  any other kind of financial accounts you have from motor

20  vehicle records, from a lot of different public databases, land

21  records, different things like that, and provides a lot of

22  information in one place about an individual or a business or

23  whatever you're trying to -- trying to do research on.

24      So we used that looking, obviously, for the Jamarr and

25  Gilbert McThunel accounts or individuals.  We also looked at

1   open Facebook pages, did searches through that to -- to help

2   further identify them.

3   **Q.**   So you were trying to identify who?

4   **A.**   Jamarr Smith and Gilbert McThunel.

5   **Q.**   You didn't know at that time who they were, did you?

6   **A.**   No, sir, we didn't.

7   **Q.**   Were you able to narrow it down and figure it out?

8   **A.**   Yes, sir.

9   **Q.**   Who did you find -- or where was Jamarr Smith and Gilbert

10   McThunel?

11   **A.**   We located both of them as residents of Batesville,

12   Mississippi.

13   **Q.**   So let me go back for one second. If you look at this,

14   there's a third account. It says permanentwavesrecords. First

15   of all, what was the time that somebody associated with that

16   account registered in this geofence box?

17   **A.**   That's the 479, the last three digits for the device ID,

18   and it was at 1758, which would have been 5:58 in the evening.

19   **Q.**   What was the approximate time this robbery was over with?

20   **A.**   5:35.

21   **Q.**   Did you try to figure out who permanentwavesrecords was?

22   **A.**   Yes, sir, but we were not successful.

23   **Q.**   So you identified -- you looked into seeing who is Jamarr

24   Smith and Gilbert McThunel; is that right?

25   **A.**   That's correct.

1  **Q.**   What else did you do to try to identify any other

2  suspects?

3  **A.**   We started looking at that tower dump information that I

4  discussed earlier.  We start looking to see -- we've got two

5  phone number -- one phone number now.  We're trying to see what

6  information we can associate, what numbers they're calling,

7  who's back and forth -- is going on between the individuals at

8  that -- during the time frame of the robbery.

9  **Q.**   Okay.  Based on reviewing all of that, did you develop a

10  third suspect?

11  **A.**   Yes, we did.

12  **Q.**   Who is that?

13  **A.**   Mr. Ayodele.

14  **Q.**   Okay.  And is that Thomas Iroko Ayodele?

15  **A.**   Yes, sir, it is.

16  **Q.**   So how did you develop him as a suspect?

17  **A.**   We were able to determine from Facebook profiles and

18  from phone -- well, from Facebook profiles we determined him

19  and Mr. Smith were friends.  There were posts on Facebook

20  showing them together.  And then we were also able to determine

21  that their phones were talking during the time period of the

22  robbery.

23  **Q.**   I meant to ask you a minute ago and I forgot.  On this

24  wallet drive marked G-3, did you initial it and date it?

25  **A.**   Yes, sir.

Mathews - Direct

1　**Q.**　Did you also seek any other search warrants as part of
2　your investigation?

3　**A.**　Yes, sir.

4　**Q.**　What was the next search warrant you did?

5　**A.**　We got several search warrants.　We got Facebook search
6　warrants for Mr. -- Mr. Ayodele and Mr. Smith.　We got search
7　warrants from the various phone companies from the phones that
8　we'd identified, and we got additional Google search warrants.

9　**Q.**　What was the other Google search warrant you asked for?

10　**A.**　The second follow-up search warrant was search warrant
11　for Mr. McThunel and Mr. -- I'm sorry -- Mr. McThunel and
12　Mr. Smith's complete Google account records.　Like I said, we
13　had originally looked for the time period from 5:00 to 6:00
14　on -- I'm sorry -- February 5th, and then we went back and
15　asked for records from January 1st of 2018 until -- I believe
16　it was March or April of 2018.

17　**Q.**　With this second Google search warrant, what information
18　specifically were you seeking?

19　**A.**　We were seeking additional -- we were seeking all of
20　their information about their Google accounts, all of the
21　accessories that they might have.　Any chats, any location
22　history, and additional -- obviously, the additional location
23　history that we didn't get that was outside that one-hour time
24　frame but any other chats or other information that was
25　associated with that Google account.

Mathews - Direct

1  **Q.**   Did you receive a response from Google for your search

2  warrant regarding Smith and McThunel?

3  **A.**   Yes, sir, we did.

4  **Q.**   All right.  Have you reviewed this wallet drive marked

5  G-4?

6  **A.**   Yes, sir.

7  **Q.**   Are these your initials and today's date on it?

8  **A.**   They are.

9  **Q.**   All right.  Is this a copy of the records that you

10  received for your second Google search warrant?

11  **A.**   Yes, sir.

12       **MR. MIMS:**  Your Honor, I'd offer this into evidence as

13  G-4.

14       **THE COURT:**  Any objection?

15       **MR. LEWIS:**  No objection.

16       **MR. TRAVIS:**  No objection, Your Honor.

17       **THE COURT:**  Be received.

18    (EXHIBIT NO. G-4 ADMITTED INTO EVIDENCE.)

19       **MR. MIMS:**  Your Honor, for the record, I also have

20  G-4A I would offer, and this is just two printed out pages from

21  G-4.

22       **THE COURT:**  Any objection?

23       **MR. LEWIS:**  No objection.

24       **MR. TRAVIS:**  No objection.

25       **THE COURT:**  It will be received.

Mathews - Direct

1    (EXHIBIT NO. G-4A ADMITTED INTO EVIDENCE.)

2    **BY MR. MIMS:**

3    **Q.**    Mr. Mathews, I'm showing you G-4A.  What is this

4    information?

5    **A.**    It's the subscriber information for the bleek2004 account

6    showing Gilbert McThunel as the subscriber.

7    **Q.**    And that is the same information that Google had

8    previously sent you in regards to your earlier search warrant

9    showing you who that bleek2004 account belonged to; correct?

10   **A.**    Yes, sir.

11   **Q.**    Okay.  And this is the second part of G-4A.  What is

12   that?

13   **A.**    That's the subscriber information for the jamarrsmith33

14   account, which shows Jamarr Smith as the subscriber.

15   **Q.**    And that's the same subscriber that showed on the first

16   Google warrant; correct?

17   **A.**    Yes, sir.  That's correct.

18           **MR. MIMS:**  Ms. Bailey, if you would, please go into

19   Exhibit G-4 on the wallet drive, and I want to go into -- let's

20   go into bleek location history.  Let's make that big on the

21   screen, if we can.  Thank you.

22   **BY MR. MIMS:**

23   **Q.**    So this is bleek2004; right?

24   **A.**    Yes, sir.

25   **Q.**    And who did you determine that belonged to?

Mathews - Direct

1   **A.**    To Gilbert McThunel.

2   **Q.**    All right.

3          **MR. MIMS:**  Let's take Column F and slide it over where

4   we can read what's on Column F.  That's good.

5   **BY MR. MIMS:**

6   **Q.**    Okay.  You see that Column F?

7   **A.**    Yes, sir.

8   **Q.**    And what does it say for the heading?

9   **A.**    Device Tag.

10  **Q.**    Okay.  What's the last three numbers of that device tag?

11  **A.**    859.

12  **Q.**    Okay.  Actually, let's read out the whole number.

13  **A.**    It's 1091690859.

14  **Q.**    I'm going to show you Exhibit G-3A.  G3-A was from the

15  step one of the geofence warrant; right?

16  **A.**    Yes, sir.  That's correct.

17  **Q.**    That's where they sent you anonymous device -- the

18  devices were anonymized so it didn't show the name.  It just

19  showed a device tag number; right?

20  **A.**    That's correct.

21  **Q.**    What's the number on there for the -- at the top?

22  **A.**    1091690859.

23  **Q.**    That's the same number we see here on the device tag for

24  the information that came back on Gilbert McThunel's search

25  warrant to Google; right?

1    **A.**    Yes, sir.

2    **Q.**    Okay.  Now, let's go -- also, one other thing.  On the

3    left, it shows latitude and longitude.  Do you see that?

4    **A.**    Yes, sir.

5    **Q.**    That's simply location information provided by Google;

6    right?

7    **A.**    That is correct.

8    **Q.**    All right.

9          **MR. MIMS:**  Let's go to the Jamarr Smith Excel

10   spreadsheet.

11   **BY MR. MIMS:**

12   **Q.**    All right.  Does this show the same -- I say the same.

13   Does this show location information for Mr. Smith's device?

14   **A.**    Yes, it does.

15          **MR. MIMS:**  And let's slide over to Column F, the

16   device tag.

17   **BY MR. MIMS:**

18   **Q.**    I want you to read just from G-3A you have there the

19   information you received from Google in step one of the

20   geofence.  The bottom device that had three hits, read off that

21   device.

22   **A.**    1577088768.

23   **Q.**    Is that the same device tag we see -- that came back on

24   Jamarr Smith?

25   **A.**    Yes, sir.

1    **Q.**   So at this point, who are your three suspects?

2    **A.**   At this point, it's Jamarr Smith, Gilbert McThunel, and

3    Thomas Iroko Ayodele.

4    **Q.**   What did you do at that point to further your

5    investigation?

6    **A.**   Like I said, we got other warrants, the Facebook

7    warrants.  We got warrants for their phone records.  We did

8    CLEAR reports.  We did more research on that.  And we started

9    looking for communications between the three devices from the

10   phone records.

11   **Q.**   What about the vehicles that were involved?

12   **A.**   We also -- from the CLEAR and other records, we were able

13   to determine that Mr. Ayodele had a 2007 Yukon XL, white in

14   color, registered to him, and also from the records that we

15   received from Panola County indicating that vehicle was

16   registered to him.

17        And then we also got information from the CLEAR records

18   initially on Mr. McThunel showing that he owned a 2013 Hyundai

19   Sonata, red in color.  And we got additional information from

20   other records showing that he was the owner of that vehicle.

21   **Q.**   Let's talk about the white SUV for a minute, if I can.

22   I show you G-15, 16, and 17.  If you would, can you identify

23   what those are?

24   **A.**   Do you want me to go through them one by one?

25   **Q.**   Yeah.  Just start with G-15.  What is G-15?

1  **A.**   G-15 is a comparison of a screenshot of the white SUV in

2  the video to a 2007 Yukon XL, white in color, that we had

3  found.

4  **Q.**   So in G-15, you have a picture of the SUV in the video?

5  **A.**   Correct.

6  **Q.**   And also just a stock white 2007 SUV?

7  **A.**   Yes, sir.

8  **Q.**   Okay.  That's not Mr. Ayodele's SUV?

9  **A.**   That's correct.

10  **Q.**   Okay.  What is G-16?

11  **A.**   G-16 is a photo that we obtained from Facebook page with

12  Mr. Ayodele and I believe his father standing in front of a

13  white SUV.

14  **Q.**   And what is G-17?

15  **A.**   G-17 is another picture, a comparison of the white SUV

16  from the surveillance video and a picture of Mr. Smith standing

17  in front of a white SUV.

18  **Q.**   You said it was Mr. Smith standing in front of a white

19  SUV?

20  **A.**   Yes.

21  **Q.**   Now, where did that picture come from?

22  **A.**   From Mr. Ayodele's Facebook page.

23        **MR. MIMS:**  Your Honor, I'm going to get to 15 in a

24  minute, but for now I'm going to offer G-16 and 17 into

25  evidence.

1    **THE COURT:**  16 and 17.  Any objection?

2    **MR. TRAVIS:**  No objection, Your Honor.

3    **MR. LEWIS:**  No objection.

4    **THE COURT:**  Both will be received.

5    (EXHIBIT NOS. G-16 AND G-17 ADMITTED INTO EVIDENCE.)

6    BY MR. MIMS:

7    **Q.**    And since the jury has not seen this yet, here is G-16.

8    Where was that picture found?

9    **A.**    On Mr. Ayodele's Facebook page.

10   **Q.**    And do you see Mr. Ayodele in that picture?

11   **A.**    Yes, sir.  He's the gentleman on the left.

12   **Q.**    Okay.  And G-17, what's the picture on the right?

13   **A.**    That's the screenshot from the surveillance video of the

14   white SUV.

15   **Q.**    Now, what's the picture on the left?

16   **A.**    It's a picture of Mr. Smith standing in front of a white

17   SUV.

18   **Q.**    And that was on whose Facebook page?

19   **A.**    Mr. Ayodele's.

20          **MR. MIMS:**  Your Honor, I'd also offer into evidence

21   G-15 at this time.

22          **THE COURT:**  Any objection?

23          **MR. LEWIS:**  Which one was that?  I'm sorry.

24          **MR. MIMS:**  It's a stock photo.

25          **MR. LEWIS:**  Okay.  No objection.

Mathews - Direct

1        **MR. TRAVIS:**  No objection, Your Honor.

2        **THE COURT:**  Okay.  It will be received.

3       (EXHIBIT NO. G-15 ADMITTED INTO EVIDENCE.)

4   BY MR. MIMS:

5   **Q.**   And G-15, again, we have the still shot from the video on

6   the right; is that correct?

7   **A.**   Yes, sir, it is.

8   **Q.**   Now, what's the picture on the left?

9   **A.**   It's a stock photo of a white Yukon XL 2007.

10  **Q.**   Okay.  That's not Mr. Ayodele's vehicle?

11  **A.**   That's correct.  It's not Mr. Ayodele's.

12  **Q.**   But it's the same make and model?

13  **A.**   Yes, sir.

14  **Q.**   And color?

15  **A.**   Yes, sir.

16  **Q.**   Did you take any photographs yourself of Mr. Ayodele's

17  vehicle?

18  **A.**   Yes, sir, I did.

19  **Q.**   Where did you take those at?

20  **A.**   In Batesville, Mississippi, outside a business called

21  Twin's Shift Shop.

22  **Q.**   Okay.  Whose business is Twin's Shift Shop?

23  **A.**   Jamarr Smith.

24  **Q.**   When did you take these photographs?

25  **A.**   In 2019.

Mathews - Direct

1  **Q.** What did you find -- what were you taking pictures of

2  that day?

3  **A.** Of the vehicle at Mr. Smith's place of business.

4  **Q.** All right. Whose vehicle was it?

5  **A.** Mr. Ayodele's.

6  **Q.** How do you know it was his vehicle?

7  **A.** Based on the CLEAR records, the registration records,

8  and, ultimately, we had a conversation with Mr. -- interview

9  with Mr. Ayodele where he advises that he had a white Yukon XL

10 and it was located at Mr. Smith's place of business.

11       **MR. MIMS:** Your Honor, I've got a four-page exhibit,

12 Collective G-18, I'd offer into evidence.

13       **THE COURT:** G-18? Any objection?

14       **MR. TRAVIS:** No objection, Your Honor.

15       **THE COURT:** Four pages?

16       **MR. MIMS:** Yes, Your Honor.

17       **MR. LEWIS:** No objection.

18       **MR. TRAVIS:** No objection, Your Honor.

19       **THE COURT:** It will be received.

20     (EXHIBIT NO. G-18 ADMITTED INTO EVIDENCE.)

21 **BY MR. MIMS:**

22 **Q.** Mr. Mathews, what is this first picture of?

23 **A.** That's Mr. Smith's business, Twin's Shift Shop.

24 **Q.** That's where all of these pictures were taken?

25 **A.** Yes, sir.

1   **Q.**   Now, you took more than just four pictures that day,

2   didn't you?

3   **A.**   Yes, sir.

4   **Q.**   We just pulled some of them out?  A few?

5   **A.**   Yes, sir.  That's correct.

6   **Q.**   What's in that picture there?

7   **A.**   That's the rear of Mr. Ayodele's vehicle, showing the

8   vehicle tag.

9   **Q.**   Is that his tag number as you know it from your research?

10   **A.**   Yes, sir, it is.

11   **Q.**   What's this picture?

12   **A.**   That's Mr. Ayodele's -- it's a front view of

13   Mr. Ayodele's SUV.

14   **Q.**   Same thing with this?

15   **A.**   Yes, sir.

16   **Q.**   So all pictures of Mr. Ayodele's SUV at Jamarr Smith's

17   transmission shop?

18   **A.**   That's correct.

19   **Q.**   So let's talk about the -- let's talk about the red

20   Hyundai.  What did you do to identify who may have owned the

21   red Hyundai?

22   **A.**   Again, we went to our CLEAR records, and we indicated

23   that Mr. McThunel had owned a red Hyundai.  At that time, we

24   noticed that the ownership had changed, and we were able to

25   determine that that vehicle had been traded in on February 8,

1    2018, at Kirk Automotive Dealership in Grenada, Mississippi.

2    **Q.**    So did you obtain records from Kirk Auto Company in

3    Grenada?

4    **A.**    Yes, sir, we did.

5    **Q.**    And what did you find out?

6    **A.**    We found out that Mr. McThunel had traded in that vehicle

7    at Kirk Auto.

8    **Q.**    I'm handing you a multi-page exhibit that's marked G-11.

9    Could you identify that?

10   **A.**    Yes, sir.  This is part of the documents that we obtained

11   from Kirk Auto.

12   **Q.**    You said part.  It's just an excerpt from the documents;

13   right?

14   **A.**    That's correct.

15   **Q.**    Not the entire file?

16   **A.**    Yes, sir.

17   **Q.**    And which documents?  The ones from Kirk Auto?

18   **A.**    Yes, sir.

19   **Q.**    What does it pertain to?

20   **A.**    It pertains to Mr. McThunel's trade-in of the Hyundai

21   Sonata.

22            **MR. MIMS:**  Your Honor, I offer G-11 into evidence.

23            **MR. CHINICHE:**  Your Honor, I have an objection.  May

24   we approach?

25            **THE COURT:**  You may.

1    (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

2    **MR. CHINICHE:**  I believe that Mr. Mims is going to try

3 to introduce the records that we had a hearing on this morning.

4 I'm just going to renew that motion.  And I understand the

5 Court's ruling.  Can I -- I would like to take a look at the

6 records.  I believe -- I was given a certificate of

7 authenticity.  My objection is not to the authenticity.

8    **THE COURT:**  Okay.

9    **MR. CHINICHE:**  But last week or so, someone at Kirk

10 certified these records as being true and correct, but this

11 exhibit that is attempted to be introduced into evidence is not

12 the entire exhibit.  And so under Rule 106, I call it the rule

13 of completeness, I believe everything has got to come in.

14    **MR. MIMS:**  Your Honor, I would be happy to put the

15 whole 42 pages in.  I was trying to shorten this.

16    **THE COURT:**  If that's the objection, all 42 pages will

17 come in.

18    **MR. CHINICHE:**  Can you do that?

19    **MR. MIMS:**  I have got them right there.  What I would

20 like to do is -- that will be fine.  I will just grab the whole

21 42 pages.  I'll show them to Mr. Chiniche here just one second

22 and put the whole thing in.

23    **MR. CHINICHE:**  Do we need to take a break?

24    **MR. MIMS:**  No.  I'm ready.  Just give me a second.

25    **THE COURT:**  Do you wish to note for the record a

1  continuing objection?

2       **MR. CHINICHE:**  Yes, Your Honor.

3       **THE COURT:**  Okay.  Thank you.

4    (END OF BENCH CONFERENCE.)

5       **THE COURT:**  They're going to need a moment to get some

6  records together.  If you want to take a break by just

7  standing, you're welcome to do that.  Stand up and stretch.

8    (PAUSE IN PROCEEDINGS.)

9  **BY MR. MIMS:**

10  **Q.**  Mr. Mathews, to speed this up just a little bit, what

11  I've now marked as G-11 is the entire -- I think it's 42 pages.

12  Don't hold me to that -- but I believe 42-page record that you

13  received from Kirk Auto Company?

14  **A.**  Yes, sir.

15  **Q.**  Okay.  So I want to go through a few things.  What did

16  you find from the records with Kirk?  What did you see?

17  **A.**  Those records -- there was Mr. McThunel's name showing as

18  the owner of the vehicle.  I believe there was also a photocopy

19  of his driver's license confirming it was him.  On the -- some

20  of the documents listed his phone number.  The number ended in

21  7511 on there.  Plus, the bleek2004 e-mail account was on the

22  record.

23  **Q.**  Okay.

24       **MR. MIMS:**  For the record, Your Honor, I've got blue

25  tabs on here where I've tabbed the pages that I -- to make it

Mathews - Direct

1   easier to find.

2           **THE COURT:** Okay.

3           **COURTROOM DEPUTY:** Has it been admitted?

4           **THE COURT:** Yes. It was admitted provided it was all

5   42 pages.

6           **MR. CHINICHE:** It was admitted at the bench, Your

7   Honor.

8           **THE COURT:** Subject to the conversation at the bench,

9   it's admitted.

10          **MR. CHINICHE:** Yes, Your Honor.

11      (EXHIBIT NO. G-11 ADMITTED INTO EVIDENCE.)

12  BY MR. MIMS:

13  **Q.**   Who is this?

14  **A.**   Gilbert McThunel.

15  **Q.**   What's that address?

16  **A.**   772 Tubbs in Batesville, Mississippi.

17  **Q.**   Is that consistent with the address that you had also

18  found for Mr. McThunel?

19  **A.**   Yes, sir, it is.

20  **Q.**   All right. Does it show a phone number for him?

21  **A.**   Yes, sir. There's an H and a C. They both indicate

22  662-710-7511.

23  **Q.**   Does it also have an e-mail account?

24  **A.**   Yes, sir. Bleek2004@gmail.com.

25  **Q.**   Okay. And is that the same e-mail account associated

1  with the Google records you received?

2  **A.**   Yes, sir, it is.

3  **Q.**   What was the date that this trade-in occurred?

4  **A.**   February 8, 2018.

5  **Q.**   Okay.  And does it show a down payment made?

6  **A.**   Yes, sir.  It shows a cash down payment of $3,000.

7  **Q.**   All right.  February 8th of 2018 -- how many days after

8  the robbery was that?

9  **A.**   That was three days.

10  **Q.**   Do you recognize what this document is?

11  **A.**   Yes, sir.  Looks like a power of attorney for the

12  transfer of ownership.  It was in the documents we received

13  from Kirk Auto.

14  **Q.**   Okay.  Is this where Mr. McThunel traded in his car?

15  **A.**   Yes, sir, it is.

16  **Q.**   What car did he trade in?

17  **A.**   2013 Hyundai Sonata sedan.

18  **Q.**   Does this record show us pretty much the same thing?

19  It's an odometer disclosure statement.

20  **A.**   Yes, sir, it does.

21  **Q.**   And it shows a 2013 Hyundai Sonata sedan?

22  **A.**   It does.

23  **Q.**   Last thing I want to ask you about on this, you see this

24  list of personal references?

25  **A.**   I do.

1    **Q.**   Okay.  Who is the reference on Number 4?

2    **A.**   Travonya Nash in Batesville, Mississippi.

3    **Q.**   Is that the same name as we saw as the subscriber on the

4    7511 record?

5    **A.**   Yes, sir, it is.

6    **Q.**   From the phone records; right?

7    **A.**   That's correct.

8    **Q.**   She's listed as a reference or a friend of Mr. McThunel?

9    **A.**   Yes, sir, she is.

10    **Q.**   And the number listed for her is not 7511, is it?

11    **A.**   It is not.

12    **Q.**   In fact, 7511 is the number that Mr. McThunel lists for

13    his phone; is that correct?

14    **A.**   That is correct.

15    **Q.**   All right.  Who else is listed as a reference here under

16    Number 3?

17    **A.**   Iroko Ayodele.

18    **Q.**   Okay.  Now, that doesn't have the 4000 number attributed

19    to Mr. Ayodele, does it?

20    **A.**   No, sir, it doesn't.

21    **Q.**   Did you interview Mr. Ayodele regarding his phone

22    numbers?

23    **A.**   Yes, sir.  In --

24    **Q.**   What did --

25    **A.**   I'm sorry.

1 **Q.** What did he tell you?

2 **A.** In October of 2019, we interviewed him, and he gave us a

3 list of several phone numbers that he used, including the 4000

4 phone number.

5 **Q.** One more question with the red sedan. Do you

6 recognize -- or what is this document, G-19?

7 **A.** That's a comparison of the -- actually, a screenshot of

8 the car in the video that we see from the post office and then

9 a stock photo of a Hyundai Sonata that we compiled.

10       **MR. MIMS:** Your Honor, I would offer this as G-19.

11       **THE COURT:** Any objection?

12       **MR. CHINICHE:** No objection.

13       **MR. TRAVIS:** No objection.

14       **THE COURT:** It will be received.

15    (EXHIBIT NO. G-19 ADMITTED INTO EVIDENCE.)

16 **BY MR. MIMS:**

17 **Q.** The photo on the left, what is that?

18 **A.** That's a screenshot from the video.

19 **Q.** Okay. And the photo on the right?

20 **A.** A stock photo of a 2013 Hyundai Sonata.

21 **Q.** So that's -- that's not Mr. McThunel's vehicle, is it?

22 **A.** Correct. It is not.

23 **Q.** But that is a red 2013 Hyundai Sonata?

24 **A.** Yes, sir, it is.

25 **Q.** Mr. Mathews, tell me again, in February 2018, how long

Mathews - Direct

1  you had been investigator with the Postal Inspection Service.

2  **A.**  With the inspection service, 19 years.

3  **Q.**  All right.  I want to talk about this case specifically.

4  Okay?  Based on your investigation in this case, did you have a

5  theory -- any theories as to how the robbery was executed?

6         **MR. LEWIS:**  Excuse me, Your Honor.  This sounds like

7  it's getting into opinion testimony.  I object.

8         **THE COURT:**  I'm going to allow him to answer it.

9  **A.**  Yes.  Based -- based on what happened in this robbery, we

10  did have a theory.

11  **BY MR. MIMS:**

12  **Q.**  What was that theory?

13  **A.**  Based on the fact that just the registered mail sacks

14  were taken off of the back of the truck, no other mail was

15  taken, we believe somebody inside the post office had given the

16  robbers inside information as to what might be in those mail

17  sacks.

18  **Q.**  Who is Chevella Hines?

19  **A.**  She was the postmaster at the Robinsonville post office

20  at the time of the robbery.

21  **Q.**  And as postmaster, what does that mean?  What's her job

22  as a postmaster?

23  **A.**  Basically, she manages the post office.  She's in charge

24  of all of the operations of that postal facility.  She also has

25  responsibility -- as Robinsonville postmaster, she supervised

1   the Lake Cormorant post office, which had one employee.

2   **Q.**   As postmaster, would she have knowledge of the procedures

3   the post office uses regarding its deposits, its money?

4   **A.**   Yes, sir.  She actually prepared the deposit for

5   Robinsonville on February 5th, 2018.

6   **Q.**   Okay.  Where did Ms. Hines live?

7   **A.**   She lived in the Batesville, Mississippi, area.

8   **Q.**   Okay.  Do you know if she had any sort of relationship

9   with any of the suspects in your case?

10  **A.**   Yes, sir, she did.

11  **Q.**   Who is that with?

12  **A.**   Jamarr Smith.

13  **Q.**   How did you determine that?

14  **A.**   Through various interviews and also through Facebook

15  posts that Mr. Smith had on his Facebook page.

16  **Q.**   Can you identify G-20?

17  **A.**   Yes, sir.

18  **Q.**   What is that?

19  **A.**   That's two photos from Mr. Smith's Facebook page.

20          **MR. MIMS:**  Your Honor, I offer this into evidence as

21  G-20.

22          **THE COURT:**  Any objection?

23          **MR. LEWIS:**  No objection.

24          **MR. TRAVIS:**  No objection, Your Honor.

25          **THE COURT:**  It will be received.

Mathews - Direct

1    (EXHIBIT NO. G-20 ADMITTED INTO EVIDENCE.)

2  **BY MR. MIMS:**

3  **Q.**    Who do you see in these photographs?  Let's start with

4  the one on the left.  Who's in the one on the left?

5  **A.**    The one on the left -- the far left is Ms. Hines,

6  Ms. Chevella Hines, and then with her in the white T-shirt is

7  Jamarr Smith.

8  **Q.**    And what about the photo on the right?

9  **A.**    The photo on the right is Ms. Hines on the left and

10  Mr. Smith on the right.

11  **Q.**    And whose Facebook page did this come from?

12  **A.**    Mr. Smith's.

13  **Q.**    Have you ever encountered Jamarr Smith at Chevella

14  Hines's residence?

15  **A.**    Yes, sir.

16  **Q.**    When was that?

17  **A.**    In 2019 we were interviewing Ms. Hines on a couple of

18  occasions.  He was there, I believe, one time at 8:15 in the

19  morning and at various times.  And at that time she also told

20  us that she was living with him.

21  **Q.**    Okay.

22          **MR. LEWIS:**  Your Honor, excuse me.  Object to the last

23  part as hearsay and move to strike.

24          **THE COURT:**  It's overruled.

25  **BY MR. MIMS:**

1  **Q.**   Mr. Mathews, did you obtain any phone records in this
2  case?
3  **A.**   Yes, sir, we did.
4  **Q.**   Who all -- who all did you obtain phone records on?  I
5  don't know if it's names or numbers.  You tell me.
6  **A.**   Yes, sir.  We obtained phone records that were associated
7  with Mr. Smith, Mr. Ayodele, Mr. McThunel, and Ms. Hines --
8  **Q.**   Okay.
9  **A.**   -- and several other people.
10 **Q.**   You've mentioned McThunel, Ayodele, Smith, and Hines as
11 ones in particular that you received phone records pertaining
12 to; correct?
13 **A.**   That is correct.
14 **Q.**   All right.  Where did all of these people live?
15 **A.**   They all lived in the Batesville, Mississippi, area.
16 **Q.**   All right.  Did you obtain their addresses as part of
17 your investigation?
18 **A.**   Yes, sir, I did.
19 **Q.**   I'm going to hand you G-26 and G-12.  Can you identify
20 G-26?  What is that?
21 **A.**   Yes, sir.  That's the addresses we developed for those
22 four individuals.
23 **Q.**   Okay.  Addresses as of what date?
24 **A.**   As of February 2018.
25 **Q.**   Okay.  And what is G-12?

Mathews - Direct

1  **A.**   G-12 are phone numbers associated with the four

2  individuals as of February 2018.

3  **Q.**   All right.

4         **MR. MIMS:**  Your Honor, I offer these into evidence as

5  G-26 and G-12.

6         **THE COURT:**  Any objection?

7         **MR. TRAVIS:**  What is that?

8         **MR. MIMS:**  Yeah, that's G-26.

9         **MR. TRAVIS:**  Okay.  No objection, Your Honor.

10         **MR. MIMS:**  And G-12 is the phone numbers.

11         **MR. TRAVIS:**  Thank you.  No objection.

12         **MR. CHINICHE:**  No objection.

13         **THE COURT:**  It will be received.

14     (EXHIBIT NOS. G-12 AND G-26 ADMITTED INTO EVIDENCE.)

15  **BY MR. MIMS:**

16  **Q.**   What did you do with these addresses as part of your

17  investigation?  Did you provide these to anybody?

18  **A.**   Yes, sir, I did, to a gentleman named Chris Moody at our

19  technical services division.

20  **Q.**   Did you provide any other information to Chris Moody in

21  this investigation?

22  **A.**   Yes, sir.  The information regarding the phone locations

23  from both the cell phone search warrants and from the Google

24  search warrants -- we provided that location information to

25  him.

1    **Q.**    And who is Chris Moody?

2    **A.**    He is a specialist that works in our technical services

3    division that analyzes phone records and cell site information.

4    **Q.**    What was the purpose in providing those records to

5    Mr. Moody?

6    **A.**    To plot the locations of those cell phones based on the

7    information we got from Google and the phone companies.

8    **Q.**    And G-12, this is the list of phone numbers that you were

9    using in your investigation?

10   **A.**    Yes, sir, they are.

11   **Q.**    All right.

12          **MR. MIMS:**  Your Honor, if I may have a minute just to

13   kind of catch up on where I am.

14          **THE COURT:**  Yes, sir.

15   **BY MR. MIMS:**

16   **Q.**    You said you obtained phone records in this case.  What

17   was the purpose in obtaining those phone records?

18   **A.**    It was twofold actually.  It was to see who was talking

19   to each other.  And, also, when we obtained the search

20   warrants, we were getting additional location information for

21   those phones.

22   **Q.**    So I want to look at a few of these records.  Let's start

23   with the T-Mobile records.  Do you recall off the top of your

24   head who T-Mobile belonged to?

25   **A.**    I believe T-Mobile was Mr. Smith.  6029.

1  **Q.**   And which number was that?  We're just going to use the
2  last four digits of the number to keep it simple.
3  **A.**   6029.
4  **Q.**   Okay.
5         MR. MIMS:  I tell you what, since this is hard to
6  read, let's pull up 5A -- G-5A.  There we go.  That's good.
7  And let's zoom -- let's go down to 2054.  Let's zoom in on it a
8  little bit and scroll on down to the first highlighted one.  On
9  farther down.  Keep going down.  Let's go all the way to 2054.
10 BY MR. MIMS:
11 **Q.**   Mr. Mathews, did I hand you a copy of this yesterday?
12 **A.**   Yes, sir, you did.
13 **Q.**   Have you reviewed these?
14 **A.**   I have.
15 **Q.**   And we see a lot of records that are highlighted.  Just
16 in general, what's highlighted?
17 **A.**   Phone calls that are relevant to the investigation.
18 **Q.**   When you say "relevant," what phone numbers or phone
19 calls are we talking about?
20 **A.**   Whether it's 6029, 7511, 4000, or Ms. Hines I believe
21 might have been 0205.
22 **Q.**   Okay.  So let's look at --
23        MR. MIMS:  If we can blow it up just a little bit
24 more.  There we go.  Thank you.  Slide over just a little bit.
25 BY MR. MIMS:

Mathews - Direct

1    **Q.**   Let's look at 20:54:55.  Now, on the T-Mobile records,
2    you have to go back to the first page to show what all the
3    columns mean.  It says here all times are reflected in
4    Coordinated Universal Time or UTC.  Do you know what UTC is?
5    **A.**   Yes, sir.
6    **Q.**   What is UTC?
7    **A.**   UTC is a basic standard time unit that businesses and
8    phone companies use to record data.  Basically converting it to
9    Central Time, at this time of the year, it would be negative
10   six hours from -- from what it shows on UTC time.
11   **Q.**   So the phone call that we see there at 20:54:55, in
12   Mississippi time -- civilian Mississippi time, what time of day
13   is that?
14   **A.**   You'd have to first back it up six hours, which would be
15   1454, which is military time.  And then you convert that to
16   civilian time, and that's 2:54 --
17   **Q.**   Okay.
18   **A.**   -- if I did my math correctly.
19   **Q.**   And what phone numbers are involved in this phone call?
20   **A.**   The 4000 number associated with Mr. Ayodele and the 6029
21   number associated with Mr. Smith.
22          **MR. MIMS:**  All right.  And let's slide all the way
23   over to the right.
24   **BY MR. MIMS:**
25   **Q.**   Based on the location information given there, where does

1  it appear -- what tower -- where's the tower being used?

2  **A.**  Tower is in Batesville, Mississippi.

3       **MR. MIMS:**  Let's slide back.

4  **BY MR. MIMS:**

5  **Q.**  Now, looking back, just following that -- we're going to

6  try to hit these briefly, but the next -- the next two calls

7  that we see are not long after that first one we talked about;

8  correct?

9  **A.**  Correct.

10  **Q.**  And who are those calls between?

11  **A.**  Same two phone numbers.  Mr. Smith and Mr. Ayodele.

12       **MR. MIMS:**  All right.  And let's scroll on down a

13  little bit or find 21:28:48.

14  **BY MR. MIMS:**

15  **Q.**  So let's take a look at that phone call, 21:28:48.  What

16  time is that?

17  **A.**  Back it up.  That would be 1528, which would convert to

18  3:28 in the afternoon.

19  **Q.**  Okay.  And who is that phone call between?

20  **A.**  Mr. Smith and Mr. Ayodele.

21  **Q.**  All right.  And let's slide over to the right.  At this

22  point, what tower is that hitting off of?

23  **A.**  Sardis, Mississippi.

24  **Q.**  And the one right after that, after those two calls,

25  where's it hitting off of?

Mathews - Direct

1   **A.**    Hernando, Mississippi.

2   **Q.**    Let me show you this map.  Is it fair to say Batesville

3   is down here?

4   **A.**    Yes, sir.

5   **Q.**    And where is -- this would be Sardis?

6   **A.**    Sardis is north.

7   **Q.**    And next -- and we're talking about towers here.  The

8   next tower is Hernando?

9   **A.**    Yes, sir.

10   **Q.**    All right.  And Lake Cormorant is over here; correct?

11   **A.**    Yes, sir.  That's correct.

12         **MR. MIMS:**  Now, let's -- let's scroll on down -- stay

13   right where you are on the right.  Scroll down just a little

14   bit.  Let's go to the next page.  Let's go on down -- we're

15   going to start -- I tell you what, slide on -- slide on over.

16   **BY MR. MIMS:**

17   **Q.**    All right.  Let's look at the 22:17:56.  What time would

18   that be?

19   **A.**    Converting would be back 1617; so it would be 4:17 p.m.

20   **Q.**    And who are these calls between during this time period?

21   **A.**    Mr. Smith and Mr. Ayodele.

22         **MR. MIMS:**  Okay.  Let's slide over to the right.

23   Well, let's go back one second.

24   **BY MR. MIMS:**

25   **Q.**    Do you see multiple phone calls in that time period

1    between those two?

2    **A.**   Yes, sir.

3          **MR. MIMS:**  Let's slide over to the right.

4    **BY MR. MIMS:**

5    **Q.**   What tower are these phone calls hitting off of?

6          **MR. LEWIS:**  Your Honor, excuse me.  Can I just state

7    an objection?  It's way more complicated than it is being

8    portrayed here that these phones are hitting off towers.  I

9    mean, this is going to be the subject of their expert testimony

10   tomorrow.  I don't think this witness is qualified to state the

11   significance and importance of that.  I mean, he's just reading

12   the record.  It's more to it than that.

13         **MR. MIMS:**  Your Honor, if I may respond.  I'm not

14   asking him to -- I'm asking him simply to read what the record

15   says and show what -- where the towers are.  Some of that is

16   for me to argue later in closing or to get into it with the

17   expert at the appropriate time.  But I think we should be

18   allowed to show what towers are in use with these phone calls

19   between the defendants at these key time periods.

20         **MR. LEWIS:**  I mean, the document is in evidence.  The

21   witness doesn't need to read it to the jury.  If an expert

22   needs to reach conclusions from it, I think that's going to

23   happen later.

24         **THE COURT:**  I haven't heard the witness reach any

25   conclusions.  It does appear that he is merely reading off of

1   the record, though the record does speak for itself.  And I

2   think the jury can read the record.  So I'll overrule the

3   objection but can't reach any conclusions from this.

4   BY MR. MIMS:

5   **Q.**   What tower is reflected in the record during the next

6   series of calls?

7   **A.**   Hernando, then Robinsonville, Lake Cormorant, then

8   Robinsonville again.

9   **Q.**   Is Robinsonville near Lake Cormorant?

10  **A.**   Yes, sir, it is.

11  **Q.**   I want to go to a specific call.

12      **MR. MIMS:**  Let's scroll down to 23:16:05.  There we

13  go.

14  BY MR. MIMS:

15  **Q.**   At 23:16:05, what time of day is that?

16  **A.**   It would be -- think for a minute -- 1716, which converts

17  to 5:16 p.m.

18  **Q.**   And who is that phone call between?

19  **A.**   That is between Mr. Smith and Mr. McThunel.

20  **Q.**   Based on your investigation, what was going on at

21  approximately 5:16 p.m. that evening?

22  **A.**   Robbery at Lake Cormorant post office.

23      **MR. MIMS:**  All right.  Let's slide over to the right.

24  BY MR. MIMS:

25  **Q.**   What does the record reflect the tower that was being

Mathews - Direct

1  used for that phone call?

2  **A.**    Can you scroll back to the left again so I can see?

3  2316?

4  **Q.**    Yeah.

5         **MR. MIMS:**  Go ahead, to the right.

6  **A.**    Lake Cormorant.

7  **BY MR. MIMS:**

8  **Q.**    All right.  Do you see additional phone calls on this

9  record between Mr. Smith and Mr. Ayodele?

10  **A.**    Yes, sir.

11  **Q.**    What about between Mr. Smith and Mr. McThunel?

12  **A.**    Yes, sir.

13  **Q.**    Do you also see phone calls between Mr. Smith and

14  Ms. Hines?

15  **A.**    I'm looking.

16         **MR. MIMS:**  Let's scroll down just a little bit.

17  **BY MR. MIMS:**

18  **Q.**    Let's start down here, for example, at 23:41:06.  Who's

19  involved in that call?

20  **A.**    Mr. Smith and Ms. Hines.

21  **Q.**    All right.  Do you see other phone calls between those

22  two during this time period?

23  **A.**    Yes, sir, I do.

24  **Q.**    And approximately what time period is that?

25  **A.**    2341 would be approximately 5:41 p.m., just after the

Mathews - Direct

1    robbery.

2         MR. MIMS:  Scroll on to the next page.

3    BY MR. MIMS:

4    Q.   Again, did you review these before -- did you review them

5    yesterday?

6    A.   Yes, sir, I did.

7    Q.   Have you seen these records before yesterday?

8    A.   Yes, sir.

9    Q.   Okay.  In reviewing these records, how many phone calls

10   do you see between the defendants in this case?

11   A.   A lot.

12   Q.   And when I ask that, I'm asking specifically during the

13   time period of 4:00 to 6:30 p.m. on February 5th of 2018.

14   A.   Yes, sir.  There were multiple calls.

15   Q.   We've just looked right now at Mr. Smith's phone records,

16   but have you also reviewed Mr. Ayodele's and Mr. McThunel's

17   phone records?

18   A.   Yes, sir, I have.

19   Q.   What did you see as far as -- from those records as far

20   as phone calls between the defendants?

21   A.   Again, saw multiple phone calls between all of the

22   defendants.

23   Q.   During the 4:00 to 6:30 p.m. time period?

24   A.   Yes, sir.

25        MR. MIMS:  Okay.  We can go to the ELMO now at this

Mathews - Direct

1 point.

2 **BY MR. MIMS:**

3 **Q.** This is G-9 -- G-9A -- I'm sorry -- excerpts from the

4 C Spire records on Ms. Hines. Did you review these last night

5 as well?

6 **A.** Yes, sir, I did.

7 **Q.** Are the ones highlighted all from February 5, 2018?

8 **A.** Yes, sir.

9 **Q.** For all of these calls that are highlighted, who are they

10 between?

11 **A.** Between Mr. Smith and Ms. Hines.

12 **Q.** How many phone calls are there that we have highlighted

13 there on the 5th? Can you count them all?

14 **A.** No, sir, not -- not that quick.

15 **Q.** We also have marked as Exhibit G-9B excerpts from the

16 text messages of Ms. Hines. Did you review those?

17 **A.** Yes, sir, I did.

18 **Q.** What did you find from those?

19 **A.** Found multiple text messages between them, Mr. Hines --

20 or Mr. Smith and Ms. Hines.

21 **Q.** On what day?

22 **A.** On February 5th, 2018.

23 **Q.** Let me ask you, have you ever been to Lake Cormorant,

24 Mississippi?

25 **A.** Yes, sir, I have.

1  **Q.**    As part of this investigation?

2  **A.**    Yes, sir.

3  **Q.**    Is there any stores there at Lake Cormorant?

4  **A.**    Only the one that's closed.

5  **Q.**    All right.  And when you say "closed," what do you mean?

6  Closed for the day or not open anymore?

7  **A.**    Not open anymore.

8  **Q.**    Do you see any diners?

9  **A.**    No, sir.

10  **Q.**    In your investigation of these three defendants, did you

11  find that any of them had any relatives anywhere around Lake

12  Cormorant?

13  **A.**    No, sir.  We checked their -- like I said, their CLEAR

14  records again.  They had no prior addresses in the Lake

15  Cormorant area, no relatives or associates that had addresses

16  in the Lake Cormorant area.

17  **Q.**    Having been to Lake Cormorant, having investigated this

18  case, did you see anything that would draw anybody to Lake

19  Cormorant, Mississippi, that lived in Batesville?

20  **A.**    No, sir.

21  **Q.**    Even if you happened to be out for a drive and driving

22  through the countryside an hour from home, was there anything

23  there that would make you stop and stay at Lake Cormorant,

24  Mississippi?

25  **A.**    No, sir.

Mathews - Direct

1  **Q.**    Did you attempt to interview Mr. Smith as part of your

2  investigation?

3  **A.**    Yes, we did.

4  **Q.**    Were you able to interview him?

5  **A.**    No, sir, we were not.

6  **Q.**    Why not?

7  **A.**    We weren't able to locate him.  We had seen him a couple

8  of times at Ms. Hines's residence.  Actually talked with

9  Ms. Hines on one occasion.  She said she didn't know how to

10  get --

11           **MR. LEWIS:**  Excuse me.  Object to hearsay on this.

12  **BY MR. MIMS:**

13  **Q.**    Please don't tell me what anybody told you.  Just I want

14  to know what you did.

15           **THE COURT:**  The objection is sustained.

16  **A.**    We were not able to locate him.  We left a card with our

17  contact information and never received a follow-up call from

18  him.

19  **BY MR. MIMS:**

20  **Q.**    Did you attempt to interview Mr. McThunel?

21  **A.**    Yes, sir, we did.

22  **Q.**    Did he choose to talk to you?

23  **A.**    He chose not to talk to us.

24  **Q.**    Did you attempt to interview Mr. Ayodele?

25  **A.**    Yes, sir, we did.

1  **Q.**  Did he choose to talk to you?

2  **A.**  Yes, sir.  We talked to him on two occasions.

3  **Q.**  Okay.  What was the first occasion you talked to him?

4  **A.**  First occasion was October 2019.  We spoke to him at his

5  residence.

6  **Q.**  What all did he tell you when you talked to him on that

7  day?

8  **A.**  During that interview is when he told us that he -- he

9  had multiple phone numbers.  He listed a bunch out, including

10  the one that ended in 4000.  He told us he was friends with

11  Jamarr Smith.  He told us that he didn't rob the post office,

12  that he -- he loans his car out a lot to an individual named

13  Little Bo, who at one time borrowed his vehicle to tow -- tow

14  another vehicle from Southaven.

15  **Q.**  And did you interview him a second time?

16  **A.**  Yes, sir, we did.

17  **Q.**  When was that?

18  **A.**  That was in December of 2019.

19  **Q.**  Okay.  What did he tell you then?

20  **A.**  At that time, again, he told us that he didn't rob the

21  post office; that he, again, loaned his car to Little Bo.  He

22  initially told us that he had loaned it that day, but then he

23  told us that he wasn't sure of the dates.  He also indicated

24  that he knew an individual named Patra Malone but said he did

25  not talk to her on the date of the robbery or text her, no

 1  contact with her at all.  He also identified the vehicle that
 2  he owned.
 3  **Q.**    Did he say anything again about Little Bo or about his
 4  cell phone?
 5  **A.**    Yes.  He also said that, you know, Little Bo had borrowed
 6  his car and that at times he had left his car -- his phone in
 7  his car, and it could have been that he left it that day.
 8  **Q.**    All right.  Let me ask you, did you follow up on his
 9  statement that he was at work at the time of the robbery?
10  **A.**    Yes, sir, we did.
11  **Q.**    And what did you find out?
12  **A.**    We did a couple of things.  We got a list from his
13  employer.  He worked for the Mississippi Department of --
14  **Q.**    And, Mr. Mathews, let me stop you one second.  I want to
15  be certain -- please don't tell me what somebody specifically
16  said.  Okay?
17  **A.**    Correct.
18  **Q.**    I just want to know what you did and what you saw.  Okay?
19  **A.**    Correct.  We spoke with them.  We also followed up with
20  his work records.  Got some subpoenaed information for his work
21  records that showed --
22          **MR. TRAVIS:**  Objection to hearsay, Your Honor.
23          **THE COURT:**  It's sustained.
24  **BY MR. MIMS:**
25  **Q.**    Let me just ask you this.  Did you attempt to determine

1  if he was at work?  Yes or no.

2  **A.**    Yes, we attempted.

3  **Q.**    Okay.  Were you able to establish that he was at work

4  that afternoon?

5  **A.**    We were not.

6  **Q.**    Okay.  Did you -- did you obtain a work number on -- for

7  Mr. Ayodele, what his work would be?

8  **A.**    For the office, yes, we did.

9  **Q.**    What number was that?

10  **A.**    I do not recall.

11  **Q.**    Do you have it in your notes somewhere?

12  **A.**    Yes.

13  **Q.**    Where would your notes be?

14  **A.**    They would be at my desk.

15  **Q.**    Would it refresh your recollection if I handed you your

16  notes?

17  **A.**    Yes.

18  **Q.**    Where did you take these notes from?

19  **A.**    I believe it was in a report.  It was -- it was from

20  phone records that we had gotten.  I don't remember what the

21  exact report was.

22  **Q.**    Did you write a report, though, on it one day?

23  **A.**    Yes.

24  **Q.**    And did you take these notes from your report in

25  preparation for trial?

1   **A.**   Yes, I did.

2        **MR. MIMS:**  Your Honor, I would ask to show him

3   his notes to refresh his recollection as to the number of

4   Mr. Ayodele's employer.

5        **MR. TRAVIS:**  May I review that at this time, please?

6        **THE COURT:**  Yes, you may.  So locate the notes and let

7   Mr. Travis review.

8        **MR. MIMS:**  Your Honor, if I may, can I show the

9   witness his notes and we can go straight to them and then show

10   Mr. Travis?

11        **THE COURT:**  Yeah.  Show them to Mr. Travis first and

12   just see --

13        **MR. MIMS:**  Okay.

14        **MR. TRAVIS:**  Court's indulgence, please.  I've not

15   seen these before.

16        **THE COURT:**  I tell you what I think let's do, let's

17   take a break at this time because y'all are going to want to

18   follow up with cross-examination, and this will give them a

19   chance to look at the records, and then we can finish with the

20   testimony today after you have a break.

21        So we'll take about a 15-minute break.  Remember not

22   to speak with anyone about the case.  Thank you.  You're in

23   recess.

24        (JURY OUT.)

25        (RECESS TAKEN.)

1           **THE COURT:**  Let me go back on the record just a second
2       before I bring the jury in.

3           Mr. Lewis, I owe you an apology.  I'll make a bunch of
4       mistakes in this trial, and I've already made a bunch, and I
5       will make a bunch, but I did make the mistake by overruling
6       your objection to Mr. Mathews's testimony of what Ms. Hines
7       told him about living with him.  That was hearsay, clearly.

8           Would you like for me to address it with the jury and
9       strike the statement?

10          **MR. LEWIS:**  If you would, Your Honor.

11          **THE COURT:**  I will.  Okay.  Bring them in.

12      (JURY IN.)

13          **THE COURT:**  You may have a seat.

14          Ladies and gentlemen, before we resume the testimony,
15      let me correct an error that I made.

16          Mr. Lewis made an objection when Mr. Mathews testified
17      that Ms. Hines -- that Ms. Hines told him that she was living
18      with Mr. Smith.  That was hearsay.  I should have sustained
19      that objection.  I failed to do it.  That is my mistake.  I'm
20      advising you to strike that testimony and not consider it.

21          **MR. LEWIS:**  Thank you, Your Honor.

22          **THE COURT:**  Thank you.

23          **MR. MIMS:**  May I proceed, Your Honor?

24          **THE COURT:**  You may.

25      **BY MR. MIMS:**

1   **Q.**   Mr. Mathews, let's see if we can't wrap this up here in a

2   couple of minutes.  First thing, you were asked about some

3   statements made by Mr. Ayodele when you interviewed him; right?

4   **A.**   Correct.

5   **Q.**   Where did he indicate he was at the time of the robbery?

6   **A.**   He indicated he was at work.

7   **Q.**   Did you investigate that?  Yes or no.

8   **A.**   Yes, sir.

9   **Q.**   Did you find anything to confirm he was at work?

10   **A.**   No, sir, we did not.

11   **Q.**   During the break, have you had an opportunity to review

12   your records to find the phone number for Ayodele's work?

13   **A.**   Yes, sir.

14   **Q.**   Did you find that number?

15   **A.**   Yes, sir.

16   **Q.**   What is that number?

17   **A.**   662-561-7620.

18   **Q.**   I'm going to hand you G-12, a list of relevant phone

19   numbers, and I would just ask you to add that number to this

20   list with a notation that it's -- of what number it is.

21   **A.**   (Marking.)

22   **Q.**   Mr. Mathews, in reviewing Exhibit G-7E, the AT&T records

23   from Mr. Ayodele, I want you to look at the phone call from

24   February 5th, 2018, at 2035.  What time is 2035?

25   **A.**   That would be 6 -- 14 -- 2:35 p.m.

1  **Q.**  All right.  What number is the 4000 number?

2  **A.**  Mr. Ayodele's.

3  **Q.**  And what number is he calling?

4  **A.**  He's calling his work number, the Mississippi Department

5  of Employment Security.

6  **Q.**  And that's the same number you've written on here --

7  **A.**  Yes.

8  **Q.**  -- as his work number; is that right?

9  **A.**  Yes, sir, it is.

10  **Q.**  Okay.  You mentioned something about that he had said

11  something about Little Bo.  What did he say about Little Bo?

12  **A.**  He said that Little Bo had borrowed his car on numerous

13  occasions and possibly borrowed it on February 5th.

14  **Q.**  Okay.  Were you able to track down Little Bo?

15  **A.**  Yes, sir -- well, sort of.  We made contact with the

16  Batesville Police Department and determined that Little Bo was

17  deceased as of mid-2019.  His name was -- James McArthur Scott

18  I believe was his -- was Little Bo's real name.

19  **Q.**  So Little Bo that Mr. Ayodele had told you about had died

20  before he -- you interviewed him?

21  **A.**  That's correct.

22  **Q.**  So you weren't able to interview Little Bo about any of

23  this, were you?

24  **A.**  No, sir.

25  **Q.**  So during the course of your investigation, did you

1   obtain Facebook records?

2   **A.**   Yes, sir, we did.

3   **Q.**   On what Facebook accounts?

4   **A.**   For Mr. Ayodele's and Mr. Smith's.

5   **Q.**   How many pages of Facebook records did you receive?

6   **A.**   A lot. A lot of -- a lot of records.

7   **Q.**   What do you mean a lot of records? Fair to say it's

8   thousands of pages?

9   **A.**   Yes, fair to say.

10   **Q.**   I have pulled just a few pages from the records. Have

11   you had a chance to look through all of these Facebook records

12   for Mr. Ayodele and Mr. Smith?

13   **A.**   Yes, sir.

14   **Q.**   All right. I'm going to show you G-23 and G-24. Do you

15   recognize those documents?

16   **A.**   Yes, sir.

17   **Q.**   What are they?

18   **A.**   The G-23 are excerpts from Mr. Ayodele's Facebook page,

19   and G-24 are excerpts from Mr. Smith's Facebook page.

20       **MR. MIMS:** Your Honor, I would offer G-23 and G-24

21   into evidence.

22       **THE COURT:** Any objection?

23       **MR. LEWIS:** No.

24       **MR. TRAVIS:** No objection.

25       **THE COURT:** Okay. They'll be received.

Mathews - Direct

1    (EXHIBIT NOS. G-23 AND G-24 ADMITTED INTO EVIDENCE.)

2  **BY MR. MIMS:**

3  **Q.**    I just want to look at a few of these pages.  G-33 (sic)

4  you said was Mr. Ayodele's Facebook page?

5  **A.**    Yes, sir.

6  **Q.**    All right.  Do you see this line right here?

7  **A.**    Yes, sir, from January 5th.

8  **Q.**    And what does it say?

9  **A.**    Iroko Ayodele is with Jamarr Smith.

10  **Q.**    All right.  And that's from what date again?

11  **A.**    January 5th, 2018.

12  **Q.**    All right.  I'm going to put a highlight on that line we

13  just talked about.  Now, is this page simply a link to get to

14  this picture behind it?

15  **A.**    Yes, sir.

16  **Q.**    And what's the picture we have here?

17  **A.**    Picture of a white SUV.

18  **Q.**    And that came off of Mr. Ayodele's Facebook page?

19  **A.**    Yes, sir.

20  **Q.**    All right.  Let's talk about Mr. Smith's Facebook page

21  for a second -- or pages.  That would be Exhibit G-24; correct?

22  **A.**    Yes, sir.

23  **Q.**    What's the date right here for this entry?

24  **A.**    January 23rd, 2018.

25  **Q.**    Now, I'm going to highlight it.  Let's talk about it.

1   What's the phone number associated with that?

2   **A.**   662-360-6029.

3   **Q.**   And who does it show as the author of that post?

4   **A.**   Jamarr Smith.

5   **Q.**   What about this one down here?

6   **A.**   February 7th is from Jamarr Smith.  It was the same phone

7   number.

8   **Q.**   I'm not going to hit every one of these pages, but have

9   you seen that same phone number referenced in these other

10  pages?

11  **A.**   Yes, sir, I have.

12  **Q.**   And that's on Jamarr Smith's Facebook page?

13  **A.**   Yes, sir.  That's correct.

14  **Q.**   And it shows which phone number?

15  **A.**   The 6029 phone number.

16  **Q.**   Okay.  Is this a picture that came off of Mr. Smith's

17  Facebook page?

18  **A.**   Yes, sir, it is.

19  **Q.**   Who's that we see in the picture?

20  **A.**   Mr. Smith on the left and Mr. Ayodele on the right.

21  **Q.**   All right.  Mr. Smith -- you're talking about the

22  gentleman in the Chicago Bulls cap?

23  **A.**   Yes, sir.

24  **Q.**   This is Mr. Ayodele on the far right with the Nike shirt?

25  **A.**   Yes, sir.  That's correct.

1  **Q.**  You don't know who the other two individuals are, do you?

2  **A.**  I do not.

3  **Q.**  Mr. Mathews, just so I'm clear, what time frame did this

4  robbery occur in Lake Cormorant?

5  **A.**  Between 5:15 and 5:35 p.m. on February 5th, 2018.

6  **Q.**  All right.  What do the phone records indicate was

7  occurring between Mr. Smith, Mr. McThunel, and Mr. Ayodele at

8  that time?

9  **A.**  They were all having phone contact during that time

10  period.

11  **Q.**  And at the time of the robbery, did Mr. Ayodele have a

12  white SUV similar to what you see in the video?

13  **A.**  Yes, sir, he did.

14  **Q.**  At the time of the robbery, did Mr. McThunel have a red

15  Hyundai similar to what you see in the video?

16  **A.**  Yes, sir, he did.

17  **Q.**  At the time of the robbery, was one of these defendants

18  in a relationship with Chevella Hines?

19  **A.**  Yes, sir.

20  **Q.**  She was the postmaster at the Robinsonville post office?

21  **A.**  That is correct.

22  **Q.**  And would Chevella Hines as postmaster know all of the

23  postal procedures regarding the money and the registered

24  mailbags and the contact -- contract carrier's route?

25  **A.**  Yes, sir, she would.

1    **MR. MIMS:**  Your Honor, I have no further questions.

2    **THE COURT:**  Thank you.

3    Cross-examination.

4                          **CROSS-EXAMINATION**

5    **BY MR. LEWIS:**

6    **Q.**   Mr. Mathews, I'm going to try to get us a timeline here.

7    The robbery occurred in February of 2018; correct?

8    **A.**   Yes, sir.

9    **Q.**   And by maybe June of 2019 is when you got the information

10   from Google that had the specific account information, not the

11   anonymous account information; correct?

12   **A.**   Correct.

13   **Q.**   So we're talking about a time period there of 16 months

14   or so; correct?

15   **A.**   That sounds right.

16   **Q.**   Okay.  So for that period of time, the Government had no

17   suspects in this case?

18   **A.**   Let me make sure I get the dates right.  From -- yes.  We

19   didn't have any specific names.  That's correct.

20   **Q.**   Okay.  That the Government had exhausted every

21   conventional investigative technique you could at that point;

22   correct?

23   **A.**   Not every -- we hadn't exhausted everything, no.

24   **Q.**   Well, you'd done a tower dump?

25   **A.**   Correct.

1  **Q.**  That didn't get you any -- any suspects; correct?

2  **A.**  Correct.  It gave us information but no suspects.

3  **Q.**  And you did what law enforcement does.  You investigated

4  the incident.  You interviewed witnesses; correct?

5  **A.**  That's correct.

6  **Q.**  Checked for physical evidence around the post office?

7  **A.**  Correct.

8  **Q.**  Fingerprints, DNA, that sort of thing?

9  **A.**  Correct.

10  **Q.**  You reviewed the video?

11  **A.**  That's correct.

12  **Q.**  And through all of those efforts, you had not gotten any

13  suspects; correct?

14  **A.**  Correct.

15  **Q.**  And so before June of 2019, you had nobody to prosecute

16  in this case; correct?

17  **A.**  Correct.

18  **Q.**  And so that's when you turned to Google?  Well, you had

19  turned to Google in November; correct?

20  **A.**  Correct.

21  **Q.**  Let me do better.  By November of 2018, you didn't have

22  any suspects to prosecute in this case; correct?

23  **A.**  That's correct.

24  **Q.**  And that's when you turned to Google?

25  **A.**  Correct.

Mathews - Cross by Mr. Lewis

1  **Q.** And you googled it; right?

2  **A.** That's one way to put it.

3  **Q.** Okay. You had never done that before?

4  **A.** Correct. I'd never gotten a geofence Google search

5  warrant.

6  **Q.** You would have to admit that you had never heard of

7  getting stuff from Google like this before until some other

8  agent suggested you try it?

9  **A.** Correct. Not from Google, no. Similar -- similar stuff

10 but not from Google.

11 **Q.** Right. But you had not gotten this kind of -- you had

12 not used this kind of warrant?

13 **A.** A geofence warrant?

14 **Q.** Right.

15 **A.** I've used search warrants but not a specific geofence

16 search warrant. That's correct.

17 **Q.** And I don't have a perfect overhead view of the -- of the

18 scene, but I'll use G-13 to help us. Right here in the middle

19 is the post office; correct?

20 **A.** Correct.

21 **Q.** So what you did was you sent a warrant to Google that

22 drew a box around the post office; right?

23 **A.** That's correct. And the locations where we'd seen --

24 **Q.** Excuse me?

25 **A.** And the -- to cover the locations we seen the suspect --

1  vehicle and the suspects on the video.

2  **Q.**   And I guess at -- at this point you do not know of any

3  other case in the country that has gone to trial with this kind

4  of evidence?

5  **A.**   I don't personally.  I don't know if any have or not.

6  **Q.**   Okay.  You've certainly not testified to this kind of

7  geofence information before, have you?

8  **A.**   I have not, no.

9  **Q.**   Right.  And so just to recap how Google responded to this

10  subpoena -- warrant, they originally sent anonymous data

11  concerning the devices that returned in the fence -- inside the

12  fence?

13  **A.**   That's correct.

14  **Q.**   And that is Exhibit G-3A.  This is what they sent back;

15  right?

16  **A.**   That is correct.

17  **Q.**   And you can't look at this and know whose accounts these

18  are; right?

19  **A.**   That's correct.  I don't know.

20  **Q.**   Okay.  And you determined at that time that there were

21  three devices that came back.  And I'll just use the last four

22  digits.  0859, that's one device; right?

23  **A.**   Correct.

24  **Q.**   And then, 0479, that's another one?

25  **A.**   Yes, sir.

1  **Q.**   And then, 8768, that's the third one; correct?

2  **A.**   Yes, sir.

3  **Q.**   Okay.  Now, you would have to agree that there were many
4  more devices than that shown in the video within the area of
5  this geofence; correct?

6  **A.**   I don't know.

7  **Q.**   You know, there were --

8      **MR. MIMS:**  Your Honor, I'm going to object just from
9  the standpoint that the question is phrased as "there were
10 devices."  We don't see devices in a video.  Don't know who had
11 what in their car or with them.

12     **THE COURT:**  I'm going to sustain the objection and
13 allow you to re-ask the question in maybe perhaps a different
14 way.

15 **BY MR. LEWIS:**

16 **Q.**   Okay.  I apologize for using my phone, but Mr. Chiniche
17 sent me an e-mail during this trial that has a list of all of
18 the vehicles and things and people that he saw in the video
19 while we were watching it earlier today.  Okay?  Tell me if you
20 agree with this.  4:14, a dark, small SUV came through the
21 scene?

22 **A.**   That's possible.

23 **Q.**   Wouldn't dispute that.  A dark sedan came through the
24 scene?

25 **A.**   That's possible.

Mathews - Cross by Mr. Lewis

1    **Q.**    Right.  A train came through the scene?

2    **A.**    Yes, it did.

3    **Q.**    Okay.  A red pickup truck came through the scene?

4    **A.**    I believe so, yeah.

5    **Q.**    And at the very end, a dark sedan pulls into the post

6    office parking lot, I think, after Mr. Cobbs was up there --

7    after the incident occurred?

8    **A.**    Correct.  I believe after the police officers were there.

9    **Q.**    Right.  So -- and we know Mr. Cobbs had a cell phone on

10   him because he used it?

11   **A.**    Correct.

12   **Q.**    Okay.  That didn't come back on the geofence?

13   **A.**    It did not.

14   **Q.**    Okay.  You mentioned a witness named Forest Coffman.

15   Most people have -- he was -- he was around.  He was at the

16   scene; correct?

17   **A.**    Correct.

18   **Q.**    Most people have cell phones; right?

19   **A.**    I would -- the majority of them do.

20   **Q.**    You worked hard on that one.

21   **A.**    Yeah.  I would say --

22   **Q.**    Probably about --

23   **A.**    I would say --

24   **Q.**    -- 90 --

25   **A.**    -- the majority.

1 **Q.** Okay.

2 **THE COURT:** Don't talk at the same time.

3 **MR. LEWIS:** Excuse me. The court reporter doesn't

4 like that. I'm sorry.

5 **BY MR. LEWIS:**

6 **Q.** And you also had Highway 61, which you could not see on

7 the video, which was behind the post office?

8 **A.** Are you talking about the four-lane Highway 61?

9 **Q.** The four-lane.

10 **A.** Correct. It was -- there's Highway 61.

11 **Q.** And then there were cars you can -- common sense says

12 there was cars whizzing by on that as well?

13 **A.** I guess I'm confused. I don't know if we're talking

14 about the geofence or --

15 **Q.** Yeah. I'm talking --

16 **A.** -- the highway.

17 **Q.** -- about inside the geofence.

18 **A.** Yeah. Highway 61, four-lane, was not inside the

19 geofence.

20 **Q.** Okay. Well, what is this right here? Is this Old 61?

21 **A.** That's Old 61. That's, I believe, also called Blythe

22 Road.

23 **Q.** Okay.

24 **A.** If you go to the right across the railroad tracks for a

25 piece, there's -- there's new 61, the four-lane.

1  **Q.**   Okay.  Fair enough.  So -- so there were a lot of

2  vehicles, well, that were -- came and went through the

3  geofence?

4  **A.**   I would say three or four.

5  **Q.**   Okay.  But at any rate, at least some of those vehicles

6  that came and went through the geofence you're confident in

7  saying had nothing to do with this robbery?

8  **A.**   Yes.

9  **Q.**   Okay.  So you can say that just because an account showed

10  up in the geofence or didn't show up in the geofence doesn't

11  mean that somebody was involved in this -- in this robbery?

12  **A.**   Would you rephrase that?

13  **Q.**   Sure.  I'll break it down.  Just because an account

14  showed up inside the geofence doesn't mean somebody was

15  involved in a robbery?

16  **A.**   That's correct.

17  **Q.**   And just because an account did not show up inside the

18  geofence, that doesn't mean somebody was involved in the

19  robbery either?

20  **A.**   That's correct.

21  **Q.**   Okay.  So the three devices that did come back -- well,

22  you eventually -- let me do it this way.  You got -- and this

23  is a terrible word -- de-anonymized data from Google; right?

24  You got the actual account names; correct?

25  **A.**   Correct.

1  **Q.** And I think we established that was in June of 2019?

2  **A.** Yes, sir. That's correct.

3  **Q.** And I'm looking at G-36, and it shows the bleek2004;

4  correct?

5  **A.** Correct.

6  **Q.** Jamarrsmith33; correct?

7  **A.** Yes, sir.

8  **Q.** And permanentwavesrecords; is that correct?

9  **A.** That's correct.

10 **Q.** Okay. So you requested additional information on the

11 first two; right?

12 **A.** That is correct.

13 **Q.** The third one you did not request additional information

14 on?

15 **A.** That's correct.

16 **Q.** You did not request information about the owner of the

17 permanentwaves account?

18 **A.** That's correct. We didn't establish probable cause to

19 include them in a search warrant.

20 **Q.** Well, you could have. You could have gotten their

21 information.

22 **A.** I don't believe we had probable cause to include them in

23 a search warrant.

24 **Q.** Well, you had probable cause to send a search warrant to

25 Google asking for accounts that showed up in the geofence

1   between 5:00 and 6:00 p.m. on the date in question; right?

2   **A**.   Correct.

3   **Q**.   And Google sent you account information that showed up in

4   the Google -- in the geofence between 5:00 and 6:00 p.m. on

5   that day; correct?

6   **A**.   Correct.

7   **Q**.   So you had probable cause to get the anonymous

8   information; right?

9   **A**.   Correct.

10  **Q**.   Okay.  You decided you had probable cause to get two of

11  the others; right?

12  **A**.   That's correct.

13  **Q**.   But just decided you weren't going to check on the

14  permanentwaves one?

15  **A**.   That's incorrect.

16  **Q**.   Okay.  Well, you didn't get information -- you never

17  requested that information from Google?

18  **A**.   Because we didn't establish probable cause.

19  **Q**.   My question is yes or no.

20         **MR. MIMS**:   Your Honor, I -- Your Honor, I would just

21  object and ask that the witness be allowed to complete his

22  answer.

23         **THE COURT**:   You may answer the question.  If you need

24  to explain, you may do so.

25  **BY MR. LEWIS**:

Mathews - Cross by Mr. Lewis

1  **Q.**   You never requested information on permanentwaves from
2  Google?

3  **A.**   We did not because we did not have probable cause to
4  obtain a search warrant for them.

5  **Q.**   Okay.  You decided not to further investigate the
6  permanentwavesrecords?

7  **A.**   That's incorrect.  We did try to identify them other --
8  others ways.  We tried to run CLEAR.  We tried to run -- you
9  know, we googled, as you say, the address or the -- the e-mail.
10 We weren't able to identify -- it only showed up at 5:58.  It
11 was only one time within the geofence, which was at the time,
12 you know, the first responders and other people had shown up at
13 the post office.

14 **Q.**   You remember you testified in a hearing in this case not
15 too long ago; correct?

16 **A.**   That's correct.

17 **Q.**   You were placed under oath at that time; correct?

18 **A.**   I was.

19 **Q.**   You swore to tell the truth?

20 **A.**   I did.

21 **Q.**   And you did tell the truth in that; correct?

22 **A.**   I did.

23          **MR. LEWIS:**  May I approach the witness, Your Honor?

24          **THE COURT:**  You may.

25 BY MR. LEWIS:

1  **Q.**   I'm on page 44 of your testimony.  Tell me if I read this
2  correctly.

3      Question, "And so you caught a phone that was within the
4  thing but at 5:58; right?"  And let me stop here.  That was the
5  permanentwaves one; right?

6  **A.**   Correct.

7  **Q.**   Your answer was "Correct."

8      Question, "And you can't tell us -- so it's relevant.
9  It's within the one-hour time frame.  It's relevant?"

10      And your answer was, "Possibly.  Possibly not."  Did I
11  read that correctly?

12  **A.**   That's correct.

13  **Q.**   Okay.  Next question, "Okay.  But you made the decision
14  to not find out who that person was and disclose it to us;
15  correct?"

16      And the answer was, "We determined that" --

17      And then there was an objection that was overruled.

18      Your answer was, "We decided not to further investigate
19  that.  Correct."  Did I read that correct?

20  **A.**   That's correct.

21  **Q.**   As you sit here today, you have no information about the
22  owner of that account?

23  **A.**   I do not.

24  **Q.**   Now, you have testified quite a bit here today about
25  people calling each other on the day of the robbery --

1  **A.**   Yes, sir.

2  **Q.**   -- as if that was a big deal.  It's a big deal; right?

3  **A.**   It was.  The contact between each other was important.

4  **Q.**   Right.  You wouldn't have mentioned that if it was not a

5  big deal?

6  **A.**   Correct.

7  **Q.**   And there was somebody that phone records reveal talked

8  to Mr. Smith a lot on the day of the robbery who's not sitting

9  at counsel table?

10 **A.**   That I don't know.

11 **Q.**   That's Mr. Brown.

12 **A.**   Edwin Brown?

13 **Q.**   Edwin T. Brown.  So he was somebody that you got quite a

14 bit of information about; correct?

15 **A.**   He was.

16 **Q.**   Y'all got his phone records?

17 **A.**   We did.

18 **Q.**   You found that he talked to Mr. Smith on the day of the

19 incident seven times?

20 **A.**   Sounds correct.

21 **Q.**   I can show you your report if you want, but you'll accept

22 that.  The Government has not put his phone records into

23 evidence here today, has it?

24 **A.**   They have not.

25 **Q.**   Okay.  And Mr. Brown had a troublesome criminal history?

1 **A.** He did.

2 **Q.** He had an armed robbery, conspiracy, and kidnapping

3 conviction; correct?

4 **A.** That's correct.

5 **Q.** He then -- I think this is another incident -- robbed a

6 grocery store in Minter City, Mississippi, and used a firearm.

7 Does that sound right?

8 **A.** I believe it was one -- I'm not positive, but it might

9 have been one incident.

10 **Q.** I'll take your word for it. You want to look at your

11 report real quick?

12 **A.** I can.

13       **MR. LEWIS:** May I approach, Your Honor?

14       **THE COURT:** You may.

15 **BY MR. LEWIS:**

16 **Q.** Yeah. And you tell me. If this is the same incident,

17 I'm with you. Read right there (indicating).

18 **A.** Yeah. It's a description of what happened, yes.

19 **Q.** Okay. So we've got one incident of armed robbery,

20 conspiracy, and kidnapping. Robbed a grocery store in Minter

21 City. Firearm involved?

22 **A.** That's correct.

23 **Q.** Okay. And so calling somebody seven times on the day of

24 the robbery was not enough to get them arrested in this case;

25 correct?

1   **A.**   Just calling him, no.

2   **Q.**   Okay.  Another thing that you noted -- that you testified

3   to earlier was that -- was that Ms. Hines changed her phone

4   number or canceled her account or something of that nature on

5   the date of the incident?

6   **A.**   Yes.  I believe that was the -- the phone person that

7   testified to that.  Correct.

8   **Q.**   You heard that?

9   **A.**   Yes.

10  **Q.**   And that was on February 5, literally the day of the

11  incident, I believe, they testified she cancelled her phone?

12  **A.**   Yes.

13  **Q.**   And so you thought that was important?

14  **A.**   Correct.

15  **Q.**   Because y'all think Ms. Hines has something to do with

16  this?

17  **A.**   Correct.

18  **Q.**   Mr. Brown also cancelled his phone on the day of the

19  robbery?

20  **A.**   If --

21        **MR. LEWIS:**  May I approach?

22  **A.**   -- that's what my report says, that's -- that's correct.

23  **BY MR. LEWIS:**

24  **Q.**   Let's read together.  "The device registered to Brown

25  used in the time frame of the robbery was established on this

1 date in 2017 and was terminated on February 5, 2018." Did I

2 read that correctly?

3 **A.** You did.

4 **Q.** February 5, 2018, is the date of the robbery?

5 **A.** Yes, sir.

6 **Q.** You write, "Based on my training and experience, the

7 termination of the phone on February 5, 2018, is indicative of

8 someone involved in criminal activity dropping a phone that was

9 used in criminal activity in an attempt to disassociate

10 themselves from the criminal activity." Did I read that

11 correctly?

12 **A.** You did.

13 **Q.** But that was not enough to get Mr. Brown arrested in this

14 thing?

15 **A.** Now, we did use that information to obtain a search

16 warrant for his Google information.

17 **Q.** Ms. Brown -- excuse me. Ms. Hines is not sitting at

18 counsel table either, is she?

19 **A.** No, sir, she's not.

20 **Q.** So to summarize -- oh, let me ask you about -- well,

21 we'll get there in a minute. So to summarize, not everybody

22 that had a phone inside the fence was a suspect?

23 **A.** That's correct. We didn't use just the phones to present

24 our case to the U.S. Attorney's Office.

25 **Q.** Not everybody who did not have a phone show up inside the

Mathews - Cross by Mr. Lewis

1   fence was a suspect; correct?

2   **A.**   Correct.

3   **Q.**   Not everybody that talked to Jamarr a lot on the date of

4   the robbery was a suspect?

5   **A.**   That's correct.

6   **Q.**   Not everybody that got rid of their phone on the date of

7   the robbery was a suspect?

8   **A.**   That's correct.

9   **Q.**   This person that approached Mr. Cobbs in Robinsonville --

10  and you heard him testify this morning he thought it was odd,

11  possibly a setup, I think was his exact words -- you didn't --

12  you didn't find anything related to that?

13  **A.**   Yeah.  We obtained the video from an ATM that was across

14  the street from the Robinsonville post office.  Due to the

15  setting sun, you couldn't tell a lot of what was going on, but

16  it corroborated what Mr. Cobbs told us, that an individual in

17  a -- you know, what he described as a tannish two-toned SUV

18  approached him and talked to him.  But we never could make a

19  connection between that vehicle -- you know, not enough

20  information between that vehicle and our suspects to, you know,

21  identify who that -- who that was.

22  **Q.**   In other words, that didn't go anywhere.  You were not

23  able to get any more information about that other than what was

24  already said?

25  **A.**   That's correct.

1  **Q.**   But you obviously thought it was significant and

2  important and needed to be investigated?

3  **A.**   That's correct.

4  **Q.**   Just a few more things.  You heard Mr. Cobbs talk this

5  morning about a salvage yard in Walls.  Did you look that up?

6  **A.**   I did not.

7  **Q.**   Okay.  So you don't have any information of Tri-State

8  Salvage in Walls?

9  **A.**   No, sir.

10  **Q.**   Okay.  I did see one thing on Exhibit G-24, which are

11  Mr. Smith's Facebook records where he said something about

12  going to Horn Lake; right?  You remember that?  I'll show you.

13  Horn Lake is in DeSoto County; right?

14  **A.**   Yes, sir.

15  **Q.**   It's north of the scene of this incident; correct?

16  **A.**   I believe so.

17  **Q.**   All right.  Here it is.  2/20/18.  "I'm headed to pick

18  one up from Horn Lake.  I'll hit you when we get back."  Did I

19  read that correctly?

20  **A.**   Yes, sir.

21  **Q.**   Okay.  You would not dispute that Mr. Smith would need to

22  go to DeSoto County for any given reason?

23  **A.**   I -- I don't know -- I don't know why he would go

24  anywhere, but, yes, I don't dispute anything about that.

25  **Q.**   Okay.

1    **MR. LEWIS:**  Thank you, Your Honor.  That's all the

2  questions I have.

3         **THE COURT:**  Thank you.  Mr. Chiniche?  Mr. Travis?

4         **MR. TRAVIS:**  Thank you, Your Honor.

5         **THE COURT:**  Either one of you.

6         **MR. CHINICHE:**  Go ahead.

7         **MR. TRAVIS:**  Excuse me.  I'm sorry.

8         **MR. CHINICHE:**  No.  Go ahead.

9         **MR. TRAVIS:**  I'm sorry.

10        **THE COURT:**  This is how excited they are about being

11  here.

12        **MR. CHINICHE:**  I was being nice.

13        **THE COURT:**  I know you were being nice.  Thank you.

14                        **CROSS-EXAMINATION**

15  **BY MR. CHINICHE:**

16  **Q.**    Mr. Mathews, this geofence that captured the suspects in

17  this case --

18  **A.**    Yes, sir.

19  **Q.**    -- right, that's what y'all believe broke the case, I

20  guess; right?

21  **A.**    It was -- it was a big help, yes.

22  **Q.**    And what the geofence does, right, it shows devices that

23  come through an area that is drawn by law enforcement on a

24  search warrant; right?

25  **A.**    That's correct.

Mathews - Cross by Mr. Chiniche

1  **Q.** And so for Google to pick it up, it can't just be a cell

2  phone; right? Google doesn't pick up every cell phone?

3  **A.** Correct. They don't pick up every cell phone. That's

4  correct.

5  **Q.** It's got to be a Google -- a Google account. That's how

6  Google has the information?

7  **A.** Correct. It has to have some -- some device that has

8  some associated Google account.

9  **Q.** That's your understanding of it?

10 **A.** Yes, that's my understanding.

11 **Q.** And some settings have to be turned on, et cetera, et

12 cetera; right?

13 **A.** Yes, that's my understanding. Yes.

14 **Q.** And you also understand that the parameters of the

15 geofence, especially in 2018, weren't exact, were they?

16 **A.** That I don't know.

17 **Q.** Okay. We'll ask somebody else that. All right. But the

18 Government's position is that bleek2004 and Jamarr Smith e-mail

19 accounts went through your geofence; right?

20 **A.** That's correct.

21 **Q.** And from that you then traced it to cell phones -- cell

22 phone numbers; right?

23 **A.** Well, on the bleek2004, there was a phone number

24 associated with that account. Correct.

25 **Q.** All right. So it's possible that the real people that

1  committed this crime weren't using their phone and they're not

2  showing up in the geofence; right?

3  **A.**   That's not my understanding or my -- my belief in this

4  case, no.

5  **Q.**   Okay.  But if the real assailants didn't have phones or

6  Google accounts, it wouldn't show up in the geofence; right?

7  **A.**   If --

8  **Q.**   I know you think -- I know you think you know who did it;

9  right?

10  **A.**   Correct.

11  **Q.**   And it's these gentlemen here, but if the people on the

12  film -- somebody committed this crime; right?

13  **A.**   That's correct.  That's correct.

14  **Q.**   And there's somebody on the film behind a mail truck;

15  right?

16  **A.**   Correct.

17  **Q.**   I think we can agree there.

18  **A.**   Correct.

19  **Q.**   We don't know if it's a man or a woman, do we?

20  **A.**   Correct.  Can't tell from the video for sure, no.

21  **Q.**   Can't tell from the video.  We don't know if it's a white

22  person or a black person?

23  **A.**   No.

24  **Q.**   So -- but if that -- would you agree with me that if the

25  person that assaulted Mr. Cobbs didn't have a cell phone on

1  him, he's not going to show up or she's not going to show up in
2  the geofence?

3  **A.**    Yes.  If he did not have an account that was -- had
4  associated Google services on it -- on him, you know, or with
5  him, then they would not show up within the geofence.  That's
6  correct.

7  **Q.**    Okay.  So if the person who assaulted Mr. Cobbs didn't
8  have a cell phone on him or had it turned off or didn't have a
9  Google account, it's not going to show up in a geofence search
10 warrant, is it?

11 **A.**    If you -- yes, if you don't have a Google -- if you don't
12 have a device that has a Google account, it's not going to show
13 up.  Just a random person walking through is not going to show
14 up.  That's correct.

15 **Q.**    Right.  We saw a number of people on that video.  We
16 saw -- I saw Mr. Cobbs.  He admitted to having a cell phone.
17 He even admitted to having a Gmail account, didn't he?

18 **A.**    Yes, he did.

19 **Q.**    But his information didn't make it back on the geofence
20 warrant that you obtained, did it?

21 **A.**    It did not.

22 **Q.**    I saw in the video -- and the jury can look at this -- I
23 saw a white gentleman walking in a nearby business.  I saw
24 that.  Did you see that?

25 **A.**    Yes.  Walking by that closed store, yes.

 1  **Q.**   Yeah.  I saw a dog running around.

 2  **A.**   Yes.

 3  **Q.**   Okay.  I saw other vehicles.  I saw a red truck -- pickup

 4  truck.  Did you see that?

 5  **A.**   I did.

 6  **Q.**   I saw a white pickup truck.  Did you see that?

 7  **A.**   I believe I did, yes.

 8  **Q.**   I saw a small black SUV.  Did you see that --

 9  **A.**   Sounds correct.

10  **Q.**   -- at the beginning?  I saw some dark-colored sedans.

11  Did you see those?

12  **A.**   I did.

13  **Q.**   Okay.  So if those vehicles had a driver and that driver

14  had a cell phone turned on and a Google account, that should

15  show up, theoretically, in a geofence, shouldn't it?

16  **A.**   Possibly.  My understanding from the hearing we had is

17  that those devices aren't -- or those hits don't necessarily

18  come second by second.

19  **Q.**   Right.

20  **A.**   You know, if you're just there for a short period of

21  time, then your device might not register within that geofence.

22  **Q.**   Right.  It's not exact, is it?

23  **A.**   In that respect, no.

24  **Q.**   Maybe that's a question for someone else as well.  Not

25  you.  Okay?  We saw a train go by, and if the conductor or the

1    person operating that train -- he had or she had a phone, that

2    should show up as well -- or might show up?

3    **A.**   Again, theoretically, maybe, maybe not, depending on the

4    amount of time it was within the geofence.

5    **Q.**   Right.  And you've been to this location, haven't you?

6    **A.**   I have.

7    **Q.**   Multiple times?

8    **A.**   Yes.

9    **Q.**   Y'all had drone footage of it?

10   **A.**   Yes, we did.

11   **Q.**   You have a drone -- I saw a drone video, and we have

12   drone still shots, I guess, where the drone was taking

13   pictures; is that right?

14   **A.**   Yes, sir.

15   **Q.**   Did you operate that drone?

16   **A.**   I did not.

17   **Q.**   Okay.  But there are other businesses -- Mr. Mims asked

18   you, are there any other businesses, any other diners -- do you

19   remember that question --

20   **A.**   I do.

21   **Q.**   -- do the defendants have any family in that area?

22   **A.**   That's correct.

23   **Q.**   But I found Sigma Supply Company of North America right

24   there on Star Landing Road.  Do you know that business?  Do you

25   know where that is?

Mathews - Cross by Mr. Chiniche

1   **A.**   I do not.  It's not in the vicinity of the post office.

2   There's the post office.  There's a clothes store, a couple of

3   houses, and a farm office right in that general area that we

4   saw in the picture.

5   **Q.**   But it's just a few miles.  You don't know -- you don't

6   know this business?

7   **A.**   No, I don't.

8   **Q.**   It's a business where 18-wheelers come and go.  They have

9   bays for 18-wheelers.  You didn't notice that?

10  **A.**   I wasn't looking for it, no.

11  **Q.**   Okay.  I noticed a Shell gas station -- a nice new Shell

12  gas station near that intersection.

13  **A.**   Yes.  There's a gas station back -- on new 61, the

14  four-lane --

15  **Q.**   Right.

16  **A.**   -- there is a gas station there.  That is correct.

17  **Q.**   Right.  Did you capture that in your drone?

18  **A.**   No.

19  **Q.**   Okay.  I noticed Lake Cormorant MB Church to the east on

20  Star Landing Road, not too far from the post office.  Do you

21  know where that is?

22  **A.**   No.

23  **Q.**   I noticed Lake Cormorant UM Church to the west on Star

24  Landing Road.  Do you know where that is?

25  **A.**   No.

1 **Q.** On Blythe Road and Old Highway 61, you have Bethlehem CME

2 Church to the north. Did you notice a church?

3 **A.** I don't recall at this time, no.

4 **Q.** What about Pettis Chapel to the south? Did you notice

5 that?

6 **A.** No. I know there are a lot of churches in the Delta, but

7 I don't recall specifically looking at any of them, no.

8 **Q.** So there are businesses -- there are entities down there

9 other than just this post office and this closed down farm

10 shop. Would you agree with that?

11 **A.** If you represent there's churches in the area, I would

12 believe that, yes.

13 **Q.** Where people are driving presumably on cell phones, but

14 none of that's showing up in the geofence; right?

15 **A.** I don't know that I understand the question.

16 **Q.** There are a number of calls between -- that you all have

17 got by way of subpoena where these three are talking; right?

18 **A.** Correct.

19 **Q.** If they're -- it does show they're talking; right?

20 They're calling each other, and they're talking, or they're

21 texting?

22 **A.** Yes, sir. That's correct.

23 **Q.** We've got Facebook photos with them together; right?

24 **A.** Yes, sir. That's correct.

25 **Q.** We don't necessarily know the date that they're together,

1     but it shows a relationship among these three; right?

2     **A.**    Yes, sir, it does.

3     **Q.**    And so a reasonable conclusion is they know each other

4     and they're friends; right? That's reasonable?

5     **A.**    Yes, sir. That's a reasonable conclusion.

6     **Q.**    And so these calls show that these are calls. They don't

7     show or mean that these three committed this crime?

8     **A.**    Yes. It shows there were calls while they're in the Lake

9     Cormorant area. Yes.

10     **Q.**    It shows they were making calls, but that's it. It

11     doesn't show that they committed this crime. It shows they

12     made calls, but it does not show, does it, sir, that they

13     committed these crimes, the fact that they talked to each

14     other?

15     **A.**    Correct. The fact that they talked to each other does

16     not show that they committed the crime, but it does show that

17     they were talking to each other and they were in the Lake

18     Cormorant area.

19     **Q.**    I understand that's your interpretation of it, but the

20     presentation of all of these phone calls yesterday -- and

21     Mr. McGee said in opening 19 phone calls -- that shows there's

22     19 phones calls; right? 19 phone calls doesn't show they

23     committed this crime?

24     **A.**    The phone calls themselves do not, no.

25     **Q.**    Thank you. Thank you for answering my question. You

1  don't have a witness that says Mr. McThunel assaulted

2  Mr. Cobbs, do you?

3  **A.**    I do not.

4  **Q.**    Was Mr. Cobbs ever a suspect?

5  **A.**    I wouldn't call him a suspect.  We did do background

6  investigation on him, but he never was a suspect, no.

7  **Q.**    I mean, you believe this to be an inside job; right?

8  **A.**    That's correct.

9  **Q.**    I mean, they stole registered mail, a certain bag that

10  had money in it; right?

11  **A.**    That's correct.

12  **Q.**    They knew that this delivery driver was going to be

13  there; right?

14  **A.**    That's correct.

15  **Q.**    I think that's a reasonable assumption.  Did it dawn on

16  you that maybe Mr. Cobbs was in on this?

17  **A.**    Again, like I said, we -- based on the information we

18  had, we did do background information on him to see if there

19  was anything suspicious or any unusual transactions with him

20  that we could find.

21  **Q.**    Right.

22  **A.**    We found nothing that seemed suspicious.  So he never was

23  a suspect, no.

24  **Q.**    Was Mr. Cobbs ever in -- did your investigation show that

25  Mr. Cobbs was in any financial trouble or tax trouble?

1  **A.**  Our investigation didn't reveal anything like that, no.

2  **Q.**  When you went to go question Mr. Smith -- Mr. Smith, he

3  has a -- he had a mechanic shop; is that right?

4  **A.**  Yeah.  I believe it was called Twin's Shift Shop.  I

5  believe it was a transmission --

6  **Q.**  Did it appear to be legitimate?  I mean, were there cars

7  and customers?

8  **A.**  No.  There were cars there, but I never saw a customer or

9  Mr. Smith at that location.  I went by there numerous

10 occasions, different days.  Never saw anybody at the location.

11 **Q.**  Mr. Ayodele said he dropped his truck off; right?

12 **A.**  That's correct.

13 **Q.**  His white SUV was at Mr. Smith's; right?

14 **A.**  That's correct.

15 **Q.**  To have work done, didn't it?

16 **A.**  That's what he told us.

17 **Q.**  That's what he told you.  And you observed it there, and

18 you took a photograph of that?

19 **A.**  Yes.  I observed it on multiple occasions -- multiple

20 times at the same location on multiple dates, and it had never

21 moved.

22 **Q.**  Mr. Cobbs told you that on the day this happened he found

23 it odd when somebody -- I think he said a gentleman approached

24 him about a job; is that right?

25 **A.**  Yes.  In Robinsonville.

Mathews - Cross by Mr. Chiniche

1    **Q.**   In Robinsonville. And this was before he was assaulted;
2    right?

3    **A.**   Correct.

4    **Q.**   All right. And he mentioned that -- whoever came up to
5    him asking him for a job, he told that person, "You need to
6    apply like I did"; right?

7    **A.**   That's correct.

8    **Q.**   And that the person who asked him that question about a
9    job got in a tan two-toned vehicle; right?

10    **A.**   That's correct.

11    **Q.**   All right. Did -- in the mapping of where these
12    gentlemen were going or any phone calls, were there any phone
13    calls by Mr. McThunel that morning in the Robinsonville area?
14    Do phone calls of Mr. McThunel show that Mr. McThunel was in
15    the Robinsonville area?

16    **A.**   I'd have to look back at the records. Are you talking
17    about that morning or --

18    **Q.**   Yes. Yes, that morning.

19    **A.**   I would have to check the records, but I believe one or
20    two of them were at the casino prior -- or at least in the area
21    of the casino either the 4th or early morning 5th. I can't
22    remember exactly.

23    **Q.**   But you're not saying that Mr. McThunel was the gentleman
24    who approached Mr. Cobbs looking for a job?

25    **A.**   Yeah. I don't know who the gentleman was that approached

1  Mr. Cobbs.

2  **Q.**  Okay.  Kirk Toyota.  You found out that through the

3  search of the CLEAR system.  This is a database that you have

4  access to; is that right?

5  **A.**  That's correct.

6  **Q.**  That Mr. McThunel owned a red Hyundai Sonata, 2013; is

7  that right?

8  **A.**  Yes, sir.  That's correct.

9  **Q.**  Okay.  Do you remember when you reached out or got a

10  warrant for Kirk Toyota?

11  **A.**  I believe we got a subpoena, but it would have been in

12  2019.

13  **Q.**  Right.  It was after the geofence; right?

14  **A.**  Yes, sir.  That's correct.

15  **Q.**  It was after you all started tracking phone numbers;

16  right?

17  **A.**  I believe it was.

18  **Q.**  Okay.  And it was after you all had searched the CLEAR

19  database and found the information about Mr. McThunel and a

20  2013 Hyundai Sonata; right?

21  **A.**  Yes, sir.  That's correct.

22  **Q.**  Okay.  I'm going to show you what's been marked as

23  Government G-11.  If I represented to you this is 42 pages,

24  does that sound about right?

25  **A.**  Yes, sir, it does.

Mathews - Cross by Mr. Chiniche

1  **Q.**  All right.  And it's got Kirk Toyota at the top; right?

2  **A.**  Yes, sir.

3  **Q.**  This is a cap sheet?

4  **A.**  Yes, sir.

5  **Q.**  Your testimony is you all obtained this directly from

6  Kirk Auto -- Toyota -- Kirk Toyota?

7  **A.**  Yes, sir.

8  **Q.**  Okay.  And it's got various sales documents in here;

9  right?

10  **A.**  Yes, sir.

11  **Q.**  And you've reviewed this file, haven't you?

12  **A.**  Yes, sir.

13  **Q.**  And so this is a transaction on February the 8th; is that

14  right?

15  **A.**  Yes, sir.

16  **Q.**  This is a transaction where Mr. McThunel traded in the

17  Hyundai Sonata, and he got what?

18  **A.**  I believe it was a Toyota Camry.

19  **Q.**  Right.  And so he made a purchase of that Toyota down

20  there; right?

21  **A.**  Yes, sir, he did.

22  **Q.**  And so he had to provide his driver's license; right?

23  **A.**  Yes, sir.

24  **Q.**  And this looks like a credit application; is that right?

25  Can you see that?

Mathews - Cross by Mr. Chiniche

1   **A.**   Yes, sir.  That's what it appears to be.

2   **Q.**   All right.  And that would be -- it's got his date of

3   birth and social security at the top and his address; is that

4   right?

5   **A.**   Yes, sir, it does.

6   **Q.**   It's got some information about him.  And that makes

7   sense because he's applying for a loan, didn't he?

8   **A.**   That's what it looks like, yes, sir.

9   **Q.**   And he lists his current job as material handling at

10  Southern Industrial Construction; right?

11  **A.**   Yes, sir, he did.

12  **Q.**   He indicates he's got some college and university

13  experience.  He lists his employer's phone number; right?

14  **A.**   Yes, sir.

15  **Q.**   He's been at that job for five years on his application;

16  right?

17  **A.**   That's correct.

18  **Q.**   He indicates that he's got alimony, child support.  His

19  income is 2,815 monthly; right?

20  **A.**   Yes, sir, that's what it says.

21  **Q.**   That's what it says.  And his bank is at BancorpSouth?

22  **A.**   Yes, sir.

23  **Q.**   Did you subpoena any records at BancorpSouth?

24  **A.**   I did not.

25  **Q.**   It says that he has monthly rent of 300; right?

1 **A.** Yes, sir.

2 **Q.** And that he lives with relatives?

3 **A.** Yes, sir.

4 **Q.** Not a bad situation. This page indicates that

5 Mr. McThunel has insurance -- auto insurance, right, with

6 Allstate? Right? It's effective --

7 **A.** I can't -- I can't --

8 **Q.** You can't see that?

9 **A.** Okay.

10 **Q.** December '17 through June of '18 --

11 **A.** Yes, sir. For --

12 **Q.** -- right?

13 **A.** Yes. For the Hyundai. Yes. That's correct.

14 **Q.** Yeah. This document, miles on the vehicle purchased,

15 45,000; miles on the trade, 133,000. That's what this document

16 says; right?

17 **A.** Yes, sir.

18 **Q.** I take it to mean that the vehicle he's trading in had

19 133,000 miles on it?

20 **A.** That's what it appears, yes, sir.

21 **Q.** Did -- this database that you looked at, this CLEAR

22 system, did it tell you that the 2013 Hyundai Sonata had an

23 engine recall?

24 **A.** Not that I recall, no.

25 **Q.** Okay. But if it did, that might be a reason why

1  Mr. McThunel traded in this vehicle?

2  **A.**   It could be one reason, yes.

3  **Q.**   Another reason could be it had 133,000 miles on it;

4  right?

5  **A.**   Possibly.  I don't really know.  My -- my vehicles have a

6  lot more than that.  So I don't really know.

7  **Q.**   But it could be a reason?

8  **A.**   It could be, yes.  Could be many reasons.

9  **Q.**   Looks like he was able to borrow a vehicle for the day.

10 Maybe test drive.  I don't know.  Salesperson signature at the

11 bottom.  He's proven he's got insurance; right?

12 **A.**   Yes.

13 **Q.**   Okay.  Mr. McThunel even has a credit score with Equifax;

14 right?  You see that?

15 **A.**   Yes, sir, I do.

16 **Q.**   And then somewhere in the back here -- here we go -- is a

17 pay stub, right, where Mr. McThunel is working at Southern

18 Industrial Constructors?  Right?

19 **A.**   Yes, sir.  That's what it appears.

20 **Q.**   Got his name and his address, how much he makes.  Did you

21 review all of that --

22 **A.**   Yes, sir, I did.

23 **Q.**   -- in taking the case to the U.S. Attorney's Office?

24 **A.**   Yes, sir.

25 **Q.**   Okay.  I'm having trouble locating the C Spire account

1    number.  Here we go.  Nope.  But the phone number 662-710-7511,

2    when you got the search warrant -- or the subpoena on C Spire

3    for that phone number, 662-710-7511, it came back not with

4    Mr. McThunel's name on it, did it?

5    **A.**    It came back with the name Travonya Nash.

6    **Q.**    Travonya Nash.  Did you interview Travonya Nash?

7    **A.**    I did not.

8    **Q.**    Do you know who Travonya Nash is?

9    **A.**    A friend of Mr. McThunel's.

10   **Q.**    How do you know that?

11   **A.**    He listed that on his application at Kirk Auto.

12   **Q.**    So the phone number making those phone calls -- the 19

13   phone calls prosecution mentioned, all of these phone calls we

14   went down through today that were highlighted in yellow,

15   (662) 710-7500, that -- the account holder is Travonya Nash?

16   **A.**    I believe it's 7511.

17   **Q.**    7511.  You're right.

18   **A.**    That's the name of the subscriber information.  Correct.

19   **Q.**    Okay.  Do you know who Latorian Clark is?

20   **A.**    The name sounds familiar.

21   **Q.**    U.S. Postal worker, a clerk, that worked under Chevella

22   Hines.

23   **A.**    Yes.

24   **Q.**    Okay.  Do you work with a guy named Charlie Tutor?

25   **A.**    I do.

1   **Q.**   Did Mr. Tutor work on this case?

2   **A.**   Yes, he did.

3   **Q.**   Charlie Tutor is also an inspector just like you; is that

4   right?

5   **A.**   That's correct.

6   **Q.**   Did you interview Latorian Clark, or did Charlie Tutor

7   interview Latorian Clark?

8   **A.**   I did not interview Latorian Clark.  If I could see the

9   MOI I could tell you who, but I don't -- I can't tell you off

10   the top of my head who interviewed her or him.

11   **Q.**   Latorian Clark was an employee of the post office that

12   Chevella Hines let off that day.  Are you aware of that?

13   **A.**   Oh.  Correct.  Yes.

14   **Q.**   So this Clark person -- is it a man or a woman?  Do you

15   know?

16   **A.**   I believe it's a man.

17   **Q.**   He asked to be off the day this robbery took place,

18   didn't he?

19   **A.**   Correct.

20   **Q.**   And Chevella Hines granted him leave that day; right?

21   **A.**   Correct.  He actually offered to stay because she was

22   going to be the only one there at the office.  So he told her,

23   "Hey, you know, I can stay."  She said, "No.  I'll get somebody

24   else to cover," which she never did.

25   **Q.**   Did you do a subpoena on Latorian Clark's phone records?

Mathews - Cross by Mr. Travis

1    **A.**    No.

2    **Q.**    Did you do a geofence warrant on Latorian Clark?

3    **A.**    I don't guess I understand the question because we

4    didn't -- are you asking did they -- was that phone found in

5    the geofence?

6    **Q.**    I'm asking -- okay.  Bad question.  I asked a bad

7    question.  Did you investigate Clark -- this employee Clark --

8    this U.S. Postal employee named Clark?

9    **A.**    We did basic background, yes.

10   **Q.**    Okay.  But you don't know where that person was all

11   throughout the day on February the 5th, 2018?

12   **A.**    I do not.

13           **MR. CHINICHE:**  Your Honor, if I may have just a

14   moment.

15           **THE COURT:**  You may.

16      (CONFERRING OFF THE RECORD.)

17           **MR. CHINICHE:**  I have no further questions, Your

18   Honor.

19           **THE COURT:**  Thank you.

20           Mr. Travis.

21           **MR. TRAVIS:**  Thank you, Your Honor.  If it please the

22   Court.  Court's indulgence just a minute, please.

23           **THE COURT:**  Yes, sir.

24                        **CROSS-EXAMINATION**

25   **BY MR. TRAVIS:**

1  **Q.**   Good afternoon, Mr. Mathews.

2  **A.**   Good afternoon.

3  **Q.**   It is afternoon.  Let me start at the top.  February the
4  5th, 2018.

5  **A.**   Yes, sir.

6  **Q.**   Let's talk about a white vehicle.  Your evidence on the
7  date of the crime -- the alleged crime on February the 5th of
8  2018 does not, by video or any other form of identification,
9  show physically Mr. Ayodele in any white vehicle at the scene;
10  is that correct?

11  **A.**   Correct.  The video does not show, you know, faces of the
12  people in the -- in the -- in the SUV.  That's correct.

13  **Q.**   Thank you.  So you can't see in that vehicle to see if
14  it's Mr. Ayodele, male or female, otherwise; correct?  That's
15  what you just stated.

16  **A.**   Correct.  The video does not show that.

17  **Q.**   Okay.  Thank you.  Now, you go -- go all day and all day
18  tomorrow, I assume -- you've got the 4000 number, Mr. Ayodele.
19  Now, to be clear, there again, that's the number that belonged
20  to Mr. Ayodele but does not physically put him into this
21  evidence that you have, is that right, with his identification?

22  **A.**   Correct.

23  **Q.**   Okay.

24  **A.**   That 4000 number was at the location.

25  **Q.**   All right.  And you've testified that you had spoken to

1  Mr. Ayodele; correct?

2  **A.**  That's correct.

3  **Q.**  On two occasions?

4  **A.**  That's correct.

5  **Q.**  And he on two occasions voluntarily spoke with you --

6  **A.**  That's correct.

7  **Q.**  -- is that right?

8  **A.**  Yes, sir.

9  **Q.**  He didn't have to do that, did he?

10 **A.**  He did not.

11 **Q.**  But he did it?

12 **A.**  He did.

13 **Q.**  Two occasions?

14 **A.**  Two occasions, yes, sir.

15 **Q.**  That would be October 30th of 2019?

16 **A.**  Yes, sir.

17 **Q.**  Eighteen months after February the 5th of 2018, more or

18 less, if my arithmetic is correct.  Fair enough?

19 **A.**  Sounds about right, yes, sir.

20 **Q.**  And he voluntarily spoke with you again on December

21 the 3rd of 2019, I believe.  Is that fair?

22 **A.**  Yes.  I know it was December of 2019.

23 **Q.**  Yes, sir.  Voluntarily?

24 **A.**  Yes, sir, he did.

25 **Q.**  That's about 20 months from February the 5th of 2018.

1    Fair enough?

2    **A.**    Sounds -- sounds about right.

3    **Q.**    Now, you earlier had put into evidence through the

4    prosecutors going to the Kirk Toyota; correct?

5    **A.**    Yes, sir.

6    **Q.**    The personal references --

7    **A.**    Yes, sir.

8    **Q.**    -- that you alluded to in your direct examination; right?

9    **A.**    That's correct.

10    **Q.**    And on there -- you brought it to the jury's attention on

11    Number 3 on the left-hand side Mr. Ayodele; correct?

12    **A.**    Yes, sir. I'm sorry. I can't see that on the screen.

13    **Q.**    Oh, I'm sorry. Forgive me. Can you see it now?

14    **A.**    Sort of.

15    **Q.**    I don't want to mess up Mr. Mims's exhibit. See it now?

16    **A.**    Yes, sir, I do.

17    **Q.**    And the number there shows -- you had testified under

18    oath that Mr. Ayodele had multiple phones, more than one. Fair

19    enough?

20    **A.**    Yes, sir. When we interviewed him, he gave us -- I don't

21    remember -- three, four phone numbers. That included the 4000

22    number.

23    **Q.**    And that would have included this 228-223-7897; is that

24    correct?

25    **A.**    That's very likely, yes, sir.

1 **Q.** Well, that's one of his phone numbers of several;
2 correct?

3 **A.** To my understanding, yes, sir.

4 **Q.** All right. So on the date of February the 5th of 2018,
5 you pick up the 4000 number that you're trying to hang your hat
6 on with this jury on Mr. Ayodele; right? You don't pick up --
7 let's use the last four digits of Exhibit G-11. You don't pick
8 up the 228-223 -- what you would have called the last four,
9 7897? Is that fair, sir?

10 **A.** Yes. That was -- we didn't pick that up in the geofence.
11 Correct.

12 **Q.** All right. You didn't pick up any other of the several
13 numbers of Mr. Ayodele's that you've testified to. Fair
14 enough?

15 **A.** Yes, sir. That sounds fair.

16 **Q.** Now, Mr. Ayodele, again, was nice enough to voluntarily
17 speak to you on two occasions. Eighteen months after the fact
18 in October of 2019; correct?

19 **A.** Yes, he spoke to us then.

20 **Q.** And we talked about the 20 months later, a few months
21 later after October of 2019?

22 **A.** Yes, sir. He spoke to us again in December of 2019.

23 **Q.** And he told you -- would you agree with me just for the
24 sake of common sense and understanding that people -- good
25 people loan their cars to other people?

1  **A.**    It's possible, yes, sir.

2  **Q.**    Oh, it's possible.  I own three cars, and I loan to

3  friends, and I've got three kids.  So half of the time I've got

4  one car.  Does that make sense?

5  **A.**    Yeah, it makes sense.

6  **Q.**    Let's be reasonable.  We're not trying to play hide and

7  seek here.

8  **A.**    Yeah, it makes sense.

9  **Q.**    Okay.  People loan their cars to other friends or family?

10  **A.**    Yes.

11  **Q.**    All right.  I'm not trying to hide the ball here.  It

12  happens; right?

13  **A.**    That's correct.

14  **Q.**    All right.  Now, you -- let's be fair -- and I don't

15  think you were trying to be unfair.  He told you that he had an

16  acquaintance or friend named Little Bo.  Fair enough?

17  **A.**    He told us that.

18  **Q.**    And that he loaned the car to him.  Fair enough?

19  **A.**    Yes, sir, he did.

20  **Q.**    And I don't know if he specifically gave a day, but he

21  had a person that he loaned a car to quite a bit?

22  **A.**    Yes, sir, he did.

23  **Q.**    Fair enough?

24  **A.**    He did.

25  **Q.**    Okay.  I've got a good friend named Randy Neal who comes

1   up from Boca Raton, Florida, once in a while and I loan him my

2   car.  It happens, doesn't it?

3   **A.**   Yes, sir.

4   **Q.**   All right.  Now, let's be clear on Little Bo.  You said

5   something that made it sound to me like he was a dead man when

6   you interviewed -- that Little Bo was already deceased, gone to

7   his great reward, when you first interviewed Mr. Ayodele

8   October 30th, 2019, and/or December of 2019.  At that point in

9   time, Little Bo was not deceased.  Is that fair?

10  **A.**   My understanding, he was deceased in mid-2019.

11  **Q.**   Mid-2019.  Okay.

12  **A.**   We spoke to Mr. Ayodele in October and December of 2019.

13  **Q.**   But that would have put -- if he's saying that he had

14  Little Bo with the car -- his vehicle around -- in February of

15  2018 -- you get me?

16  **A.**   I think you're asking me was he alive in February of

17  2018?

18  **Q.**   That's right.

19  **A.**   That would be correct.

20  **Q.**   That would be correct; right?

21  **A.**   Yes.  But he was not alive when we spoke to Mr. Ayodele.

22  **Q.**   Based on your professional investigation, he told you

23  that Little Bo was a friend or acquaintance he loaned the truck

24  to or the car to, whatever; right?

25  **A.**   Yes, sir, that's what he told us.

1  **Q.**  And that that man was alive and well in February the 5th

2  of 2018.  Is that fair?

3  **A.**  It is my understanding he was alive in February of 2018

4  but was not when we interviewed Mr. Ayodele.

5  **Q.**  Right.

6  **A.**  Correct.  I just want to make sure we're talking about

7  the same thing.

8  **Q.**  You were talking to my client about what's going on in

9  February of 2018; right?

10  **A.**  That's correct.

11  **Q.**  And we both agree right now Little Bo was alive and well;

12  right?

13  **A.**  Yes, sir, he was alive.

14  **Q.**  Thank you.  And at that time when he met with you on

15  those two occasions voluntarily, he told you that he was not

16  involved in any wrongdoing; correct?

17  **A.**  That's correct.

18  **Q.**  Both times?

19  **A.**  Both times, yes, sir.

20  **Q.**  And then you -- this is -- you asked him about his

21  employment.  He is employed; right?

22  **A.**  Yes, sir, he is.

23  **Q.**  He works for a living; right?

24  **A.**  Yes, sir.  He works for Mississippi Department --

25  **Q.**  Got that.

1  **A.**    -- of Employment Security.

2  **Q.**    But you're interviewing him on the -- you were -- did you

3  interview him yourself?

4  **A.**    Yes.

5  **Q.**    Did he have his Day-Timer from, what, 18, 20 months

6  before telling you that he knew he was at work that day?

7  **A.**    Did he have his what?  I'm sorry.

8  **Q.**    His Day-Timer or calendar or something.

9        **MR. MIMS:**  Your Honor, I'm going to object for a

10  minute.  This calls for hearsay for him to ask what Mr. Ayodele

11  told him if it's not a statement against interest.

12        **MR. TRAVIS:**  They brought -- they brought this up.

13  They opened the door, Judge.  They --

14        **MR. MIMS:**  Your Honor, may we approach the bench and

15  discuss this?

16        **THE COURT:**  You can.

17     (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

18        **MR. TRAVIS:**  Let me tell her what I want to ask.

19        **THE COURT:**  Okay.

20        **MR. TRAVIS:**  Judge, I just want to ask him if he was

21  just basically answering the question as honestly -- the point

22  I want to make -- and he answered as honestly as he could.

23  This is 18 or 20 months after the fact.  Okay?  Just -- it's a

24  memory question.  You know, do I remember what I was doing

25  18 months ago?

1    **THE COURT:** Yeah.

2        **MR. TRAVIS:** The short answer is no. The long answer

3    is, heck, no. That's all I'm trying to say. They brought

4    the -- they brought this up. I didn't.

5        **MR. MIMS:** Your Honor, I think if he wants to present

6    an alibi defense he needs to have Mr. Ayodele testify that he

7    was working that day. His question was did Mr. Ayodele tell

8    you this or do that. And that is not a statement against

9    interest; therefore, it is hearsay. I can ask what did Ayodele

10   say because I'm asking about --

11       **MR. TRAVIS:** I'm not trying to create an alibi.

12       **THE COURT:** The objection is sustained, but you can

13   ask the question you want to ask. The question is sustained

14   because it is not an admission of opposite party.

15       **MR. TRAVIS:** So you're going to let me still ask --

16       **THE COURT:** Yes.

17       **MR. MIMS:** Which question can he ask? Because I'm

18   confused.

19       **MR. TRAVIS:** I'm simply asking -- it's a memory

20   question when he asked him in 2019 was he at work that day.

21   That's just -- the bottom line is this. That's 18 to 20 months

22   after the fact. He didn't have -- he is not sitting there with

23   his darn work records any more than I would be.

24       **THE COURT:** Yeah.

25       (END OF BENCH CONFERENCE.)

1    **MR. TRAVIS:**  Thank you, Your Honor.

2    **BY MR. TRAVIS:**

3    **Q.**    Just briefly, Mr. Mathews.  When you spoke to Mr. Ayodele

4    in October and/or December of 2019, you've testified that he

5    said he was at work.  And you've testified, well, you didn't

6    determine that he was.  Now, he's basically talking to you

7    basically based on his memory; right?

8    **A.**    That's my understanding.

9    **Q.**    He's sitting there with you voluntarily talking to you;

10   correct?

11   **A.**    Yes, sir.

12   **Q.**    On two occasions; correct?

13   **A.**    Yes, sir.

14   **Q.**    And do you remember, if I asked you right now, what you

15   were doing 18 or 20 months ago right now?

16   **A.**    Probably not.

17   **Q.**    Fair enough.

18              **MR. TRAVIS:**  Thank you, Your Honor.  Court's

19   indulgence, please.

20              **THE COURT:**  Yes, sir.

21         (CONFERRING OFF THE RECORD.)

22              **MR. TRAVIS:**  Thank you for the Court's time.  Thank

23   you, sir.

24              **THE COURT:**  Thank you.

25              Redirect.

Mathews - Redirect

1     **REDIRECT EXAMINATION**

2   **BY MR. MIMS:**

3   **Q.**   Mr. Mathews, did you follow up with Mr. Ayodele's work?

4   **A.**   Yes, sir, we did.

5   **Q.**   Did you do all you could to see if that excuse was

6   legitimate?

7   **A.**   Yes, sir.  We made every effort we could to determine

8   whether he was telling us the truth or not.

9   **Q.**   Yes or no.  Could you confirm Ayodele was at work on the

10   afternoon of February 5th of 2018?

11   **A.**   No, we could not confirm it.

12   **Q.**   Now, you were asked a question a minute ago about this

13   7511 phone number, and the subscriber on that is Travonya Nash;

14   correct?

15   **A.**   Yes, sir.  That's correct.

16   **Q.**   She is some sort of friend of Mr. McThunel?

17   **A.**   That's correct.

18   **Q.**   What phone number did Mr. McThunel list as his phone

19   number on the Kirk Auto records?

20   **A.**   Kirk Auto records he listed the 7511.

21   **Q.**   You were asked a question a minute ago, I believe by

22   Mr. Chiniche, about Twin's Shift Shop.

23   **A.**   Yes, sir.

24   **Q.**   That's owned by Mr. Smith?

25   **A.**   Yes, sir, it is.

1    **Q.**    Did you do any research to determine when that business

2    was opened?

3    **A.**    Yes, sir.  It was opened in March of 2018.

4    **Q.**    So approximately a month after this robbery?

5    **A.**    Yes, sir.  That's correct.

6    **Q.**    You were asked some questions about Latorian Clark.  Have

7    I got the name right?

8    **A.**    Yes, sir.

9    **Q.**    Did you tell me -- is that a Mr. or Ms. Clark?

10   **A.**    My understanding, it's a Mr. Clark.

11   **Q.**    All right.  Where is it that Mr. Clark worked?

12   **A.**    He was employed at the Robinsonville post office.

13   **Q.**    And that's the same one where Chevella Hines is a

14   postmaster?

15   **A.**    That's correct.

16   **Q.**    And Ms. Hines was at work on February 5th, 2018, wasn't

17   she?

18   **A.**    That's correct.  She was.

19   **Q.**    Did she work a full day that day?

20   **A.**    She did.

21   **Q.**    So I'm a little confused.  What is it about Mr. Clark?

22   Was he working that day?

23   **A.**    No.  Mr. Clark was actually interviewed a couple of

24   times, but he stated that --

25   **Q.**    No.  Hold on.  Hold on.  Don't tell me what he stated.

1  **A.**    I'm sorry.

2  **Q.**    Just was he working that day?

3  **A.**    He was -- he was not working that day.

4  **Q.**    Okay.  Do I understand from your questions and answers

5  earlier that he had offered to come to work?

6  **A.**    That is correct.

7  **Q.**    And Ms. Hines had told him don't come to work?

8  **A.**    That's correct.

9  **Q.**    Now, you were asked a question a little while ago -- a

10  point was made that what we have here is we have these three

11  folks who are friends, apparently.  Even the defendants'

12  attorneys admit they're friends; right?

13  **A.**    That's correct.

14  **Q.**    And they're making multiple phone calls on February 5th,

15  2018?

16  **A.**    Yes, sir, they are.

17  **Q.**    Based on the phone records that you have reviewed and the

18  cell tower information that you've seen, where were those

19  phones located during the time of the robbery?  What towers

20  were they pinging off of?

21  **MR. LEWIS:**  Okay.  Excuse me, Your Honor.  And, again,

22  this goes back to stuff that I don't think he's qualified to

23  state.

24  **MR. MIMS:**  May I respond?

25  **THE COURT:**  Come to the bench.

1    (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

2         **MR. MIMS:**  The issue on cross is he was -- I believe

3    it was Mr. Lewis that was making his cross at that time and was

4    basically saying all these folks are doing -- we just have

5    phone calls -- we just have phone calls, as the evidence is,

6    just friends calling each other.

7         I think the point to go into on redirect is, yes, they

8    are making phone calls, but the phones are all -- based on the

9    records, appear to be in and around Lake Cormorant at that

10   time.  And I think that's important.  It's not just they were

11   making phone calls, but the phones were in that area according

12   to the phone records.

13        **MR. LEWIS:**  They are going to have a witness tomorrow

14   to testify as an expert.

15        **MR. MIMS:**  I don't think I should be allowed to ask

16   questions of only one witness.  I think they brought it up in

17   cross.  I should be able to go into redirect with this witness.

18        **THE COURT:**  Okay.  It's overruled.

19   (END OF BENCH CONFERENCE.)

20   **BY MR. MIMS:**

21   **Q.**   Mr. Mathews, I'll ask you again.  On the afternoon of

22   February 5th, 2018, in the 5:00 to 5:30 time frame, when we

23   have multiple phone calls between these defendants, where do

24   the phone records show what towers were being used?

25   **A.**   Lake Cormorant, Mississippi, towers.

1   **Q.**    You were asked a question a minute ago -- been a few

2   minutes ago now -- about permanentwavesrecords.  That was the

3   third device that hit one time in the original geofence

4   warrant; correct?

5   **A.**    That's correct.

6   **Q.**    At approximately what time did that device hit?

7   **A.**    5:58 p.m.

8   **Q.**    Did you or did you not do what you could to identify who

9   had that device?

10   **A.**    We did what we could, yes, sir.

11   **Q.**    Were you successful in that ultimately?

12   **A.**    No, sir, we were not.

13   **Q.**    Based on your investigation of this case, did you believe

14   that that device that hit at 5:58 p.m. was involved in this

15   robbery?

16   **A.**    We did not believe it was involved in the robbery.

17   **Q.**    Why not?

18   **A.**    Based on the time, there was no other connection with any

19   of our suspects, phone records.  Like I said, no other location

20   history during the time of the robbery that we could show.

21   **Q.**    Mr. Mathews, I'm going to show you Exhibit G-13A.  This

22   is one of the overhead drone shots showing the post office

23   there at Lake Cormorant.  Are you familiar with the geofence

24   warrant in this case?

25   **A.**    Yes, sir, I am.

1  **Q.**  Specifically, are you familiar with the actual box so to

2  speak that was drawn for the geofence warrant?

3  **A.**  Yes, sir.

4  **Q.**  Would you please, on the screen there, to the best of

5  your estimate, draw where the box was.

6  **A.**  (Drawing)  I can't remember how far to the left we went.

7  That's a general.

8  **Q.**  Okay.  Mr. Mathews, to be fair, you're not proclaiming

9  that's the exact latitude and longitude, but it's your best

10  faith -- best good faith estimate?

11  **A.**  Yes, sir.

12  **Q.**  It took in the post office, correct, the box did?

13  **A.**  Yes, sir.

14  **Q.**  And it took in a part of the road in front of the post

15  office where we see the white SUV and the red Hyundai; correct?

16  **A.**  Yes, sir.

17  **Q.**  Okay.  Was the geofence search warrant asking for devices

18  inside that box?

19  **A.**  Yes, sir, it was.

20  **Q.**  Only inside the box.  Not -- not devices everywhere in

21  Lake Cormorant but just inside the box?

22  **A.**  That is correct.

23  **Q.**  Now, you were asked questions about several businesses

24  here.  One of them I didn't catch the whole name.  I thought it

25  was something like Sigma Supply Company.  You remember the

1  questions about Sigma Supply Company?

2  **A.**  Yes, sir.

3  **Q.**  Is Sigma Supply Company inside that box?

4  **A.**  No, sir.

5  **Q.**  You were asked about a Shell station on Highway 61.  Is

6  the Shell station inside that box?

7  **A.**  No, sir, it's not.

8  **Q.**  You were asked about a church.  Is the church inside that

9  box?

10 **A.**  No, sir, it's not.

11 **Q.**  So if there are people at the Shell station or the church

12 or the supply company, would you expect to receive information

13 back from Google for your geofence warrant?

14 **A.**  No, sir, I wouldn't.

15 **Q.**  You were asked questions about a Mr. Brown.  That's Edwin

16 Brown; is that right?

17 **A.**  Yes, sir.  Edwin Brown.

18 **Q.**  Let me ask you this just in general.  Well, let me skip

19 that.  Let me just ask you about Mr. Brown specifically.  At

20 one time, did you consider he might be a suspect in this case?

21 **A.**  Yes, sir, we did.

22 **Q.**  Why is that?

23 **A.**  Because he was having phone conversations with Mr. Smith

24 during the time of the robbery and his past criminal history.

25 **Q.**  Okay.  What about his past criminal history?

1   **A.**   He had a conviction for armed robbery.

2   **Q.**   So what about the conviction and the phone conversations

3   with Mr. Smith made you think he might be a suspect?

4   **A.**   Seemed like that he might be involved in the robbery.  I

5   mean, Mr. Brown had information -- you know, he had done a

6   robbery before; so he knew how to commit robbery.  So we

7   thought maybe he was working with Mr. Smith to commit the

8   robbery.

9   **Q.**   Okay.  Can you prove that Mr. Brown was involved?

10  **A.**   That Mr. Brown was involved?

11  **Q.**   That he was -- can you prove Mr. Brown was involved?  He

12  was a suspect; right?

13  **A.**   Correct.

14  **Q.**   Could he still even to this day possibly be a suspect?

15  **A.**   That's possible.  He could have given -- given them

16  information how to commit a robbery.

17  **Q.**   But can you prove that Mr. Brown was involved?

18  **A.**   I cannot.

19  **Q.**   Do you have an eyewitness that places Mr. Brown at Lake

20  Cormorant at the time of the robbery near the post office?

21  **A.**   I do not.

22  **Q.**   Does Mr. Brown have a white SUV like the one we see in

23  the video?

24  **A.**   He does not.

25  **Q.**   Does Mr. Brown have a red Hyundai like the one we see in

1   the video?

2   **A.**   He does not.

3   **Q.**   When you received the information from Google from the

4   geofence warrant, did you find -- did you receive any records

5   that you could connect to Mr. Brown?

6   **A.**   I did not.

7   **Q.**   In other words, did Google send you anything that showed

8   you Mr. Brown's phone was in that box?

9   **A.**   No records.

10   **Q.**   Did you, in fact, do a search warrant to Google for

11   Mr. Brown's location information?

12   **A.**   Yes, sir, we did.

13   **Q.**   That would be similar to the search warrants that you did

14   for Mr. Smith and Mr. McThunel's location information; is that

15   right?

16   **A.**   Yes, sir.  That's correct.

17   **Q.**   Did you review that information?

18   **A.**   Yes, sir.

19   **Q.**   In reviewing that information, did the location history

20   on Mr. Brown place him near Lake Cormorant at that time of the

21   robbery?

22        **MR. LEWIS:**  Excuse me, Your Honor.  I object to that.

23   Those documents aren't in evidence.

24        **THE COURT:**  It's sustained.

25        **MR. MIMS:**  Your Honor, may we approach and discuss it?

1    (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

2    **MR. MIMS**:  Your Honor, I don't think the documents

3    have to be in evidence.  I have got them here.  I can put them

4    in evidence if I need to.

5         The fact of the matter is they went into great detail

6    on cross about Mr. Brown being a potential suspect, and he is a

7    suspect.  We can't prove beyond a reasonable doubt he did it,

8    but he did, in fact, investigate Mr. Brown.  He obtained the

9    phone record -- I'm sorry -- the Google record just like Smith

10   and McThunel.  The difference is, Smith and McThunel, the

11   records put them at Lake Cormorant and Brown's don't.

12        And I think it's important for the jury to hear he was

13   a suspect.  We fleshed him out.  We can't connect him to the

14   robbery even though we were suspicious of him.

15        **THE COURT**:  I don't think you have established that.

16   You have asked those questions.

17        **MR. MIMS**:  I have -- I think Mr. Chiniche was asking

18   the question about further records on Mr. Brown.

19        **MR. CHINICHE**:  I didn't ask --

20        **MR. MIMS**:  Maybe it was Mr. Lewis that asked about it.

21   The point is -- this is my last question, by the way, on this

22   line of questioning, but I do think I should be able to ask

23   him, did you get those records?  Did they put him there?

24   Because that is why he is not sitting at counsel table like

25   everybody else, because the records don't put him there.

Mathews - Redirect

1    **MR. CHINICHE:**  I think Mr. Mims can ask the questions
2    he has so far, but what they are trying to do is, through
3    testimony, put in records about the location of where Mr. Brown
4    is, and that's not been into -- been put into evidence.  It's
5    not in front of the jury.

6    **MR. MIMS:**  I think it's relevant.  If they want to put
7    the record in, they can.  I think it's relevant that
8    Mr. Brown's records don't put him there.  That's why he is not
9    sitting as a defendant.

10    **THE COURT:**  But you can ask him that question.

11    **MR. MIMS:**  Yes, ma'am.  I just did, and they objected.

12    **MR. CHINICHE:**  We objected -- Mr. Lewis objects to
13    where was Mr. Brown's location and what did the records show.

14    **MR. MIMS:**  I asked him was he in Lake Cormorant, did
15    the records place him in Lake Cormorant.  That's all I want to
16    know.  Yes or no.

17    **MR. LEWIS:**  The records are not in evidence.  He
18    cannot opine about something that has not been -- you see what
19    I'm saying?

20    **MR. MIMS:**  They don't have to be in evidence, but I
21    can put them in if I need to.

22    **THE COURT:**  I think, Robert, where we are is that you
23    have asked the pertinent question already.  You have asked,
24    based on his investigation, was Mr. Brown within that area.
25    And he has answered no.

Mathews - Redirect

1    **MR. MIMS**:  Your Honor, I asked if the Google records

2    put him in that -- if the Google geofence warrant put him

3    there.  The next question is he subpoenaed further records like

4    we did for Smith and McThunel.  Those records don't place him

5    there either.

6         But that's the question I didn't get to finish the

7    answer.  There are other -- the second Google search warrant

8    that included Brown, the question is do those records place him

9    there.  The answer is no.  And that's what they are objecting

10   to, is to him saying no.  That's it on this line.

11        **THE COURT**:  It's sustained.

12      (END OF BENCH CONFERENCE.)

13   **BY MR. MIMS:**

14   **Q.**   Mr. Mathews, let me ask you something.  The geofence

15   warrant that we talked about earlier, it did identify who as

16   being present in the geofence box?

17   **A.**   Mr. Smith and Mr. McThunel.

18   **Q.**   But that's not the end of your investigation, is it?

19   **A.**   It is not.

20   **Q.**   You didn't just get the geofence search warrant returns

21   that puts Mr. Smith and Mr. McThunel in the box and say,

22   "That's it.  We've got our guys," did you?

23   **A.**   No, sir, we didn't.

24   **Q.**   What other steps did you take to confirm the involvement

25   of Mr. Smith and Mr. McThunel in this robbery, in brief?

 1  **A.**    In brief, we got additional Google search warrant.  We

 2  got additional information about them.  We got the Facebooks

 3  from -- or the search warrants from Facebook, search warrants

 4  for their phone records, which also had location history.  Did

 5  a lot of background information on them.

 6  **Q.**    That other Google search warrant, that's the second

 7  Google search warrant; is that right?

 8  **A.**    Yes, sir.  I believe we had a total of three Google

 9  search warrants in this case.

10  **Q.**    The second Google search warrant, that's in evidence as

11  G-4?

12  **A.**    I believe so, yes, sir.

13  **Q.**    That asks for a little bit longer location history on

14  Smith and McThunel?

15  **A.**    Yes, sir, it does.

16  **Q.**    And what does it show them -- where does it show their

17  location at the time of the robbery?

18  **A.**    In Lake Cormorant.

19          **MR. MIMS:**  No further questions, Your Honor.

20          **THE COURT:**  Thank you.

21          So you may return to counsel table, Inspector Mathews.

22          So, ladies and gentlemen, that's going to conclude our

23  testimony this afternoon.  So I admonish you again.  You cannot

24  discuss this case among yourselves.  You cannot discuss it with

25  anybody this evening.  We'll start back tomorrow at 9:30.  So

1  make sure you're in the jury room and ready to start promptly
2  at 9:30.

3      I am advising you that tomorrow afternoon -- and,
4  Counselors, you do not know this, but tomorrow afternoon we're
5  going to finish our testimony around 4:30.  Ms. Phyllis is --
6  has got to teach a class in court reporting tomorrow night; so
7  we have got to excuse her in time to get to her class.  So we
8  will stop a little bit early tomorrow afternoon.

9      Be careful traveling.  Thank you very much for your
10  service.  You're excused.

11  (JURY OUT.)

12      **THE COURT:**  And you may have a seat.

13      So, Mr. Mims, can you kind of give me a -- where we're
14  going for tomorrow?

15      **MR. MIMS:**  I can, Your Honor.  Mr. McGee and I were
16  just talking about that.  We have six witnesses we anticipate
17  calling tomorrow.

18      **THE COURT:**  Okay.

19      **MR. MIMS:**  One is Chris Moody, which we anticipate to
20  be a longer witness, an hour and a half, maybe two hours.  I
21  don't know for certain.  Everybody else should be relatively
22  short.

23      **THE COURT:**  Okay.

24      **MR. MIMS:**  A couple of them will be five minutes,
25  maybe ten with cross.  A couple of those are going to be a

1    little longer but, still, nothing like Mr. Mathews today.

2        **THE COURT:**  Sure.

3        **MR. MIMS:**  Your Honor, what I would like to do for

4    various reasons, including trying to accommodate various

5    people's work schedules, doctors' appointments, and whatnot,

6    plus just kind of the order of proof -- my thinking is at 9:30

7    we've got four witnesses we would like to get to first before

8    we get to Mr. Moody.

9        **THE COURT:**  Okay.

10       **MR. MIMS:**  Maybe have Mr. Moody ready at 11:00 Central

11   Time for his testimony.

12       **THE COURT:**  11:00.  That helps us about getting IT

13   arranged too.  So around 11:00 if all goes well.  Okay.

14       **MR. MIMS:**  Your Honor, just on a different note, I'm

15   assuming there's no chance for closing tomorrow because our

16   proof is going to take us up through lunchtime and maybe a

17   little later, frankly.  It will probably be early afternoon.

18   Even if they call no witnesses, if they by chance don't, I'm

19   assuming we're not going to try to close knowing that we're

20   quitting at 4:30.

21       **THE COURT:**  Okay.

22       **MR. LEWIS:**  Yeah.  I just have one question.  So

23   you're going to call four fact witnesses at 9:30, Moody at

24   11:00, and then a final fact witness after Moody?

25       **MR. MIMS:**  That's my intention if everybody shows up.

1         **THE COURT:**  Yeah.  Okay.  Are you in a position to

2  tell me if you anticipate calling your expert?

3         **MR. LEWIS:**  Oh, we're not calling an expert.

4         **THE COURT:**  You're not?  Okay.

5         **MR. LEWIS:**  We may have a fact witness but, quite

6  frankly, have not made that decision yet and need to discuss

7  it.  But I sort of agree with Mr. Mims.  I mean, if Moody is

8  going to start at 11:00 and take a couple or three hours, you

9  know, that gets us well into the afternoon.  Got to do jury

10  instructions.  I don't think we could close before 4:30.

11         **THE COURT:**  Right.  Okay.  I hear you both.  That

12  sounds reasonable.  So let me just say that we -- I will not be

13  asking you for closing statements tomorrow.  Regarding jury

14  instructions, have you submitted those yet?

15         **MR. LEWIS:**  Yes, Your Honor.

16         **MR. CHINICHE:**  Yes, Your Honor.

17         **MR. MIMS:**  We have, Your Honor.  And there's one that

18  I might possibly add that I need to discuss and think about

19  tonight.  I don't think I will.  But, otherwise, we have

20  submitted jury instructions, and I think we're in pretty close

21  agreement on them.  I don't think there's going to be -- I

22  think our jury instruction conference will literally take five

23  minutes.

24         **THE COURT:**  Never has but --

25         **MR. MIMS:**  Actually, with Mr. Chiniche and I in our

1  last case, I believe it did.

2      **THE COURT**:  It was pretty quick.  It was pretty quick.

3      Okay.  So we will see if we discuss jury instructions

4  tomorrow afternoon.  That all depends on what we need to do on

5  the record based upon she's got to leave at 4:30.  Okay?  But I

6  will tell y'all, call your witnesses tomorrow, and I will not

7  ask you to do closing statements tomorrow.  Is that fair?

8      **MR. MIMS**:  Yes, ma'am.

9      **MR. TRAVIS**:  Thank you, Your Honor.

10     **THE COURT**:  Okay.  Everybody ready to recess?  Okay.

11 Thank you.

12     (RECESSED AT 5:15 P.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25